1  HILARY POTASHNER (Bar No. 167060)
   Federal Public Defender
2  BRIANNA FULLER MIRCHEFF (Bar No. 243641)
   (E-Mail: Brianna_Mircheff@fd.org)
3  Deputy Federal Public Defender
   321 East 2nd Street
4  Los Angeles, California 90012-4202
   Telephone: (213) 894-4784
5  Facsimile: (213) 894-0081

6  Attorneys for Petitioner
   STEVE LOREN SCOTT

7

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE LOREN SCOTT,<br><br>     Petitioner,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>    Respondent. | Case No. CV _____<br>CR 02-938-R<br><br>**MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY (FILED PROTECTIVELY) AND NOTICE OF FILING OF SECOND OR SUCCESSIVE PETITION IN THE NINTH CIRCUIT**<br><br>**FILED PURSUANT TO *JOHNSON V. UNITED STATES*** |

Petitioner, by and through his counsel of record Brianna Fuller Mircheff, hereby files the attached motion to vacate his sentence. This petition is filed protectively, in order to ensure compliance with the one-year statute of limitations. Petitioner further notifies the Court that he has filed an application for leave to file the instant second or successive motion to vacate his sentence in the Ninth Circuit, Case No. 16-71507. Petitioner asks that this Court hold this petition in abeyance until such time as the Ninth Circuit grants his application. Petitioner will notify the Court if his application is granted.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED: May 18, 2016          By  /s/ Brianna Fuller Mircheff
                                 _____
                                 Brianna Fuller Mircheff
                                 Deputy Federal Public Defender

1  HILARY POTASHNER (Bar No. 167060)
   Federal Public Defender
2  BRIANNA FULLER MIRCHEFF (Bar No. 243641)
   (Email: Brianna_Mircheff@fd.org)
3  Deputy Federal Public Defender
   321 East 2nd Street
4  Los Angeles, California 90012-4202
   Tel: 213-894-4784
5  Fax: 213-894-0081

6  Attorneys for Petitioner
   STEVE LOREN SCOTT

7
                    **UNITED STATES DISTRICT COURT**
8
                   **CENTRAL DISTRICT OF CALIFORNIA**
9
                          **WESTERN DIVISION**
10
   STEVE LOREN SCOTT,                  Case No. CV_____
11
                 Petitioner,            Case No. CR 02-0938-R
12
          v.                            **MOTION TO VACATE, SET ASIDE,**
13                                       **OR CORRECT SENTENCE UNDER**
                                         **28 U.S.C. § 2255**
14 UNITED STATES OF AMERICA,

15                 Respondent.

16

17        Petitioner Steve Loren Scott, through undersigned counsel, hereby respectfully

18 moves this Court to vacate, set aside, or correct his sentence pursuant to 28 U.S.C.

19 § 2255.

20                                  Respectfully submitted,

21                                  HILARY POTASHNER
                                    Federal Public Defender
22

23 DATED: May 18, 2016          By   /s/ Brianna Fuller Mircheff
                                    BRIANNA FULLER MIRCHEFF
24                                  Deputy Federal Public Defender

25

26

27

28
                                       1

# TABLE OF CONTENTS

                                                                                    **Page**

I. INTRODUCTION ............................................................................................. 1

II. PROCEDURAL HISTORY ............................................................................ 1

    A.    Conviction and Sentencing .................................................................. 1

    B.    Direct Appeal ......................................................................................... 3

    C.    Section 2255 Motion ............................................................................ 3

    D.    Second or Successive 2255 .................................................................. 4

III. ARGUMENT .................................................................................................. 4

    A.    RICO Conspiracy Is Not A Crime of Violence
         After *Johnson*. ................................................................................... 5

        1.    RICO Conspiracy Is Not a Crime of Violence
            Under the Residual Clause. .......................................................... 5

        2.    Because the Residual Clause Is Invalid, RICO
            Conspiracy Cannot Be A Crime of Violence
            Under the Commentary to the Crime of Violence
            Definition. ...................................................................................... 7

        3.    RICO Conspiracy Is Not a Crime of Violence
            under the Force Clause. ................................................................ 11

    B.    Oregon Armed Robbery Is Not a Crime of Violence
        Under *Johnson*. ................................................................................. 14

         1.    Oregon Armed Robbery Is Not A Crime of Violence
            under the Force Clause. ................................................................ 15

        2.    The Inclusion of "Robbery" Among the Offenses
            Enumerated in the Commentary to the Guideline
            Does Not Serve to Make Petitioner a Career Offender ............ 16

    C.    Federal Armed Bank Robbery Is Not A Crime of Violence
        under *Johnson*. .................................................................................. 18

        1.    Armed Bank Robbery Does Not Require the
            *Intentional* Use or Threatened Use of Force. ............................ 20

        2.    Armed Bank Robbery Does Not Require the Use
            or Threatened Use of *Violent* Force. .......................................... 22

        3.    Following *Johnson*, Armed Bank Robbery Does
            Not Qualify as an Enumerated Offense under the
            Residual Clause or the Commentary of Section 4B1.2 ............ 24

i

1

      D.    Mr. Scott's Assault Conviction Was Never a Crime
of Violence for Career Offender Purposes.................................................25

IV. CONCLUSION .........................................................................................26

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Federal Cases**

4

*Carter v. United States,*
5
    530 U.S. 255 (2000).................................................................................. 20

6

*Chrzanoski v. Ashcroft,*
7
    327 F.3d 188 (2d Cir. 2003) ................................................................... 22

8

*Descamps v. United States,*
9
    133 S. Ct. 2276 (2013)....................................................................... 11, 12

10

*Matter of Guzman-Polanco,*
11
    26 I. & N. Dec. 713 (BIA 2016) ............................................................ 23

12

*James v. United States,*
13
    550 U.S. 192 (2007)............................................................................... 6, 9

14

*Johnson v. United States,*
    135 S. Ct. 2551 (2015)....................................................................*passim*
15

*Johnson v. United States,*
16
    559 U.S. 133 (2010)................................................................................ 12

17

*Leocal v. Ashcroft,*
18
    543 U.S. 1 (2004).......................................................................... 12, 21, 24

19

*McLaughlin v. United States,*
20
    476 U.S. 16 (1986).......................................................................... 23, 24

21

*Miller v. Gammie,*
22
    335 F.3d 889 (9th Cir. 2003) ............................................................ 21, 24

23

*Mistretta v. United States,*
24
    488 U.S. 361 (1989).................................................................................. 8

25

*Salinas v. United States,*
    522 U.S. 52 (1997).......................................................................... 12, 13
26

*Scott v. United States,*
27
    132 S. Ct. 440 (2011) ............................................................................... 3

28

1

**Federal Cases (cont.)**

*Sloan v. Ives*,
    3:15-cv-00342-MO (D. Or. Apr. 8, 2016) .......................................................... 15

*Stinson v. United States*,
    508 U.S. 36 (1993) ............................................................................................ 8, 9

*Sykes v. United States*,
    131 S. Ct. 2267 (2011) .......................................................................................... 7

*Taylor v. United States*,
    495 U.S. 575 (1990) ............................................................................................ 11

*United States v. Alsop*,
    479 F.2d 65 (9th Cir. 1973) ................................................................................ 21

*United States v. Alvarado-Pineda*,
    774 F.3d 1198 (9th Cir. 2014) ............................................................................ 17

*United States v. Anderson*,
    942 F.2d 606 (9th Cir. 1991) ................................................................................ 8

*United States v. Armijo*,
    651 F.3d 1226 (10th Cir. 2011) .......................................................................... 10

*United States v. Baza-Martinez*,
    464 F.3d 1010 (9th Cir. 2006) ............................................................................ 11

*United States v. Benavides*,
    617 Fed. App'x 790 (9th Cir. 2015) ..................................................................... 7

*United States v. Boyd*,
    924 F.2d 945 (9th Cir. 1991) .............................................................................. 23

*United States v. Chandler*,
    743 F.3d 648 (9th Cir. 2014) .................................................................. 14, 17, 25

*United States v. Crews*,
    621 F.3d 849 (9th Cir. 2010) ................................................................................ 7

*United States v. Cruz-Rodriguez*,
    625 F.3d 274 (5th Cir. 2010) .............................................................................. 22

1

**Federal Cases (cont.)**

2

3

*United States v. Doe*,
    49 F.3d 859 (2d Cir. 1995) ............................................................... 6, 9

4

5

*United States v. Dominguez-Maroyoqui*,
    748 F.3d 918 (9th Cir. 2014) .............................................................. 26

6

7

*United States v. Edmundson*,
    __ F. Supp. 3d __, 2015 WL 9582736 (D. Md. Dec. 30, 2015)............................. 14

8

9

*United States v. Foppe*,
    993 F.2d 1444 (9th Cir. 1993) ............................................................ 20

10

*United States v. Gore*,
    636 F.3d 728 (5th Cir. 2011) ............................................................. 14

11

12

*United States v. Grajeda*,
    581 F.3d 1186 (9th Cir. 2009) ........................................................ 11, 12

13

14

*United States v. Hopkins*,
    703 F.2d 1102 (9th Cir. 1983) ............................................................ 22

15

16

*United States v. Jones*,
    84 F.3d 1206 (9th Cir. 1996) ............................................................. 23

17

18

*United States v. Juvenile Female*,
    566 F.3d 943 (9th Cir. 2009) .............................................................. 6

19

20

*United States v. Juvenile Male*,
    118 F.3d 1344 (9th Cir. 1997) ........................................................... 6, 9

21

*United States v. Kelley*,
    412 F.3d 1240 (11th Cir. 2005) .......................................................... 20

22

23

*United States v. Landa*,
    642 F.3d 833 (9th Cir. 2011) .............................................................. 9

24

25

*United States v. Leshen*,
    453 Fed. App'x 408 (4th Cir. 2011) .................................................... 9, 17

26

27

*United States v. Luong*,
    Case No. CR 99-00433, 2016 WL 1588495 (E.D. Cal. Apr. 20, 2016).................... 13

28

*United States v. Martinez-Jimenez,*
   864 F.2d 664 (9th Cir. 1989) ................................................................. 21, 23, 24

*United States v. McDougherty,*
   920 F.2d 569 (9th Cir. 1990) ..................................................................... 14, 17, 25

*United States v. Parnell,*
   __ F.3d __, 2016 WL 1633167 (9th Cir. April 12, 2016) ................................... 16, 22

*United States v. Perez-Vargas,*
   414 F.3d 1282 (10th Cir. 2005) ........................................................................ 22

*United States v. Prince,*
   772 F.3d 1173 (9th Cir. 2014) ................................................................... 14, 17, 25

*United States v. Scott,*
   642 F.3d 791 (9th Cir. 2011) ................................................................... 2, 3, 5, 7

*United States v. Selfa,*
   918 F.2d 749 (9th Cir. 1990) ........................................................................ 25

*United States v. Serna,*
   309 F.3d 859 (5th Cir. 2002) ........................................................................ 11

*United States v. Shell,*
   789 F.3d 335 (4th Cir. 2015) ........................................................................ 9, 10

*United States v. Simmons,*
   782 F.3d 510 (9th Cir. 2015) ........................................................................ 11

*United States v. Soto-Rivera,*
   811 F.3d 53 (1st Cir. 2016) ........................................................................ 10

*United States v. Terrell,*
   593 F.3d 1084 (9th Cir. 2010) ........................................................................ 7, 14

*United States v. Torres-Miguel,*
   701 F.3d 165 (4th Cir. 2012) ................................................................... 12, 22, 23

*United States v. Werle,*
   815 F.3d 614 (9th Cir. 2016) ........................................................................ 16

*United States v. White,*
   571 F.3d 365 (4th Cir. 2009) ........................................................................ 14

**Federal Cases (cont.)**

*United States v. Woodrup*,
   86 F.3d 359 (4th Cir. 1996) ....................................................................... 21

*United States v. Wright*,
   215 F.3d 1020 (9th Cir. 2000) .......................................................... 19, 24

*United States v. Yockel*,
   320 F.3d 818 (8th Cir. 2003) ............................................................... 20

*Whyte v. Lynch*,
   807 F.3d 463 (1st Cir. 2015) ............................................................... 23

**State Cases**

*State v. Edwards*,
   251 Or. App. 18 (Ct. App. 2012) ....................................................... 16

*State v. Scott*,
   59 Or. App. 220 (Ct. App. Ore. 1982) ............................................. 15

*State v. Zimmerman*,
   12 P.3d 996 (Ct. App. Or. 2000) ....................................................... 16

**Federal Statutes**

18 U.S.C. § 16 ....................................................................................*passim*

18 U.S.C. § 111 ........................................................................................ 26

18 U.S.C. § 113 .......................................................................................... 2

18 U.S.C. § 924 .................................................................................... 7, 19

18 U.S.C. § 1961 .............................................................................. 1, 3, 13

18 U.S.C. § 1962 .................................................................................. 1, 2, 3

18 U.S.C. § 2113 ...............................................................................*passim*

28 U.S.C. § 994 .......................................................................................... 8

28 U.S.C. § 2255 ........................................................................... 1, 3, 4, 26

U.S.S.G. § 1B1.7 ......................................................................................... 8

**Federal Statutes (cont.)**

U.S.S.G. § 4B1.1..................................................................................1, 2, 4

U.S.S.G. § 4B1.2.....................................................................................*passim*

**State Statutes**

Or. Rev. Stat. § 164.415..........................................................................15, 16

# TABLE OF EXHIBITS

Exhibit A:    Judgment and Commitment Order (January 9, 2007, CR 4354)

Exhibit B:    First Superseding Indictment (August 25, 2005, CR 2295)

Exhibit C:    Defendant Scott's Position Re: Sentencing (November 30, 2006, CR 4216)

Exhibit D:    Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody 28 U.S.C. § 2255 (October 11, 2012, CR 6978)

Exhibit E:    Order Denying Defendant's Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (June 5, 2013, CR 7009)

Exhibit F:    Transcript, Closing Argument (October 4, 2006)

## MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

## I.  INTRODUCTION

Petitioner Steve Loren Scott, by and through his attorney, Deputy Federal Public Defender Brianna Fuller Mircheff, hereby submits this motion to vacate, set aside, or correct his sentence, based on *Johnson v. United States*, 135 S. Ct. 2551 (2015).  In *Johnson*, the Supreme Court held that the residual clause of the Armed Career Criminal Act, 18 U.S.C. § 924(e), is void for vagueness.  *Johnson*'s reasoning applies equally to the residual clause in the career offender guideline, U.S.S.G. § 4B1.2(a)(2).  Therefore, in light of *Johnson*, Mr. Scott's sentence under U.S.S.G. § 4B1.1 was imposed in violation of the Constitution or the laws of the United States.  Petitioner therefore requests that this Court grant this motion, vacate his current sentence, and re-sentence him.

## II.  PROCEDURAL HISTORY

**A.    Conviction and Sentencing**

Mr. Scott was convicted, following a jury trial, of Racketeer Influenced and Corrupt Organizations conspiracy ("RICO conspiracy"), in violation of 18 U.S.C. § 1961(d) (Count 2).  (Ex. A, Judgment and Commitment Order, January 9, 2007, CR 4354.)[1]  On January 8, 2007, he was sentenced to 220 months imprisonment.  (Ex. A, Judgment and Commitment Order, January 9, 2007, CR 4354.)

Relevant to this application, Count 2 of the First Superseding Indictment charged Mr. Scott with violating Section 1962(d) by being a "member[] and associate[] of a criminal organization whose members and associates engaged in, among other things, murder, attempted murder, conspiracy to commit murder, extortion, robbery, and

---

[1] Unless otherwise indicated, all citations to "CR" refer to the clerk's record in CR 02-0938-R, Mr. Scott's underlying criminal case in this Court. Counsel does not yet have all the relevant documents relating to this case, but will supplement the exhibits as they become available and prove relevant to Mr. Scott's claims.

1

narcotics trafficking." (Ex. B, First Superseding Indictment, August 25, 2005, CR 2295, at 1.)  The jury found Mr. Scott guilty of Count 2, the RICO conspiracy charge. Of all of the predicate acts charged, the jury found that the government had proved only that Mr. Scott had agreed that the offenses of murder and conspiracy to commit murder would be committed. (PSR ¶ 3.)

The Second Revised Presentence Report, disclosed on December 20, 2006, ("PSR") concluded that Mr. Scott was a career offender under U.S.S.G. § 4B1.1 because he had at least two prior adult felony convictions for crimes of violence: (1) armed robbery in violation of Oregon state law, for which he received a sentence of 20 years; (2) armed bank robbery, in violation of 18 U.S.C. § 2113(a), (d), for which he received a sentence of 240 months; and (3) assault with a dangerous weapon with intent to do bodily harm, in violation of 18 U.S.C. § 113(a)(3), for which he received a sentence of 120 months.  (PSR ¶¶ 65, 77, 88, 95.)  The PSR concluded that these convictions and Mr. Scott's underlying RICO conspiracy conviction "me[]t the definition of 'crime of violence' as defined in U.S.S.G. § 4B1.2(a)."  (PSR ¶ 65.)

The career offender finding affected Petitioner's sentence. The PSR found that his non-career-offender offense level was 31, but that his career-offender offense level was 32. (PSR ¶¶ 61, 65-67.)  In total, then, the career offender designation had the effect of changing Petitioner's guideline range from 188-235 months to 210-240 months.

Petitioner disputed the PSR's determination of career offender status, on the ground that his RICO conspiracy conviction under 18 U.S.C. § 1962(d) was not a qualifying "crime of violence."  (Ex. C, Defendant Scott's Position Re: Sentencing, at 12-14.)  The probation officer rejected this argument and declined to amend the PSR with respect to its career offender determination.  (PSR ¶ 65.)  At the sentencing hearing held on January 8, 2007, "[t]he district court rejected [Mr.] Scott's objections to the PSR, noting that they merely reargued the merits of the case[,] adopted the PSR[,]" and imposed a term of 220 months imprisonment.  (*See United States v. Scott*, 642 F.3d

2

791, 795-96, 801 (9th Cir. 2011) (*per curiam*) ("[T]he district court merely adopted the PSR's 'crime of violence' determination."); Ex. A, Judgment and Commitment Order, January 9, 2007, CR 4354.)

**B.    Direct Appeal**

Petitioner appealed his conviction and sentence.  Relevant to this petition, Petitioner challenged the district court's determination that his RICO conspiracy conviction under 18 U.S.C. § 1962(d) qualified as a "crime of violence" for career offender purposes. *See Scott*, 642 F.3d at 800-01.  On June 8, 2011, the Ninth Circuit rejected Petitioner's challenges to his conviction and sentence, including his career offender claim. *See generally Scott*, 642 F.3d 791.  With respect to Petitioner's career offender claim, the Ninth Circuit found "it was proper" for the district court to "look[] behind the RICO conviction and consider[] the underlying predicate offenses in determining whether Scott's offense qualified as a crime of violence." *See Scott*, 642 F.3d at 801. The Court found that the underlying conduct, based on the jury's verdict, was conspiracy to murder, which was a crime of violence. *Id.* The Court cited the career-offender guideline's commentary note 1, i.e., that crime of violence definition includes "conspiracy to murder." *Id.*

Petitioner sought a writ of certiorari from the United States Supreme Court, which was denied on October 11, 2011. *Scott v. United States*, 132 S. Ct. 440 (2011).

**C.    Section 2255 Motion**

On October 11, 2012, Petitioner filed *pro se* a Section 2255 motion in the Central District of California.  (Ex. D, Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody 28 U.S.C. § 2255, October 11, 2012, CR 6978.)  The motion raised five grounds: (1) "[t]he predicates upon which the verdict rests do not satisfy RICO's statutory definition of 'racketeering activity' under 18 U.S.C. § 1961(a)(A)" (*id.* at 6); (2) "[t]he three state murder conspiracy acts upon which the verdict depends were but a single conspiracy to murder . . . therefore, the evidence was insufficient to prove that the petitioner agreed that a 'pattern' of racketeering would take place" (*id.* at

3

18); (3) "[Defendant] is actually innocent of the crime of RICO Conspiracy" (*id.* at 26);
(4) "[t]rial counsel's failure to move under [R]ule 29 for a judgment of acquittal
deprived the petitioner of his right to effective assistance of counsel in violation of the
Sixth Amendment and excuses any procedural default[,] forfeiture[,] or waiver" (*id.* at
28); and (5) Appellate counsel's failure to notice or even argue the issues presented [in
the 2255 motion] . . . resulted in denial of [Petitioner's] rights under the Fifth and Sixth
Amendments to effective assistance of counsel on appeal, thus excusing any procedural
forfeiture or waiver." (*Id.* at 29; Ex. E, Order Denying Defendant's Motion to Vacate,
Set Aside or Correct Sentence by a Person in Federal Custody, June 5, 2013, CR 7009,
1-2.)  The district court denied Petitioner's Section 2255 motion on June 5, 2013.  (Ex.
E, Order Denying Defendant's Motion to Vacate, Set Aside or Correct Sentence by a
Person in Federal Custody, June 5, 2013, CR 7009, 5.)  The Ninth Circuit denied a
certificate of appealability on December 10, 2014.  (Order, December 10, 2014, CA 13-
56483, Dkt. 10.)

**D.    Second or Successive 2255**

This 2255 Motion is filed in conjunction with Petitioner's application for leave to
file a second or successive 2255 petition in the district court.

## III.  ARGUMENT

Under 28 U.S.C. § 2255(a), a defendant is entitled to a resentencing when his
original sentence was imposed "in violation of the Constitution or laws of the United
States."  Petitioner is entitled to relief on these grounds because under *Johnson v.
United States*, 135 S. Ct. 2251 (2015), he is now serving illegal and unconstitutional
career offender sentence.

Section 4B1.1 of the Sentencing Guidelines provides for enhanced guidelines
ranges where (1) the defendant is 18 years or older at the time of the instant offense, (2)
the instant offense is a felony "crime of violence" or "controlled substance offense,"
and (3) the defendant has at least two prior felony convictions of either a "crime of

4

violence" or a "controlled substance offense." See USSG § 4B1.1(a). As set out in the career offender guideline, the term "crime of violence" is defined as:

> [A]ny offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—
>
> > (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or
> >
> > (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2(a). As used in this brief, subsection (1) is called the "force clause"; subsection (2)'s list of offenses is called the "enumerated offenses clause," and the remainder of subsection (2) is called the "residual clause." Mr. Scott's career offender designation was based on the finding that his underlying instant offense, RICO conspiracy, was a crime of violence, and that he had at least two prior crimes of violence. After *Johnson*, however, neither the instant offense nor the prior offenses qualify as crimes of violence. As such, Mr. Scott's sentence should be vacated, and he should be resentenced under the non-career-offender guideline.

**A.    RICO Conspiracy Is Not A Crime of Violence, After *Johnson*.**

A RICO conspiracy offense based on conspiracy to commit murder was only ever a crime of violence under the residual clause and under commentary tied to the residual clause – as highlighted by the Ninth Circuit's decision in this case. Because *Johnson* rendered unconstitutional the residual clause of the career offender guideline, and with it, the commentary that solely interpreted the residual clause, Mr. Scott's career-offender sentence must be vacated and he must be resentenced.

**1.    RICO Conspiracy Is Not A Crime of Violence Under the Residual Clause.**

Prior to *Johnson*, the Ninth Circuit had long held that RICO conspiracy was a crime of violence under the residual clause whenever the predicate racketeering activity

5

the defendant agreed should be committed was a crime of violence. *E.g., United States v. Scott*, 642 F.3d 791, 801 (9th Cir. 2011) (citing to *United States v. Juvenile Male*, 118 F.3d 1344, 1350 (9th Cir. 1997), and affirming district court's conduct in "look[ing] behind the RICO [conspiracy] conviction and consider[ing] the underlying predicate offenses in determining whether [the defendant's RICO conspiracy] offense qualified as a crime of violence"); *Juvenile Male*, 118 F.3d at 1350. In *Juvenile Male*, for example, the court reasoned that "'a conspiracy to commit an act of violence is an act involving a "substantial risk" of violence.'" 118 F.3d at 1350 (quoting *United States v. Mendez*, 992 F.2d 1488, 1490 (9th Cir. 1993) and citing *United States v. Chimurenga*, 760 F.2d 400, 404 (2d Cir. 1985) and *United States v. Doe*, 49 F.3d 859, 866 (2d Cir. 1995)); *see also Doe*, 49 F.3d at 866 (concluding that RICO conspiracy to commit robbery is a crime of violence because "the nature of the conspiracy's substantive objective [ ] provide[s] an indication as to whether the conspiracy creates the substantial risk that physical force against the person or property of another may be used in the offense"). The *Juvenile Male* court concluded that the RICO conspiracy charge in that case satisfied the identical residual clause of the Juvenile Delinquency Act[2] because the predicate activity of Hobbs Act robbery was itself a crime of violence. *Id.* at 1350.

In *Johnson*, the Supreme Court declared the residual clause of the ACCA to be "unconstitutionally vague" because the "indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges." *Johnson*, 135 S. Ct. at 2557. Thus, the Supreme Court concluded, "[i]ncreasing a defendant's sentence under the clause denies due process of law." *Id.* The Supreme Court held the residual clause "vague in all its

---

[2] "Crime of violence" for purposes of the Juvenile Delinquency Act is defined by 18 U.S.C. § 16, *see United States v. Juvenile Female*, 566 F.3d 943, 947 (9th Cir. 2009). which, as noted *infra*, is worded and interpreted identically to the definition of "crime of violence" set forth in Section 924(c).

1   applications," *id*. at 2561, and overruled its contrary decisions in *James v. United*

2   *States*, 550 U.S. 192 (2007), and *Sykes v. United States*, 131 S. Ct. 2267 (2011).

3   *Johnson*, 135 S. Ct. at 2562-63.

4       The holding in *Johnson* invalidating the residual clause of the ACCA applies

5   equally to the career offender residual clause. Section 4B1.2(a)(2)'s residual clause

6   tracks the ACCA's residual clause verbatim. *Compare* U.S.S.G. § 4B1.2(a)(2) ("or

7   otherwise involves conduct that presents a serious potential risk of physical injury to

8   another"); *with* 18 U.S.C. § 924(e)(2)(B)(ii) ("or otherwise involves conduct that

9   presents a serious potential risk of physical injury to another"). Accordingly, the Ninth

10  Circuit interprets the clauses identically and applies ACCA residual clause precedent in

11  career offender cases. *See, e.g.*, *United States v. Terrell*, 593 F.3d 1084, 1087 n.1 (9th

12  Cir. 2010) (internal citations omitted) (stating that the ACCA's "violent felony"

13  definition is "nearly identical" to Section 4B1.2 and that the decision's ACCA analysis

14  "applies equally to § 4B1.2"); *United States v. Crews*, 621 F.3d 849, 852 n.4 (9th Cir.

15  2010) ("In the past we have made no distinction between the terms 'violent felony' and

16  'crime of violence' for purposes of interpreting the residual clause . . ."). *Johnson*'s

17  discussion of the legal uncertainty and infirmity inherent in an ACCA residual-clause

18  analysis applies with equal force to Section 4B1.2(a)(2), as the government itself has

19  conceded. *United States v. Benavides*, 617 Fed. App'x 790 (9th Cir. 2015) (vacating

20  and remanding for resentencing in light of government's concession that *Johnson*

21  applies to the similarly worded residual clause in the guidelines).

22      **2.**    **Because the Residual Clause Is Invalid, RICO Conspiracy Cannot**

23      **Be A Crime of Violence Under the Commentary to the Crime of**

24      **Violence Definition.**

25      The application notes contained in the commentary to section 4B1.2 include a

26  separate list of offenses that the application notes state qualify as crimes of violence.

27  Among those offenses is "conspiracy" and "murder."  See U.S.S.G. § 4B1.2 cmt. n.1.

28  This commentary seems to be the basis of the Ninth Circuit's decision in this case. *See*

*Scott*, 642 F.3d at 801. With the excision of the residual clause from the career offender provision, however, the offenses listed only in the commentary to the guideline – and particularly conspiracy -- are no longer of any effect either, because they only possibly interpreted the residual clause.

The Sentencing Reform Act of 1984 created the Sentencing Commission and authorized it to create "guidelines . . . for use of a sentencing court in determining the sentence to be imposed in a criminal case." 28 U.S.C. § 994(a)(1). Those guidelines are submitted to Congress in advance, *id.* § 994(p), making the Sentencing Commission "fully accountable to Congress." *See Mistretta v. United States*, 488 U.S. 361, 393-94 (1989) (upholding the Sentencing Commission against a separation of powers challenge on this ground).

Commentary, on the other hand, does not receive the same treatment as the guidelines. The Sentencing Reform Act does not explicitly authorize the creation of commentary. 28 U.S.C. § 994(a) (authorizing "guidelines" and "policy statements"); *see also Stinson v. United States*, 508 U.S. 36, 41 (1993). Nor does the Sentencing Reform Act require that commentary be submitted to Congress for approval. *See* 28 US.C. § 994(p) (requiring only that amendments to guidelines be submitted to Congress); *Stinson*, 508 U.S. at 46 (commentary "is not reviewed by Congress"). And the Sentencing Commission itself has relegated commentary to a secondary, interpretative role. *See* U.S.S.G. § 1B1.7 (explaining that the purpose of the commentary is to "interpret [a] guideline or explain how it is to be applied"); *United States v. Anderson*, 942 F.2d 606, 611 (9th Cir. 1991), *abrogated on other grounds by Stinson v. United States*, 508 U.S. 36 (1993) (noting the Sentencing Commission's belief that commentary "is an aid to correct interpretation of the guidelines, not a guideline itself or on a par with the guidelines themselves"). Where commentary assists and amplifies the text of the guideline – and where the text of the guideline "will bear the construction" the commentary offers – the commentary's interpretation of the guideline is binding. *Stinson*, 508 U.S. at 46. But where commentary runs afoul of the

8

Constitution or a federal statute or where it is "plainly erroneous or inconsistent" with the guideline it interprets, it is the text of the guideline, not the commentary, that must control. *Id.* at 45-47; *United States v. Landa*, 642 F.3d 833, 836 (9th Cir. 2011) (stating if there is a potential conflict between the text and the commentary, the text controls).

Because commentary is solely an interpretative aid, it "does not have freestanding definitional power" and only has force insofar as it interprets or explains a guideline's text. *United States v. Leshen*, 453 Fed. App'x 408, 413-15 (4th Cir. 2011) (unpublished) (finding that prior state sex offenses did not qualify as crimes of violence, despite government argument that offenses fell within the commentary); *accord United States v. Shell*, 789 F.3d 335, 340-41 (4th Cir. 2015) ("[The government skips past the text of § 4B1.2 to focus on its commentary," but "it is the text, of course, that takes precedence.").  It follows that, if a portion of a guideline is excised, the commentary that interpreted that portion of the guideline must go as well. Vestigial commentary without a textual hook must be deemed "inconsistent" with the text under *Stinson*, because its only "functional purpose" was to "assist in the interpretation and application" of a rule no longer exists. *Stinson*, 508 U.S. at 45.

The only question that remains, then, is whether the term "conspiracy" in the commentary interpreted the residual clause or whether it interpreted some portion of the definition that remains intact. This Court's precedents have always tied conspiracy to the residual clause. *See*, e.g., *Juvenile Male*, 118 F.3d at 1350 ("'a conspiracy to commit an act of violence is an act involving a "substantial risk" of violence.'" (quoting *United States v. Mendez*, 992 F.2d 1488, 1490 (9th Cir. 1993) and citing *United States v. Chimurenga*, 760 F.2d 400, 404 (2d Cir. 1985) and *United States v. Doe*, 49 F.3d 859, 866 (2d Cir. 1995)); *see also Doe*, 49 F.3d at 866 (concluding that RICO conspiracy to commit robbery is a crime of violence because "the nature of the conspiracy's substantive objective [ ] provide[s] an indication as to whether the conspiracy creates the substantial risk that physical force against the person or property of another may be used in the offense"); *see also James v. United States*, 550 U.S. 192,

9

206 (2007) (holding that attempt was appropriately included in the commentary enumerated offenses, "based on the Commission's review of empirical sentencing data [which] presumably reflects an assessment that attempt crimes often pose a similar risk of injury as completed offenses"). It cannot be said, then, that the commentary included conspiracy in order to "assist in the interpretation of" the force clause —the inclusion of those offenses is quite inconsistent with the text of the force clause.

With the residual clause excised from the guideline, the commentary no longer serves to interpret or amplify any provision of the remaining text, but, instead, is a contrary and plainly erroneous interpretation of what remains. Once the residual clause is gone, the commentary offenses—and especially conspiracy offenses—must go as well.

The First Circuit has already reached a similar conclusion post-*Johnson*, holding that the list of enumerated offenses contained in the guidelines commentary was interpreting only the residual clause, and that post-*Johnson*, such commentary is no longer of any effect. As the Court stated, "once shorn of the residual clause § 4B1.2(a) sets forth a limited universe of specific offenses that qualify as a 'crime of violence.' There is simply no mechanism or textual hook in the Guideline that allows us to import offenses not specifically listed therein into 4B1.2(a)'s definition of 'crime of violence.'" *See United States v. Soto-Rivera*, 811 F.3d 53, 60 (1st Cir. 2016). This holding is in line with the interpretation many Circuits had given to the career-offender commentary even before *Johnson*. *See Shell*, 789 F.3d at 345 (finding that a state statute that did not meet the requirements of the *text* of § 4B1.2 could not be saved on the grounds that it might fall under one of the commentary's list of offenses, noting that the commentary serves "only to amplify that definition, and any inconsistency between the two [must be] resolved in favor of the text") (citing *Stinson*, 508 U.S. at 43); *United States v. Armijo*, 651 F.3d 1226, 1234-37 (10th Cir. 2011) (rejecting the government's argument that Colorado manslaughter qualifies as a crime of violence simply because it is listed in the commentary and need not qualify under the definitions set out in the text;

10

"[t]o read application note 1 as encompassing non-intentional crimes would render it utterly inconsistent with the language of § 4B1.2(a)"); *see also United States v. Serna*, 309 F.3d 859, 862 & n.6 (5th Cir. 2002) (possession of a sawed-off shotgun, while listed in the commentary, must satisfy one of the definitions in the text). The Ninth Circuit should do so as well.

### 3.    RICO Conspiracy Is Not a Crime of Violence under the Force Clause.

Mr. Scott's career offender designation cannot be salvaged under the force clause because his conviction for RICO conspiracy does not have "as an element the use, attempted use, or threatened use of physical force against the person of another."

To determine whether a predicate offense qualifies as a "crime of violence" under the force clause, this Court must employ the categorical approach outlined in *Taylor v. United States*, 495 U.S. 575, 600 (1990). *See United States v. Simmons*, 782 F.3d 510, 513 (9th Cir. 2015); *see also Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013) (applying categorical approach in an Armed Career Criminal Act (ACCA) case). Under *Taylor*, only the statutory definitions —i.e., the elements—of the predicate crime are relevant to determine whether the conduct criminalized by the statute, including the most innocent conduct, qualifies as a "crime of violence." 495 U.S. at 599-601.

Determination of whether a criminal offense is categorically a crime of violence is done by "assessing whether the 'full range of conduct covered by [the statute] falls within the meaning of that term.'" *United States v. Grajeda*, 581 F.3d 1186, 1189 (9th Cir. 2009) (citation omitted). To do this, courts must look "at the least egregious end of [the. . . statute's] range of conduct." *United States v. Baza-Martinez*, 464 F.3d 1010, 1014 (9th Cir. 2006) (quoting *United States v. Lopez-Solis*, 447 F.3d 1201, 1206 (9th Cir. 2006)). In other words, under the categorical approach, a prior offense can only qualify as a "crime of violence" if all of the criminal conduct covered by a statute—

11

"including the most innocent conduct" —matches or is narrower than the "crime of violence" definition. *United States v. Torres-Miguel*, 701 F.3d 165, 167 (4th Cir. 2012). If the statute punishes some conduct that would qualify as a crime of violence and some conduct that would not, it does not categorically constitute a crime of violence. *Grajeda*, 581 F.3d at 1189. In a "narrow range of cases," if the statute is divisible as to a material element, then the court may apply the modified categorical approach by looking beyond the statutory elements to certain documents of conviction to determine whether the defendant's conviction necessarily involved facts corresponding to the generic federal offense. *Descamps*, 133 S. Ct. at 2283-84.

To be a categorical match to the terms of the force clause in the career offender guideline, a state statute must require, among other things, proof of violent, physical force. "Physical force" has the meaning given to it by the Supreme Court's 2004 decision in *Leocal v. Ashcroft*, 543 U.S. 1, 9-10 (2004), and its 2010 decision in *Johnson v. United States*, 559 U.S. 133, 140 (2010) (*Johnson I*). In *Leocal*, the Supreme Court held that the phrase "physical force" in that section requires a "violent, active crime[]." 543 U.S. at 11. The *Johnson I* Court expanded on that definition, holding that the phrase "physical force" in ACCA's almost-identical force clause defining "violent felony" means "*violent* force—that is, force capable of causing physical pain or injury to another person." *Johnson I*, 559 U.S. at 140.

Mr. Scott's RICO conspiracy conviction categorically is not a crime of violence under the force clause because RICO conspiracy does not have as an element the use or threatened use of any physical force. In a prosecution for a substantive RICO offense, the government must prove "(1) the conduct (2) of an enterprise [engaged in, or the activities of which affect, interstate or foreign commerce] (3) through a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997). A "pattern of racketeering activity" "requires at least two acts of 'racketeering activity,'" which, in turn, is defined to include "murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed

12

chemical . . . , which is chargeable under State law and punishable by imprisonment for more than one year." 18 U.S.C. § 1961(1)(A), (5). In a RICO conspiracy prosecution, however, the government must only prove that a defendant "knew about and agreed to facilitate the scheme" of racketeering activity. *Salinas*, 522 U.S. at 66. "There is no requirement of some overt act or specific act" in a RICO conspiracy case. *Id.* at 63. Thus, "[t]he RICO conspiracy provision [ ] is even more comprehensive than the general conspiracy offense in [18 U.S.C.] § 371." *Id.*

Indeed, the government argued just that in this case. In closing the prosecutor argued:

> We don't have to prove that this defendant ever actually did anything. We don't have to prove that anyone in the Aryan Brotherhood ever actually did anything. What we have to prove is that this defendant agreed with other members of the conspiracy that a racketeering organization would be formed. We have to prove that this defendant agreed that he would be associated with this future enterprise. And we have to prove that this defendant agreed that at some point in the future, some co-conspirator, some member of the conspiracy, would commit two racketeering acts.

Ex. F, at 24-25.

Because the RICO conspiracy statute only requires a showing that the defendant agreed to violate the RICO statute, and does not require the government to demonstrate that the defendant or anyone else involved in the conspiracy committed an overt act in furtherance of the conspiracy *or took any action at all*, it does not have as an element the use, attempted use, or threatened use of force, let alone the use, attempted use, or threatened use of violent, physical force. For that reason, it cannot be a crime of violence under the force clause. *Cf. United States v. Luong*, Case No. CR 99-00433, 2016 WL 1588495, *2 (E.D. Cal. Apr. 20, 2016) (dismissing Section 924(c) counts post-*Johnson*, reasoning that Hobbs Act conspiracy is not a crime of violence under the force clause because it only requires an agreement between two or more persons, and

13

does not require that the persons actually commit the crime; therefore it does not require the use, attempted use, or threatened use of physical force); *United States v. Edmundson*, __ F. Supp. 3d __, 2015 WL 9582736 (D. Md. Dec. 30, 2015) (same); *United States v. Chandler*, 743 F.3d 648 (9th Cir. 2014) (implying that Nevada conspiracy to commit robbery does not satisfy the force clause and is not an enumerated offense under the ACCA; holding that it qualified under the residual clause), *vacated and remanded in light of Johnson*, 135 S. Ct. 2926 (2015), *by* 619 F. App'x 641 (9th Cir. 2015); *United States v. White*, 571 F.3d 365, 368-69 (4th Cir. 2009) (holding that North Carolina conspiracy statute, which lacks an overt act element, does not satisfy the force clause of the ACCA because it does not have as an element the use, attempted use, or threatened use of force), *abrogated on other grounds by Johnson*, 135 S. Ct. 2551 (2015); *United States v. Gore*, 636 F.3d 728, 731 (5th Cir. 2011) (same, with respect to Texas conspiracy to commit robbery statute).

In other words, regardless of what the underlying racketeering activity *is*, a RICO conspiracy charge does not have, as an element, the use, attempted use, or threatened use of force.

**B.     Oregon Armed Robbery Is Not a Crime of Violence Under *Johnson*.**

Nor is Oregon armed robbery is not a crime of violence under the career offender definition. Previous Ninth Circuit precedent had held that various state robbery statutes were violent crimes under the residual clause. *See United States v. Prince*, 772 F.3d 1173, 1176 (9th Cir. 2014) (finding that second degree robbery is a violent felony under the residual clause of the Armed Career Criminal Act, because it "certainly" is the kind of crime that presents a serious potential risk of physical injury to another);[3] *see also United States v. McDougherty*, 920 F.2d 569, 574 & n.3 (9th Cir. 1990) ("Clearly then,

---

[3] *United States v. Terrell*, 593 F.3d 1084, 1087 n.1 (9th Cir. 2010) (internal citations omitted) (stating that the ACCA's "violent felony" definition is "nearly identical" to Section 4B1.2 and that the decision's ACCA analysis "applies equally to § 4B1.2").

14

robbery as defined in California falls under 18 U.S.C. 16(b) as a felony that 'by its nature, involves a substantial risk' that physical force may be used"; interpreting an earlier version of the career-offender residual clause, but stating that the "result . . . would be no different" under the present version of the guideline). However, as set out above, *supra* Section III.A.1, *Johnson* had the effect of rendering unconstitutionally vague the identical language in the career offender crime of violence definition. As such, these cases are no longer good law.

### 1. Oregon Armed Robbery Is Not A Crime of Violence under the Force Clause.

Nor is Oregon "armed robbery" a crime of violence under the force clause. It appears, based on the opinion from the Oregon Court of Appeals, that Mr. Scott's conviction for armed robbery was based on Oregon First Degree Robbery. *State v. Scott*, 59 Or. App. 220 (Ct. App. Ore. 1982). Oregon First Degree Robbery has all of the elements of Oregon Third Degree Robbery, with the addition of one of three elements: (a) is armed with a deadly weapon; (b) uses or attempts to use a dangerous weapon; or (c) causes or attempts to cause serious physical injury to any person. Or. Rev. Stat. § 164.415.

In a district court in Oregon, Oregon third degree robbery has been found not to be a violent felony because "the level of force required to sustain a conviction does not rise to the level of 'violent force' required by Johnson I." *United States v. Dunlap*, 2016 WL 591757 at *5; *accord Sloan v. Ives*, 3:15-cv-00342-MO (D. Or. Apr. 8, 2016).  In *Dunlap*, the Court cited state cases interpreting the force element of third-degree robbery to require only "minimal force," including purse snatchings that did not involve enough force to cause pain or injury. 2016 WL 591757, at *5 (citing State v. Johnson, 215 Or. App. 1, 168 P.3d 312 (2007)).

The circumstances that transform third-degree robbery into first-degree robbery do not render the latter offense a qualifying predicate because they do not necessarily entail a threat to use violent force.  The most innocuous of the three options – which is

15

necessarily the focus of the categorical analysis[4] – is a person who "is armed with" a

dangerous weapon. Or. Rev. Stat. § 164.415. To sustain a conviction for Oregon First

Degree robbery, "[t]he person committing the crime need not actually use the deadly

weapon, much less make any representation about it." *State v. Zimmerman*, 12 P.3d 996

(Ct. App. Or. 2000).

Under similar facts, the Ninth Circuit has found that Massachusetts armed

robbery was not a violent felony after *Johnson* for purposes of the ACCA. In *Parnell*,

the Ninth Circuit held that Massachusetts armed robbery is not a violent felony under

the ACCA because merely possessing a dangerous weapon does not communicate an

intent to use the weapon: "The mere fact an individual is armed, however, does not

mean he or she has used the weapon, or threatened to use it, in any way."  2016 WL

1633167 at *3.  The Court pointed out that the Massachusetts statute did not "require a

weapon be used or displayed, or even that the victim be aware of it." *Id.* at *3; *accord*

*United States v. Werle*, 815 F.3d 614, 621-22 (9th Cir. 2016) (a defendant having a

weapon accessible and readily available for use for offensive or defensive purposes

does not "necessarily mean that he or she has used the weapon in any way").

Like the Massachusetts statute at issue in *Parnell*, Oregon Armed Robbery is not

a crime of violence under the force clause. And, with the residual clause and the

commentary offense of robbery excised, Oregon First Degree Robbery cannot be a

crime of violence under the force clause.

**2.**     **The Inclusion of "Robbery" Among the Offenses Enumerated in**
         **the Commentary to the Guideline Does Not Serve to Make**
         **Petitioner a Career Offender**

Finally, just as the commentary's inclusion of "conspiracy" falls under *Johnson*,

because that term interpreted the residual clause, so too does the commentary offense

---

[4] *See State v. Edwards*, 251 Or. App. 18, 23 (Ct. App. 2012) (finding that the
three subsections of first degree robbery "define a single crime")

16

robbery.  Of all of the substantive offenses listed in the commentary, robbery has perhaps the strongest tie to the residual clause.  The Ninth Circuit's generic definition of robbery is tied to the risk of harm to the person, not to any element of force. *See Becerril-Lopez*, 541 F.3d at 891 (defining generic robbery as "aggravated larceny, containing at least the elements of misappropriation of property under circumstances *involving immediate danger to the person*") (emphasis added); *see also Leshen*, 453 Fed. App'x. at 415 (noting that the generic term "robbery" in the commentary interpreted the residual clause of the career offender guideline). Indeed, Ninth Circuit precedents have generally tied state robbery statutes to the residual clause of various crime-of-violence definitions. *United States v. Prince*, 772 F.3d 1173, 1176 (9th Cir. 2014) (finding that California second degree robbery is a violent felony under the residual clause of the Armed Career Criminal Act, because it "certainly" is the kind of crime that presents a serious potential risk of physical injury to another); *United States v. Chandler*, 743 F.3d 648, 652-55 (9th Cir. 2014) (Nevada conspiracy to commit robbery is a violent felony under the residual clause), *remanded pursuant to Johnson*, 743 F.3d 648 (9th Cir. 2015); *see also United States v. McDougherty*, 920 F.2d 569, 574 & n.3 (9th Cir. 1990) ("Clearly then, robbery as defined in California falls under 18 U.S.C. 16(b) as a felony that 'by its nature, involves a substantial risk' that physical force may be used"; interpreting an earlier version of the career-offender residual clause, but stating that the "result . . . would be no different" under the present version of the guideline).

On the flip side, it is equally clear that the majority of Ninth Circuit state robbery statutes are not crimes of violence under the force clause. *See Dixon*, 805 F.3d at 1197 (California robbery does not satisfy the force clause); *United States v. Alvarado-Pineda*, 774 F.3d 1198 (9th Cir. 2014) (suggesting, without deciding, that Washington robbery might not be a crime of violence under the similarly worded force clause of 18 U.S.C. § 16(a), because the statute required "any force or threat, no matter how

17

slight"); *United States v. Dunlap*, ___ F. Supp. 3d ___, 2016 WL 591757, at *4-6 (D. Or. 2016) (Oregon robbery is not a crime of violence under the force clause).

Against this background, it is clear that the commentary's reference to robbery could only have interpreted the residual clause, i.e., as an example of a type of crime that entails "a serious potential risk of physical injury to another." With the residual clause excised from the guideline, the commentary no longer serves to interpret or amplify any provision of the remaining text, but, instead, is a contrary and plainly erroneous interpretation of what remains. Once the residual clause is gone, the commentary offenses—and especially robbery—must go as well.

California robbery is not a crime of violence under any provision of the text of Section 4B1.2, and commentary cannot be used to expand the definition of crime of violence beyond what the text will bear. As such, it cannot serve as a basis to hold that petitioner's conviction is a crime of violence.[5]

## C.    Federal Armed Bank Robbery Is Not A Crime of Violence under *Johnson*.

Aarmed bank robbery is not a crime of violence after *Johnson* either. A person violates the armed bank robbery statute if he, "by force and violence, or by intimidation, takes or attempts to take, from the person or presence of another" the property of a bank and in so doing "assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device." 18 U.S.C. § 2113(a), (d). Thus, the elements of the crime are

> (1) the defendant took money belonging to a bank, credit union, or savings and loan, (2) by using force and violence or intimidation, (3) the deposits

---

[5] It appears that Oregon First Degree Robbery may not be a crime of violence even if robbery remains an enumerated offense for career offender purposes. However, because the commentary has been effectively excised from the career offender guideline, this Court need not reach that question.

18

1    of the institution were insured by the Federal Deposit Insurance

2    Corporation ("FDIC"), and (4) in committing the offense, the defendant

3    assaulted any person, or put in danger the life of any person by the use of a

4    dangerous weapon.

5    *United States v. Wright*, 215 F.3d 1020, 1028 (9th Cir. 2000).  In *Wright*, the Ninth

6    Circuit held that armed bank robbery was a crime of violence under the almost-

7    identical force clause of Section 924(c)(3)(A).[6] *Id.*  The decision's analysis was limited,

8    reasoning only "[a]rmed bank robbery qualifies as a crime of violence because one of

9    the elements of the offense is a taking 'by force and violence, or by intimidation.'"  *Id.*

10   (citing 18 U.S.C. § 2113(a)).

11         There is much water under the bridge since *Wright* was decided, however, and

12   intervening Supreme Court and en banc Ninth Circuit decisions have undermined

13   *Wright's* reasoning that armed bank robbery was a crime of violence.  Specifically, the

14   Supreme Court issued a series of cases redefining the boundaries of the force clause,

15   such that armed bank robbery no longer satisfies that clause because it does not require

16   an *intentional* threat of force, nor does it require a threat of *violent* force. *Johnson*,

17   moreover, removed the alternative grounds on which bank robbery could have been

18   deemed a crime of violence; that armed bank robbery qualified as a career offender

19   predicate crime of violence under the residual clause or the commentary to the

20   guideline.  After *Johnson*, Mr. Scott's armed bank robbery conviction no longer serves

21   as a career offender prio.

---

26         [6] Section 924(c)(3)(A)'s force clause differs from the career offender guideline's
27   force clause only in that Section 924(c)(3)(A) includes the use, attempted use, or
     threatened use of physical force against both a person "*or property of another*."  18
28   U.S.C. § 924(c)(3)(A).

19

### 1.    Armed Bank Robbery Does Not Require the *Intentional* Use or Threatened Use of Force.

The first reason armed bank robbery is categorically overbroad and cannot support a finding that a defendant is a career offender under the force clause is because the statute contains no requirement that a defendant have possessed any *mens rea* with respect to either his or her use of force and violence or intimidation, let alone that the defendant used force and violence or intimidation intentionally.

In *Carter v. United States*, 530 U.S. 255, 268 (2000), the Supreme Court held that bank robbery is a general intent crime. That is, the defendant must have "possessed knowledge with respect to the *actus reus* of the crime." *Id.* As an example of a hypothetical defendant who should not be punished under the statute, the *Carter* Court wrote that "Section 2113(a) certainly should not be interpreted to apply to the hypothetical person who engages in forceful taking of money while sleepwalking[.]" *Id.* at 269. Following *Carter*, courts have held that the actus reus of bank robbery is the taking of money and therefore, the statute requires a showing only that the defendant "knew he was physically taking money." *See United States v. Yockel*, 320 F.3d 818, 823 (8th Cir. 2003). Whether the defendant took money via an intentional use of force and violence or intimidation is "irrelevant." *Id.*; *see also United States v. Kelley*, 412 F.3d 1240, 1244 (11th Cir. 2005) ("[A] defendant can be convicted under section 2113(a) even if he did not intend for an act to be intimidating."). Thus, in *Yockel*, the Eighth Circuit affirmed the district court's exclusion at trial of any evidence regarding whether the defendant intended to use force and violence or intimidation. 320 F.3d at 823.

*Yockel* and *Kelley* are in accord with this Circuit's longstanding, pre-*Carter* case law which also holds that, at least in cases involving intimidation, whether a defendant "specifically intended to intimidate . . . is irrelevant." *United States v. Foppe*, 993 F.2d 1444, 1451 (9th Cir. 1993). This holding stems from the court's conclusion that the definition of taking, or attempting to take "'by intimidation' means

20

willfully to take, or attempt to take, in such a way that would put an ordinary, reasonable person in fear of bodily harm." *United States v. Alsop*, 479 F.2d 65, 67 n.4 (9th Cir. 1973). Because this definition focuses on the effect of the accused's actions on the victim, "[t]he determination of whether there has been an intimidation should be guided by an objective test focusing on the accused's actions," *not* his or her intent. *Id.*; *see also United States v. Woodrup*, 86 F.3d 359, 363 (4th Cir. 1996) ("The intimidation element of § 2113(a) is satisfied if 'an ordinary person in the [victim's] position reasonably could infer a threat of bodily harm from the defendant's acts,' whether or not the defendant actually intended the intimidation."). It makes no difference in the analysis that a defendant in an armed bank robbery case uses a dangerous weapon in the course of committing the offense: whether he intentionally used the weapon is simply not an element of the crime. In short, a defendant may be convicted of armed bank robbery even though he did not intend to put another in fear, but merely did some act involving a dangerous weapon that would put an ordinary, reasonable person in fear of bodily harm. *See United States v. Martinez-Jimenez*, 864 F.2d 664, 666-67 (9th Cir. 1989) (Section 2113(d) "focuses on the harms created, not the manner of creating the harm.").

As a statute must require the intentional use of force in order to match the definition of "use of force" in the career offender guideline force clause following *Leocal* and *Fernandez-Ruiz*, and because Section 2113(a), (d) requires no such showing, *Wright's* conclusion that bank robbery is a crime of violence under the force clause is no longer good law. *See Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc) ("[T]he issues decided by the higher court need not be identical in order to be controlling. Rather, the relevant court of last resort must have undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable."). Following *Leocal* and *Fernandez-Ruiz*, federal armed bank robbery cannot be a crime of violence under the force clause.

21

## 2. Armed Bank Robbery Does Not Require the Use or Threatened Use of *Violent* Force.

Moreover, armed bank robbery does not require the use or threat of *violent* physical force. With respect to the use-of-force-and-violence-or-intimidation element, nothing in the term "intimidation" requires a threat of *violent* physical force. Intimidation is satisfied even where there is no explicit threat at all, let alone the threat of violent force.  For example, a simple demand for money from a bank teller will support a bank robbery conviction. *See United States v. Hopkins*, 703 F.2d 1102, 1103 (9th Cir. 1983) ("Although the evidence showed that Hopkins spoke calmly, made no threats, and was clearly unarmed, we have previously held that 'express threats of bodily harm, threatening body motions, or the physical possibility of concealed weapon[s]' are not required for a conviction for bank robbery by intimidation." (quoting *United States v. Bingham*, 628 F.2d 548, 549 (9th Cir.1980))).  But, as the Ninth Circuit recently held, an "uncommunicated willingness or readiness to use [physical] force . . . is not a threat to do so." *United States v. Parnell*, __ F.3d __, 2016 WL 1633167, *3 (9th Cir. April 12, 2016).  A threat of physical force, as would satisfy the force clause "requires some outward expression or indication of an intention to inflict pain, harm or punishment." *Id.* Federal bank robbery has no such requirement.

Further, the Ninth Circuit's definition of intimidation does not require a showing of the use or threatened use of violent physical force because placing a person "in fear of bodily harm" does not necessarily require the use or threatened use of violent physical force.  On this matter, the Fourth Circuit has "recognized that, to constitute a predicate crime of violence justifying a sentencing enhancement under the Guidelines, a [predicate] offense must constitute a use or threatened use of violent force, not simply result in physical injury or death." *Torres-Miguel*, 701 F.3d at 169; *Accord United States v. Cruz-Rodriguez*, 625 F.3d 274, 276 (5th Cir. 2010); *Chrzanoski v. Ashcroft*, 327 F.3d 188, 194 (2d Cir. 2003) ("there is 'a difference between causation of an injury and in injury's causation by the "use of physical force"'"); *United States v. Perez-*

22

*Vargas*, 414 F.3d 1282, 1287 (10th Cir. 2005); *Whyte v. Lynch*, 807 F.3d 463, 469-72 (1st Cir. 2015). For example, a defendant could commit bank robbery through intimidation by threatening to poison the teller, but this would not constitute the threatened use of violent physical force, even though it would result in the teller being in fear of bodily harm. *Cf. Torres-Miguel*, 701 F.3d at 168-69 (holding that California's criminal threats statute does not constitute a crime of violence because "a defendant can violate statutes like § 422(a) by threatening to poison another, which involves no use or threatened use of force."); *Matter of Guzman-Polanco*, 26 I. & N. Dec. 713 (BIA 2016) ("Caesar's death at the hands of Brutus and his fellow conspirators was undoubtedly violent; the death of Hamlet's father at the hands of his brother, Claudius, by poison, was not.") (quoting *Rummel v. Estelle*, 445 U.S. 263, 282 n.27 (1980)).

With respect to the deadly weapon element of Section 2113(d), a defendant may be found guilty of armed bank robbery without engaging in conduct that involves the use or threat of violent physical force. For example, a defendant's mere display of or reference to possession of a gun, without making any threat to use the gun, is sufficient to sustain a conviction under section 2113(d). *See United States v. Jones*, 84 F.3d 1206, 1211 (9th Cir. 1996); *McLaughlin v. United States*, 476 U.S. 16, 17-18 (1986); *Martinez-Jimenez*, 864 F.2d at 666.

Moreover, a defendant may be convicted of armed bank robbery even though he displays or refers only to an unloaded or inoperable firearm, or even a toy resembling a firearm. *See McLaughlin*, 476 U.S. 16, 17-18 (1986) (unloaded gun); *Martinez-Jimenez*, 864 F.2d at 666-67 (inoperable gun, toy gun); *see also United States v. Boyd*, 924 F.2d 945, 947-48 (9th Cir. 1991) (road flare qualifies as a dangerous weapon). This conduct does not involve the use or threatened use of violent force. In *McLaughlin*, the Supreme Court reasoned that an unloaded gun qualified as a dangerous weapon within the meaning of Section 2113(d) because "a gun is an article that is typically and characteristically dangerous . . . and the law reasonably may presume that such an

23

article is always dangerous even though it may not be armed at a particular time or place" and because "the display of a gun instills fear in the average citizen; as a consequence, it creates an immediate danger that a violent response will ensue." 476 U.S. at 17-18. In other words, the *McLaughlin* court concluded that a robber's use of an unloaded gun could be considered to put in danger another person's life not because the robber could actually use the gun or because the gun actually posed a threat of violence against anyone in the bank but merely because it was a reasonable position for the law to take that all guns are dangerous, since as a general matter guns often are dangerous. The Court also concluded that a robber's use of an unloaded gun could put in danger another person's life not because the robber actually used or threatened to use the gun in a violent, active way but only because others who saw the gun might *themselves* react in a violent way. In the words of the *Martinez-Jimenez* court, "[t]he *McLaughlin* opinion recognizes that the dangerousness of a device used in a bank robbery is not simply a function of its potential to injure people directly. Its dangerousness results from the greater burdens that it imposes upon victims and law enforcement officers." 864 F.3d at 666. As these cases make clear, defendants can be, and indeed many have been, convicted of armed bank robbery without using or threatening to use violent force.

For these reasons, federal armed bank robbery does not qualify as a crime of violence under the force clause of Section 4B1.2. The contrary holding in *Wright* is clearly irreconcilable with *Johnson I* and *Leocal*. *See Miller*, 335 F.3d at 899-900.

### 3. Following *Johnson*, Armed Bank Robbery Does Not Qualify as an Enumerated Offense under the Residual Clause or the Commentary of Section 4B1.2

Until *Johnson*, defendants like Petitioner had little motivation to challenge *Wright's* force clause holding, knowing that their armed bank robbery predicate would likely still be deemed a crime of violence under the residual clause or the term "robbery" in the Commentary. Indeed, prior to *Johnson*, the Ninth Circuit had held that

24

various state robbery crimes were crimes of violence under the residual clause of several crime-of-violence definitions. *See, e.g., United States v. Prince*, 772 F.3d 1173, 1176 (9th Cir. 2014) (finding that California second degree robbery is a violent felony under the residual clause of the Armed Career Criminal Act, because it "certainly" is the kind of crime that presents a serious potential risk of physical injury to another); *United States v. Chandler*, 743 F.3d 648, 652-55 (9th Cir. 2014) (Nevada conspiracy to commit robbery is a violent felony under the residual clause), *remanded pursuant to Johnson*, 743 F.3d 648 (9th Cir. 2015); *see also United States v. McDougherty*, 920 F.2d 569, 574 & n.3 (9th Cir. 1990) ("Clearly then, robbery as defined in California falls under 18 U.S.C. 16(b) as a felony that 'by its nature, involves a substantial risk' that physical force may be used"; interpreting an earlier version of the career-offender residual clause, but stating that the "result . . . would be no different" under the present version of the guideline). And the court cited to the commentary's inclusion of the word "robbery" in *United States v. Selfa*, 918 F.2d 749, 751 (9th Cir. 1990), to support its conclusion that Section 2113(a) was a crime of violence. *Johnson*, however, removed these alternative grounds of justifying Petitioner's sentence: *Johnson* caused the residual clause of the career offender guideline to fall and, in doing so, *Johnson* necessarily took with it the enumerated offenses in the commentary that interpreted the residual clause. Thus, for the reasons set out *supra* Section III.A.1 and III.B.3, neither the residual clause nor the commentary offense of "robbery" provides an alternative basis for finding that Mr. Scott's armed bank robbery conviction is a crime of violence.

## D.    Mr. Scott's Assault Conviction Was Never a Crime of Violence for Career Offender Purposes

Although the PSR lists *three* prior convictions, Mr. Scott only ever had two qualifying prior offenses, because his assault conviction does not meet the terms of U.S.S.G.§ 4B1.2.

In order to serve as a "prior felony conviction" for career offender purposes, a conviction must, indeed, be *prior*. The Guidelines define a prior felony conviction to

25

mean that "the defendant committed the instant offense of conviction subsequent to sustaining at least two felony convictions of either a crime of violence or a controlled substance offense. . . ." U.S.S.G. § 4B1.2(c). The guideline further states that the date a defendant sustains a conviction "shall be the date that the guilt of the defendant has been established, whether by guilty plea, trial, or plea of *no lo contendere*." *Id.*

Under this definition, Mr. Scott sustained his assault conviction on September 25, 2002, the date on which the jury found him guilty of that offense. (PSR ¶ 95.) But the offense Mr. Scott committed, as charged in the Indictment, was a conspiracy that ended, according to the government, July 25, 2002. (Ex. B, at 8.) According to the PSR, the last of the relevant overt acts committed by Mr. Scott was in 1999. (PSR ¶ 37.) As such, Mr. Scott's assault conviction could not have been a qualifying offense for career offender purposes.[7]

## IV.  CONCLUSION

For the reasons set forth above, Petitioner's sentence was "imposed in violation of the Constitution or laws of the United States."  Petitioner is entitled to Section 2255 relief and should be resentenced under the non-career-offender guideline.

Respectfully submitted,

HILARY POTASHNER
Federal Public Defender

DATED: May 18, 2016          By  /s/ *Brianna Fuller Mircheff*
                                 BRIANNA FULLER MIRCHEFF
                                 Deputy Federal Public Defender

---

[7] Moreover, even if assault were possibly a *prior* offense, it is not a crime of violence under *United States v. Dominguez-Maroyoqui*, 748 F.3d 918, 921 (9th Cir. 2014) (holding that 18 U.S.C. Section 111, assault of a federal officer, categorically does not satisfy the force clause following *Johnson I* because it "does not require that any particular level of force be used.' . . . In fact, a 'defendant may be convicted of violating section 111 if he or she uses *any force whatsoever* against a federal officer.")

26

# EXHIBIT A

United States District Court

**Central District of California**

**UNITED STATES OF AMERICA vs.**                    CR 02-938(A)-R

Defendant **STEVE LOREN SCOTT**                     S.S.#-------6240

Residence: Metropolitan Detention Center    Mailing:  SAME
           535 Alameda Street
           Los Angeles, Ca 90012
------------------------------------------------------------------------
**JUDGMENT AND PROBATION/COMMITMENT ORDER**
------------------------------------------------------------------------
         In the presence of the attorney for the government, the defendant
appeared in person, on:  JANUARY 8, 2007
                        Month / Day / Year
COUNSEL:
    _____ WITHOUT COUNSEL
           However, the court advised defendant of right to counsel and asked if
defendant desired to have counsel appointed by the Court and the defendant thereupon
waived assistance of counsel.
     XX  WITH COUNSEL Amy Jacks, appointed
_PLEA:
     __ GUILTY, and the Court being satisfied that there is a factual
basis for the plea.
    _____ NOLO CONTENDERE       _____ NOT GUILTY
FINDING:
     There being a jury verdict of   XX   GUILTY, defendant has been
convicted as charged of the offense(s) of: Racketeer Influenced and
Corrupt Organizations Conspiracy in violation of Title 21 USC 1962(d)
as charged in count 2 of the 1st superseding indictment.

JUDGMENT AND PROBATION/COMMITMENT ORDER:
       The Court asked whether defendant had anything to say why judgment should not be pronounced.  Because no sufficient cause to the
contrary was shown, or appeared to the Court, the Court adjudged the defendant guilty as charged and convicted and ordered that: Pursuant
to the Sentencing Reform Act of 1984, it is the judgement of the court the defendant is hereby committed to the Bureau of Prisons to be
imprisoned for a term of:
     Two hundred twenty (220) months, to be served consecutively to any
sentence the defendant may currently be serving.


     IT IS FURTHER ADJUDGED that upon release from imprisonment
defendant shall be placed on supervised release for three (3) years,
under the following terms and conditions: the defendant 1) shall comply
with the rules and regulations of the U.S. Probation Office and General
Order 318; 2) shall cooperate in the collection of a DNA sample from
the defendant; 3) shall during the period of community supervision pay
the special assessment in accordance with this judgment's orders
pertaining to such payment; 4) shall not associate or affiliate with
any member of any criminal or disruptive group as directed by the
Probation Officer, specifically, any member of the Aryan Brotherhood.


**-- GO TO PAGE TWO --**                              WH
                                                Deputy Clerk

U.S.A. V. STEVE LOREN SCOTT                                    CR 02-938(A)-R

-- CONTINUED FROM PAGE ONE --                                 PAGE TWO

==================================================================

## JUDGMENT AND PROBATION/COMMITMENT ORDER

==================================================================

    IT IS FURTHER ORDERED that all fines and costs of imprisonment are waived.

    IT IS FURTHER ORDERED that defendant pay a special assessment of $100.00, which is due immediately.

    IT IS FURTHER ORDERED that any remaining counts and underlying indictments are dismissed as to this defendant.

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release set out on the reverse side of this judgment be imposed.  the Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

Signed by:  District Judge _____

                              **MANUEL L. REAL**

It is ordered that the Clerk deliver a copy of this Judgment and Probation/Commitment Order to the U.S. Marshal or other qualified officer.

                              Sherri R. Carter, Clerk of Court

Dated/Filed January 9, 2007          By_____/S/_____
            Month / Day / Year           William Horrell, Deputy Clerk

In addition to the special conditions of supervision imposed above, it is hereby ordered that the Standard Conditions of Probation and Supervised Release within this judgment be imposed.  The Court may change the conditions of supervision, reduce or extend the period of supervision, and at any time during the supervision period or within the maximum period permitted by law, may issue a warrant and revoke supervision for a violation occurring during the supervision period.

_____

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below).

### STANDARD CONDITIONS OF PROBATION AND SUPERVISED RELEASE

    While the defendant is on probation or supervised release pursuant to this judgment:

1. The defendant shall not commit another Federal, state or local crime;
2. the defendant shall not leave the judicial district without the written permission of the court or probation officer;
3. the defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;
4. the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
5. the defendant shall support his or her dependents and meet other family responsibilities;
6. the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
7. the defendant shall notify the probation officer at least 10 days prior to any change in residence or employment;
8. the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician;
9. the defendant shall not frequent places where controlled substances are illegally sold, used, distributed or administered;
10. the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
11. the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;
12. the defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;
13. the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
14. as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to conform the defendant's compliance with such notification requirement;
15. the defendant shall, upon release from any period of custody, report to the probation officer within 72 hours;
16. and, for felony cases only: not possess a firearm, destructive device, or any other dangerous weapon.

☐ The defendant will also comply with the following special conditions pursuant to General Order 01-05 (set forth below).

## STATUTORY PROVISIONS PERTAINING TO PAYMENT AND COLLECTION OF FINANCIAL SANCTIONS

The defendant shall pay interest on a fine or restitution of more than $2,500, unless the court waives interest or unless the fine or restitution is paid in full before the fifteenth (15th) day after the date of the judgment pursuant to 18 U.S.C. §3612(f)(1). Payments may be subject to penalties for default and delinquency pursuant to 18 U.S.C. §3612(g). Interest and penalties pertaining to restitution , however, are not applicable for offenses completed prior to April 24, 1996.

If all or any portion of a fine or restitution ordered remains unpaid after the termination of supervision, the defendant shall pay the balance as directed by the United States Attorney's Office. 18 U.S.C. §3613.

The defendant shall notify the United States Attorney within thirty (30) days of any change in the defendant's mailing address or residence until all fines, restitution, costs, and special assessments are paid in full. 18 U.S.C. §3612(b)(1)(F).

The defendant shall notify the Court through the Probation Office, and notify the United States Attorney of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay a fine or restitution, as required by 18 U.S.C. §3664(k). The Court may also accept such notification from the government or the victim, and may, on its own motion or that of a party or the victim, adjust the manner of payment of a fine or restitution- pursuant to 18 U.S.C. §3664(k). See also 18 U.S.C. §3572(d)(3) and for probation 18 U.S.C. §3563(a)(7).

Payments shall be applied in the following order:

1. Special assessments pursuant to 18 U.S.C. §3013;
2. Restitution, in this sequence:
   Private victims (individual and corporate),
   Providers of compensation to private victims,
   The United States as victim;
3. Fine;
4. Community restitution, pursuant to 18 U.S.C. §3663(c); and
5. Other penalties and costs.

## SPECIAL CONDITIONS FOR PROBATION AND SUPERVISED RELEASE

As directed by the Probation Officer, the defendant shall provide to the Probation Officer: (1) a signed release authorizing credit report inquiries; (2) federal and state income tax returns or a signed release authorizing their disclosure and (3) an accurate financial statement, with supporting documentation as to all assets, income and expenses of the defendant. In addition, the defendant shall not apply for any loan or open any line of credit without prior approval of the Probation Officer.

The defendant shall maintain one personal checking account. All of defendant's income, "monetary gains," or other pecuniary proceeds shall be deposited into this account, which shall be used for payment of all personal expenses. Records of all other bank accounts, including any business accounts, shall be disclosed to the Probation Officer upon request.

The defendant shall not transfer, sell, give away, or otherwise convey any asset with a fair market value in excess of $500 without approval of the Probation Officer until all financial obligations imposed by the Court have been satisfied in full.

These conditions are in addition to any other conditions imposed by this judgment.

---

### RETURN

I have executed the within Judgment and Commitment as follows:

Defendant delivered on _____ to _____

Defendant noted on appeal on _____

Defendant released on _____

Mandate issued on _____

Defendant's appeal determined on _____

Defendant delivered on _____ to _____

at _____ the institution designated by the Bureau of Prisons, with a certified copy of the within Judgment and Commitment.

United States Marshal

By _____

_____   _____
Date                    Deputy Marshal

### CERTIFICATE

I hereby attest and certify this date that the foregoing document is a full, true and correct copy of the original on file in my office, and in my legal custody.

B
y

_____                    _____

Filed                                       Deputy Clerk
Date

================================================================

## FOR U.S. PROBATION OFFICE USE ONLY

Upon a finding of violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision.

    These conditions have been read to me.  I fully understand the conditions and have been provided a copy of them.

(Signed) _____            _____
    Defendant                              Date

_____            _____
U. S. Probation Officer/Designated Witness   Date

# EXHIBIT B

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

February 2005 Grand Jury

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 02-938(E) |
| | ) | |
| Plaintiff, | ) | F I R S T |
| | ) | S U P E R S E D I N G |
| v. | ) | I N D I C T M E N T |
| | ) | |
| STEVE LOREN SCOTT, | ) | [18 U.S.C. § 1962(d): Racketeer |
| aka "Scottie," | ) | Influenced and Corrupt |
| | ) | Organizations Conspiracy] |
| Defendant. | ) | |
| _____ | ) | |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

THE RACKETEERING ENTERPRISE

1.    At all relevant times, defendant[] ... STEVE LOREN
SCOTT, aka "Scottie," ... and others, were members and associates
of a criminal organization whose members and associates engaged
in, among other things, murder, attempted murder, conspiracy to
commit murder, extortion, robbery, and narcotics trafficking.  At
all relevant times, this organization, which is known as "the
Aryan Brotherhood," operated in the Central District of
California and elsewhere.  The Aryan Brotherhood and the
individuals who associate with it for criminal purposes
constitute an "enterprise" as defined by Title 18, United States
Code, Section 1961(4), that is, a group of individuals associated
in fact, who engaged in, and whose activities affected,
interstate and foreign commerce.  The enterprise constituted an

ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

### GENERAL BACKGROUND

2.    The Aryan Brotherhood is a powerful gang that controls drug distribution and other illegal activity within portions of the California and federal prison systems and has worked to expand its influence over illegal activity conducted outside of prison.

3.    The Aryan Brotherhood was formed in the California prison system in approximately 1964 by white inmates who wanted to gain power and authority in prison by forming a race-based gang.  While it is not necessary to be white to join the Aryan Brotherhood, nearly all of its members are white.  All Aryan Brotherhood members are male.

4.    Although the Aryan Brotherhood began in the California prison system, it has spread to other prison systems.  During the early 1970's, members of the Aryan Brotherhood who had entered the federal prison system formed a faction of the Aryan Brotherhood in the federal prison system.  Although the California and federal factions have distinct membership and leadership, both are part of one organization called the Aryan Brotherhood.  If a member of either faction enters the prison system controlled by the other faction, that member automatically becomes a member in his new prison system.  Although there are Aryan Brotherhood members in other prison systems, the California and federal factions are the Aryan Brotherhood's primary factions.

5.    In addition to Aryan Brotherhood members in prison, there are members who have been released from prison.  When Aryan Brotherhood members leave prison, they are required to remain loyal to the Aryan Brotherhood and to work to further the goals of the Aryan Brotherhood while in the community.

6.    The Aryan Brotherhood enforces its rules and promotes discipline among its members and associates by murdering, attempting to murder, conspiring to murder, assaulting, and threatening those who violate the enterprise's rules or pose a threat to the enterprise.  The Aryan Brotherhood also uses murder and the threat of murder to maintain a position of power within the California and federal prison systems.  Inmates and others who do not follow the orders of the Aryan Brotherhood are subject to being murdered, as is anyone who uses violence against an Aryan Brotherhood member.  Inmates who cooperate with law enforcement authorities are also subject to being murdered.

<u>MEMBERSHIP</u>

7.    Aryan Brotherhood members are recruited from the prison population.  In order to be considered for membership in the Aryan Brotherhood, an inmate must be sponsored by a member.  Once an inmate is sponsored, he generally must serve a term of "probation" while his conduct is observed by the members of the Aryan Brotherhood.  If the inmate's conduct during the probationary period is satisfactory, he is admitted into the Aryan Brotherhood.  Once accepted as an Aryan Brotherhood member, the inmate must swear an oath of loyalty, pledging his life to the Aryan Brotherhood.

8.    Members are required to follow all orders of higher-

3

ranking members.  In particular, members are required, when
ordered, to kill without hesitation.  They are also required to
give false testimony in court on behalf of other members.
Members who do not fulfill their obligations to the Aryan
Brotherhood are subject to being murdered.

9.    In addition to members, the enterprise includes those
closely affiliated with the Aryan Brotherhood, who are called
"associates."  Associates are required to follow the orders of
Aryan Brotherhood members.  Associates who do not fulfill their
obligations to the Aryan Brotherhood are subject to being
murdered.

<u>LEADERSHIP</u> <u>STRUCTURE</u>

10.   Originally, the Aryan Brotherhood did not have a
leadership structure, but instead was governed by consensus.  In
approximately 1980, with the blessing of the California faction
of the Aryan Brotherhood, the members of the federal faction
formed a three-man Federal "Commission" with authority over the
activities of the federal faction.  In approximately 1993, the
members of the Federal Commission formed a "council," reporting
to the Federal Commission, with authority over day-to-day
operations of the federal faction.

11.   In approximately 1982, inmates in the California
faction of the Aryan Brotherhood met and formed a 12-man
California Council to govern the faction's affairs.  The members
of the California Council then formed a three-man California
Commission with authority over the California Council and all
other California Aryan Brotherhood members.  The number of
members on the California Council has since been reduced to six.

4

1    12.   In both the California and federal factions of the
2  Aryan Brotherhood, the commission in charge of a particular
3  faction has final authority over all matters involving that
4  faction.   A murder of or assault on a member may be carried out
5  only if it is authorized by the commission of the faction to
6  which the member belongs, although the murder of a nonmember does
7  not require commission approval.

8                    PURPOSES OF THE ENTERPRISE
9    13.   The members of the Aryan Brotherhood and their
10  associates constitute an enterprise, referred to below as "the
11  Aryan Brotherhood," "the Aryan Brotherhood criminal enterprise,"
12  or "the enterprise."   The word "member" as used below refers to a
13  full-fledged member of the Aryan Brotherhood.   Both members and
14  associates of the Aryan Brotherhood are participants in the Aryan
15  Brotherhood criminal enterprise.

16    14.   The purposes of the Aryan Brotherhood criminal
17  enterprise include, but are not limited to, the following:

18         a.   Controlling illegal activities, such as narcotics
19  trafficking, gambling, and extortion, within the California and
20  federal prison systems.

21         b.   Preserving, protecting, and expanding the power of
22  the Aryan Brotherhood through the use of intimidation, violence,
23  threats of violence, assaults, and murders.

24         c.   Promoting and enhancing the Aryan Brotherhood and
25  the activities of its members and associates.

26            THE MEANS AND METHODS OF THE ENTERPRISE
27    15.   Among the means and methods by which the defendants and
28  their co-racketeers conduct and participate in the conduct of the

affairs of the Aryan Brotherhood criminal enterprise are the following:

a.    Members of the Aryan Brotherhood use the Aryan Brotherhood criminal enterprise to commit, and attempt and threaten to commit, acts of violence, including murder and assault, to protect and expand the enterprise's criminal operations.

b.    Members of the Aryan Brotherhood use the Aryan Brotherhood criminal enterprise to promote a climate of fear through violence and threats of violence.

c.    Members of the Aryan Brotherhood promulgate rules to be followed by all participants in the Aryan Brotherhood criminal enterprise, including the rule that a participant in the enterprise may not act as an informant for law enforcement authorities.

d.    To enforce the rules of the Aryan Brotherhood criminal enterprise and to promote discipline, the members of the Aryan Brotherhood use the enterprise to murder, attempt to murder, assault, and threaten those participants in the enterprise and others who violate rules or orders, or who pose a threat to the enterprise.

e.    To generate income, participants in the Aryan Brotherhood criminal enterprise engage in illegal activities under the protection of the enterprise, including narcotics trafficking, bookmaking, extortion, robbery, and contract murder.

f.    To generate income, participants in the Aryan Brotherhood criminal enterprise require that white inmates engaged in profit-making activities in prison pay "taxes" to the

Aryan Brotherhood under threat of violence.

g.    To generate income, participants in the Aryan Brotherhood criminal enterprise who are not in prison require that white narcotics dealers and other white criminals pay "taxes" to the Aryan Brotherhood under threat of violence.

h.    To perpetuate the Aryan Brotherhood criminal enterprise, participants in the enterprise attempt to conceal from law enforcement the existence of the Aryan Brotherhood, the identity of its participants, and the ways in which it conducts its affairs.

i.    To keep secret the activities of the Aryan Brotherhood criminal enterprise, participants in the enterprise communicate using codes and hidden messages, and use a network of Aryan Brotherhood members and associates outside of prison to relay messages to incarcerated members and associates.

7

COUNT TWO

[18 U.S.C. § 1962(d)]

65.  Paragraphs One through Fifteen of the Introductory
Allegations of this Indictment are realleged and incorporated by
reference as though fully set forth herein.

66.  From a date unknown to the Grand Jury and continuing
until at least July 25, 2002, within the Central District of
California and elsewhere, defendant[] ... STEVE LOREN SCOTT, aka
"Scottie," ... and others known and unknown, being persons
employed by and associated with the Aryan Brotherhood criminal
enterprise described in Paragraphs One through Fifteen of the
Introductory Allegations of this Indictment, as defined in Title
18, United States Code, Section 1961(4), which enterprise was
engaged in, and the activities of which affected, interstate and
foreign commerce, unlawfully, willfully, and knowingly combined,
conspired, confederated, and agreed together and with each other
to violate Title 18, United States Code, Section 1962(c), that
is, to conduct and participate, directly and indirectly, in the
conduct of the affairs of the enterprise through a pattern of
racketeering activity, as that term is defined in Title 18,
United States Code, Sections 1961(1) and 1961(5), consisting of
multiple acts involving murder, in violation of ... Illinois
Criminal Code Sections 8-2 and 9-1 ... Kansas Criminal Code
Sections 21-3302 and 21-3401 ... and Missouri Revised Statutes
Sections 562.041, 564.011, and 565.020; and distribution of
controlled substances, including heroin, methamphetamine, and
cocaine, in violation of Title 21, United States Code, Sections
841(a)(1), 843(b), and 846.  It was a further part of the

8

conspiracy that the defendant[] agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

OVERT ACTS

67.   In furtherance of the conspiracy and to accomplish the objects of the conspiracy, the defendant[] and [his] coconspirators committed the following overt acts on the dates set forth below:

Organization and Membership

1)   In or about 1964, a group of inmates in the California prison system formed the Aryan Brotherhood prison gang.

2)   In or about 1973, a group of inmates in the federal prison system formed a federal faction of the Aryan Brotherhood prison gang.

5)   In or about 1980 ... Aryan Brotherhood members formed a three-member "Federal Commission" ... to govern the activities of the federal faction of the Aryan Brotherhood.

15)   In or about 1993, [Aryan Brotherhood members] formed a "Federal Council," reporting to the Federal Commission, to govern the day-to-day operations of the federal faction of the Aryan Brotherhood.

24)   In or about 1997, the members of the Federal Commission ... formed departments within the federal faction of the Aryan Brotherhood, including a security department, a drug department, a gambling department, and a business department.

25)   In or about 1997, the members of the Federal Commission, including ... BARRY BYRON MILLS and TYLER DAVIS

9

1  BINGHAM, placed defendant STEVE LOREN SCOTT in charge of the

2  Business Department.

3        33)  On or about December 25, 1997, defendant STEVE

4  LOREN SCOTT sent a message to Lawrence Klaker informing Klaker of

5  recent promotions to the Federal Council and of new members of

6  the Aryan Brotherhood.

7        34)  In or about 1998, the members of the Federal

8  Commission, including ... BARRY BYRON MILLS and TYLER DAVIS

9  BINGHAM, named defendant STEVE LOREN SCOTT to the Federal

10 Council.

                <u>Attempted</u> <u>Murder</u> <u>of</u> <u>Jimmy</u> <u>Lee</u> <u>Inman</u>

12       99)  In or before September 1993, ... BARRY BYRON MILLS

13 ordered Aryan Brotherhood member Kurt King to murder Jimmy Lee

14 Inman.

15       100) On or about September 30, 1993, Kurt King

16 attempted to murder Jimmy Lee Inman by stabbing him.

                <u>Attempted</u> <u>Murder</u> <u>of</u> <u>Ismael</u> <u>Benitez-Mendez</u>

18       206) In or before January 1992, ... TYLER DAVIS BINGHAM

19 ordered defendant STEVE LOREN SCOTT to murder Ismael Benitez-

20 Mendez because Benitez-Mendez had assaulted an Aryan Brotherhood

21 associate.

22       207) On or about January 4, 1992, defendant STEVE LOREN

23 SCOTT attempted to murder Ismael Benitez-Mendez by stabbing him.

              <u>Distribution</u> <u>of</u> <u>Proceeds</u> <u>of</u> <u>Narcotics</u> <u>Trafficking</u>

25       228) In or about August 1995, ... TYLER DAVIS BINGHAM,

26 MICHAEL PATRICK McELHINEY, and DAVID MICHAEL SAHAKIAN arranged to

27 have the proceeds of narcotics trafficking sent to defendant SEAN

28 MATTHEW DARCY.

235) On or about August 31, 1995, defendant SEAN MATTHEW DARCY mailed a money order in the amount of $105 to defendant STEVE LOREN SCOTT at the Administrative Maximum Facility at Florence, Colorado.

<u>Race War with Black Inmates</u>

297) On or about December 25, 1997, defendant STEVE LOREN SCOTT sent a message to Aryan Brotherhood member Lawrence Klaker informing Klaker that the Aryan Brotherhood was "at on sight war" with the DC Blacks.

298) On or about December 29, 1997, defendant STEVE LOREN SCOTT sent a message to Lawrence Klaker informing Klaker of efforts to manufacture weapons to arm all members of the Aryan Brotherhood for the war against the DC Blacks.

299) On or about January 30, 1998, defendant STEVE LOREN SCOTT had secreted within his body a prison-made knife to be used in the war against the DC Blacks.

302) On or about June 9, 1998, defendant STEVE LOREN SCOTT possessed a "hit list" of black inmates who were to be murdered.

359) On or about December 11, 1999, in the Central District of California and elsewhere, defendant RONALD BOYD SLOCUM mailed a letter to defendant STEVE LOREN SCOTT in which, among other things, defendant RONALD BOYD SLOCUM said that he had agreed to commit crimes with an Aryan Brotherhood member who was later discovered to be cooperating with law enforcement authorities.

11

# EXHIBIT C

1  AMY E. JACKS, SBN 155681
   amyejacks@sbcglobal.net
2  1717 Fourth Street, Third Floor
   Santa Monica, California 90401-3319
3  Tel: (310)576-6242
   Fax:(310)576-6247
4

5  Attorney for Defendant
   STEVE LOREN SCOTT
6

7
                    UNITED STATES DISTRICT COURT
8
                  CENTRAL DISTRICT OF CALIFORNIA
9
   UNITED STATES OF AMERICA,        )  **CR. No. 02-938-R**
10                                    )
                        Plaintiff,   )  **DEFENDANT SCOTT'S**
11                                    )  **POSITION RE: SENTENCING**
         v.                          )
12                                    )  Date: January 8, 2007
                                     )  Time: 1:30 pm
13  STEVE LOREN SCOTT.,              )  Ctrm: Hon. Manuel Real
                                     )
14                      Defendant.    )
                                     )
15  _____ )

16       TO THE HONORABLE MANUEL REAL, UNITED STATES DISTRICT

17  COURT JUDGE:

18       Defendant Steve Loren Scott, by and through his counsel, Amy E. Jacks,

19  respectfully presents his position regarding the sentence to be imposed following

20  his conviction of a violation of 18 U.S.C. 1962(d).

21
   Dated: November 28, 2006      Respectfully submitted,
22

23                               By  _____

24                                   Amy E. Jacks
                                     Attorney for Defendant
25                                   STEVE LOREN SCOTT

26

27

28

# I.
## INTRODUCTION

The Pre-Sentence Report, initially disclosed to counsel on November 7, 2006, incorrectly stated the maximum statutory penalty.  Counsel conferred with counsel for the government and the Probation Officer was contacted regarding this error.  A revised Pre-Sentence report was provided  to counsel on November 15, 2006.

Mr. Scott submits corrections to the paragraphs describing the charges and convictions.

Mr. Scott objects as further described herein to paragraphs 10-37, which purport to describe the offense conduct.  In the event these paragraphs are permitted to remain in the Pre-Sentence Report, Mr. Scott submits that additional statements regarding the circumstances of the offense should be included in order to more accurately describe the relevant conduct constituting the offense for which Mr. Scott was convicted.  These factual submissions are contained herein.

Mr. Scott objects to the offense level calculation in the revised Pre-Sentence Report for the following reasons: the ex post facto clause of the United States Constitution requires the use of the November 1, 2001 Guidelines Manual; the multiple count adjustment is incorrectly applied; the calculation fails to take into account Mr. Scott's minimal participation in the offense; the career offender enhancement is incorrectly applied, since the current conviction does not fall within the definition of a "crime of violence"; and Mr. Scott's criminal history points are incorrectly calculated.

# II.
## THE JURY VERDICT:
## IT'S MEANING AND IMPACT ON GUIDELINE CALCULATIONS

In United States v. Booker, 543 U.S. 220, 244 (2005) the United States Supreme Court held that the Sixth Amendment right to a jury trial extended to any fact (other than a prior conviction) which is necessary to support a sentence

exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict .  Therefore, in order to enhance a defendant's sentence by any such fact, it must either be admitted by the defendant or proved to a jury beyond a reasonable doubt.

The Booker court went on to hold that instead of binding the sentencing court to the calculation made pursuant to the United States Sentencing Guidelines (hereinafter the "Guidelines"), the Sentencing Reform Act requires the sentencing court to consider the Guidelines but permits the court to tailor the sentence in light of other statutory concerns.  See § 3553(a)(4),  Booker, *supra*, 543 U.S. at 245-246.  Thus, the Guideline calculation is to be viewed as one among a number of sentencing factors set forth in 18 U.S.C. § 3553(a).

In order to accurately calculate the Guidelines sentence range, it is necessary to examine the facts established by the jury verdict in this case.

Mr. Scott commenced trial on Count Two of the First Superceding Indictment on September 26, 2006.  During the course of the trial, the government presented the testimony of seven (7) informants, who claimed that  Mr. Scott committed or aided and abetted various acts of violence within the federal prison system on behalf of a prison gang named the Aryan Brotherhood (hereinafter, the "AB").  These informants testified that Mr. Scott stated that he stabbed inmate Ismael Benitez-Mendez on behalf of the AB on January 4, 1992 at United States Penitentiary, Leavenworth, Kansas; provided a weapon to another inmate so that the inmate could stab Jimmy Lee Inman on the prison yard at United States Penitentiary, Marion, Illinois on September 30, 1993; conspired with other inmates to murder inmate Frank Rupoli; stabbed inmate Erving Bond on November 24, 2000 at the United States Medical Center for Federal Prisoners, Springfield, Missouri as part of an AB race war against black inmates; and conspired with other inmates to carry out a contract murder against Walter "Wakil" Johnson on behalf of John Gotti.

The government also introduced several letters, dated in December 1997 and January 1998 and attributed to Mr. Scott.  Among other things, these writings discussed a war with black inmates from the District of Columbia (identified during the trial as the "D.C. Blacks"), the location of weapons, the identity of allies and potential enemies, and recent events within the federal prison system.  The letters were provided to another inmate, Lawrence Klaker, who was acting, at the time, as an informant for the Special Investigative Unit at the United States Administrative Detention, Maximum Security Prison (hereinafter "ADX") located in Florence , Colorado.  In addition to these letters, the government introduced another writing attributed to Mr. Scott entitled the "Party List."  This writing was reportedly found in Mr. Scott's property sometime between January-June 1998.  It contained a list of individuals associated or allied with the D.C. Black inmates and included inmate Walter "Butch" or "Prince" Johnson.

At the conclusion of the case, the jury was instructed that in order to convict Mr. Scott of Count Two, the RICO conspiracy, they need not find that the alleged enterprise was actually established, that Mr. Scott was actually associated with the enterprise, or that the enterprise or its activities actually affected interstate commerce.  Rather, they were instructed that, because the agreement to commit a RICO offense is the essence of the charged RICO conspiracy offense, the government need only prove that if the conspiracy offense were completed as contemplated, the enterprise would be established, the defendant would be associated with the enterprise, and the enterprise or its activities would affect interstate commerce.  See Government's Instruction #3 as given by the court.

The jury was further instructed that to convict Mr. Scott on the charged RICO conspiracy offense in Count Two, the government was not required to prove that any defendant or any conspirator actually committed, caused, or aided and abetted any racketeering act.  Moreover, they were told, that it was not necessary, in order to convict Mr. Scott of the charged conspiracy, that the objectives or

- 4 -

purposes of the conspiracy have been achieved or accomplished. "The ultimate success or failure of the conspiracy is irrelevant. Rather, the conspiratorial agreement to commit a RICO offense is the essential aspect of a RICO conspiracy offense." See Government's Instruction #9 as given by the court.

Based on these instructions, the jury could return a guilty verdict on Count Two without finding that the AB existed, that Mr. Scott was associated with the AB, or that anyone within the AB committed any acts of racketeering.

On October 4, 2006, the jury commenced deliberations and on October 6, 2006, returned a verdict of guilty as to Count Two, a violation of 18 U.S.C. 1962(d), RICO conspiracy.   The jury completed a special verdict form submitted to them by the court.   The form is attached as Exhibit 1.

The special verdict form did not require the jury to find whether a racketeering enterprise was established; whether Mr. Scott was a member of or associated with the racketeering enterprise; or whether any member of the enterprise committed, caused, aided or abetted any racketeering act.

The special verdict form asked the jury to determine which acts of racketeering Mr. Scott agreed would be committed in the event the racketeering enterprise was established and the conspiracy was completed as contemplated . As reflected in their special verdict form, the jury rejected each and every act of violence alleged in the indictment that was supposedly perpetrated or aided by Mr. Scott.

The only acts the jury found that Mr. Scott agreed would be committed in the event the racketeering enterprise was established and the conspiracy was completed as contemplated were the murder of Walter "Butch" Johnson and two other unnamed D.C. Blacks. The "Party List" and Mr. Scott's letters to Mr. Klaker provided the evidentiary basis for these findings. Depending on the jury's view of the evidence, these writings were either made between December 27, 1997 and January 16, 1998 or December 27, 1997 and June 9, 1998.

No evidence was presented, nor was the jury asked to find, that physical force was used, attempted or threatened against Walter "Butch" Johnson or any other D.C. Black inmate after Mr. Scott became a member of the charged conspiracy. The jury was also not asked to make a special finding as to whether Mr. Scott's conduct "presented a serious potential risk of physical injury to another." *See* U.S.S.G. § 4B1.2 (a), defining crime of violence for purposes of Guidelines calculations.

### III.
### THE OFFENSE: OBJECTIONS AND ADDITIONS TO THE FACTUAL STATEMENTS CONTAINED WITHIN THE PRE-SENTENCE REPORT

Mr. Scott makes the following objections and additions to the purported factual statements contained in the Pre-Sentence Report:

Paragraph 3: In reaching their verdict, the jury made no affirmative finding regarding the existence of the AB as a racketeering organization, Mr. Scott's association with the AB, the affect the AB had on interstate commerce or that any member of the AB actually committed, caused, or aided and abetted any racketeering act.

Paragraph 4: Count One of the first superceding indictment was dismissed against Mr. Scott on July 26, 2006.

Paragraph 6: Mr. Scott was originally charged in Count Eight of the first superceding indictment, the murder of Terry Walker. This count was dismissed against Mr. Scott on June 30, 2006.

Paragraph 9: Mr. Scott objects to this paragraph to the extent it could be interpreted that he made any statements or admissions about the Offense Conduct as related in the Pre-Sentence Report Paragraphs 10-37. Although Mr. Scott and his counsel met with the probation officer, Mr. Scott did not discuss the circumstances of the offense. This fact is accurately reflected in Paragraph 40 of the Pre-Sentence Report.

Paragraph 10:  Mr. Scott objects to this paragraph and asks that it be stricken from the report, since it states nothing more that an allegation contained in the indictment.  As discussed, *supra*, in II, the jury made no findings as to the sufficiency of the proof of this allegation.

In the event the paragraph is not stricken, Mr. Scott objects to the assertion that the AB's primary purpose was to maintain and enhance its position inside and outside of prison and to make money through various illegal means.  Substantial evidence was presented at trial that the AB was formed to protect and defend white inmates in an racially divided and extremely violent prison environment, and that remained it's primary goal.  There was no evidence presented that Mr. Scott ever benefitted financially from any association with the AB during his time in federal prison.  In fact, an examination of Mr. Scott's financial account during his time in prison, an exhibit introduced at trial, establishes his indigent status throughout his period of incarceration.

Paragraphs 11-24:  Mr. Scott objects to these paragraphs and asks that they be stricken, since, like Paragraph 10, they state nothing more than unproven allegations contained in the indictment.

In the event that the paragraphs are not stricken, Mr. Scott requests that a paragraph be added noting that the government sought to prove many of these allegations through the testimony of informants. By referencing the jury's findings in the special verdict form, it is evident that the testimony these informants was rejected by the jury.  Furthermore, substantial evidence was presented at trial that the actions and values attributed to the AB are really attributable to the prison population as a whole and form the basis of "convict culture."

Paragraphs 25-32:  Mr. Scott objects to these paragraphs and requests that they be stricken since they state nothing more than allegations contained in the indictment.  As discussed, *supra*, in rendering their verdict, the jury was not required to find that the AB was actually established in the manner alleged or

engaged in activities as alleged in these paragraphs.

Paragraphs 33-37: Mr. Scott submits that the following facts should be added so that the actions attributed to Mr. Scott are viewed fairly and within the relevant context.  These facts were established through the uncontroverted testimony of the government's prison gang expert, Ms. Danine Adams.

(1) Prison is a dangerous environment.  In prison, mistakes or slights that would be excused or overlooked in free society, can result in extreme acts of violence.  Weapons are necessary for survival in prison.  Weapons making is a basic skill learned by every prison inmate.

(2) The D.C. Blacks are a group of black inmates committed to the Federal Bureau of Prisons (hereinafter the "BOP") after committing acts of street terrorism in the District of Columbia.  They are a powerful force within the BOP because of their overwhelming numbers, young age and penchant for violence.

(3) On November 5, 1996 at United States Penitentiary, Marion, Illinois, (hereinafter "USP-Marion) Walter "Butch" Johnson, a leader among the D.C. Black inmates, hit an older white inmate by the name of Joe Tokash in the head with a radio.  The attack was unprovoked.  Mr. Tokash suffered head injuries as a result of the attack.

(4) On January 2, 1997 at USP-Marion a group of D.C. Black inmates, armed with knives, attacked a smaller group of white inmates on a recreation yard.  Some of the white inmates were seriously injured.  As a result of this incident, white and black inmates were transferred to the ADX in Florence, Colorado.  D.C. Black inmate, Walter "Butch" Johnson was among the inmates transferred.

(5) ADX staff were warned, prior to the transfer of Walter Johnson, of his violent and provocative nature.  Upon his arrival at ADX, Walter Johnson began to recruit black inmates to participate in a race war against white inmates.  In June of 1997, prison staff at ADX intercepted communication from Walter Johnson in which he urged black inmates to attack white inmates on sight and stated  "No

matter what, I'm at war and you will hear about it because when I see them it's on."

(6) Prison officials at ADX did nothing to warn or protect white inmates from assaults instigated by D.C. Black inmates.  On August 22, 1997, white inmate Anthony Pfeffer was attacked by a D.C. Black inmate.  Shortly thereafter inmates were segregated on the basis of race and not permitted to recreate together.

(7) In late December 1997, white inmate Lawrence Klaker was moved onto a tier where he could communicate with Mr. Scott.  Unbeknownst to Mr. Scott, Mr. Klaker was an agent of the BOP and had been providing information on the racial conflict to intelligence officials at the prison.  Mr. Klaker and Mr. Scott knew each other but had not been able to communicate with each other since the racial attacks at ADX had begun.

(8) At this same time, prison officials at ADX were beginning to re-integrate inmates and send inmates out to recreate in racially mixed groups.

(9) On January 22, 1998, John Sliverfox, an American Indian inmate, who was considered by the D.C. Blacks to be an associate of the white inmates was assaulted on the recreation yard by two D.C. Black inmates, Opio Moore and James Holloway.

Paragraph 36: Mr. Scott notes that the testimony at trial showed that there were conflicting stories as to when this list was seized.  Names on this list were referenced, in the order they appear on the list, in a January 16, 1998 ADX intelligence report.  He objects to the list, entitled "Party List" being referenced as a "hit list."  Evidence adduced at trial showed that Mr. Scott used the term "party" in his communications to refer to individuals' gang or group affiliation and submits that the list is a list of potential allies of Walter Johnson who may pose a threat to white inmates .

Paragraph 38: Mr. Scott objects to the classification of any individual or individuals being listed as victims of his conviction.  The jury was instructed that

- 9 -

in order to convict Mr. Scott of Count 2 they need not find that the alleged enterprise was actually established or that he was in fact actually associated with the enterprise.  Thus, in reaching their verdict, the jury was not required to find that the AB existed, that the AB constituted a racketeering enterprise, that Mr. Scott was associated with the AB, or that any member of the AB actually committed, caused, or aided and abetted any racketeering act.

## IV.
## GUIDELINES CALCULATIONS

### 1. Base Offense Level

Pursuant to U.S.S.G. § 1B1.11(a), the Guidelines Manual in effect on the date the defendant is sentenced shall apply.  However, if the court determines that use of the Guidelines Manual in effect on that date would violate the ex post facto clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed.  U.S.S.G. § 1B1.11(b).  In order to determine whether there is an ex post facto problem with using the current edition of the Guidelines Manual, the calculations should be done using both the current edition and the edition in effect at the time of the offense of conviction.  The recommended sentencing range should then be compared to determine if the new Guidelines Manual works to the detriment of the defendant.

In both the November 1, 2005 Guidelines Manual and the November 1, 2001 Guidelines Manual, § 2E1.1(a) defines the base offense level as the greater of (1) 19 or (2) the offense level applicable to the underlying racketeering activity.  In this case, the jury was not required to find that any racketeering activity, whatsoever, was committed by Mr. Scott or any member of the alleged racketeering enterprise.  There being no factual finding of what underlying racketeering activity, if any, occurred, Mr. Scott submits that the base offense level should be 19.

Mr. Scott notes that his Sixth Amendment rights would be violated if any

fact finder other than the jury made a finding as to this fact that would be used to increase the calculation of his Guidelines sentence.  Mr. Scott objects to the court making any such finding.

**2.  Multiple Count Adjustment**

The revised Pre-Sentence Report suggests that the court impose a "multiple count adjustment" of +3 units pursuant to U.S.S.G. § 3D1.4.  Given the facts and circumstances of this offense, the adjustment is inappropriate.

Mr. Scott was convicted of one count: conspiracy to commit racketeering. The essence of the crime is the agreement to commit a RICO offense.   The jury was not required to find that any defendant or any conspirator actually committed, caused, or aided and abetted any racketeering act.  Nor were they required to find that the objectives or purposes of the conspiracy were attempted, achieved or accomplished.

U.S.S.G. § 3D1.1 outlines the procedure for determining offense level on multiple counts.  Mr. Scott was convicted of ONE  count, not multiple counts. And, based on the instructions given, because there was no requirement that Mr. Scott, or anyone, actually commit any acts of racketeering, Mr. Scott submits that this adjustment should not and does not apply.

**3.  Adjustment for Role in the Offense**

U.S.S.G. § 3B1.2 (a) provides that the offense level should be decreased four (4) levels if the defendant was a minimal participant in any criminal activity. A "participant" is a person who is criminally responsible for the commission of the offense.  U.S.S.G. § 3B1.1 Application Notes.  This adjustment is a heavily fact-based determination, dependent on the circumstances of a particular case.

It is submitted that, for the following reasons, Mr. Scott was a minimal participant in the conspiracy to commit racketeering:

The jury did not find that Mr. Scott personally perpetrated any acts of violence against others in furtherance of the conspiracy;

The jury did not find that Mr. Scott personally ordered any specific act of violence against others in furtherance of the conspiracy;

The jury did not find that Mr. Scott personally aided, abetted or otherwise conspired to commit any act of violence in furtherance of the conspiracy.

Based on the jury's special verdict, the jury found that Mr. Scott was not a participant in the racketeering conspiracy over a prolonged period of time;

While the jury found that Mr. Scott became a member of the conspiracy, they did not find that any inmate was harmed in furtherance of the conspiracy after Mr. Scott's joinder;

D.C. Black inmate, Butch Johnson, attacked an older white inmate and declared war on all other white inmates prior to the time that Mr. Scott was found to have become a member of the conspiracy.

Mr. Scott was motivated by a desire to protect himself and his friends from potentially deadly attacks.

Mr. Scott was not motivated by a desire for financial gain.

Mr. Scott was living in an extremely dangerous environment and had no control over which other inmates he would encounter and under what circumstances.

**4.  Career Offender Enhancement**

The revised Pre-Sentence Report suggests that career offender provisions of U.S.S.G. § 4B1.1 are applicable to this case, since Mr. Scott is a career offender and the instant offense is a qualifying "crime of violence."

Mr. Scott submits that the violation of 18 U.S.C. § 1962 (d), for which he was convicted, is not a "crime of violence" as defined by U.S.S.G. § 4B1.2 (a). Furthermore, the determination as to whether the current conviction constitutes a "crime of violence" is a fact, not established by the jury verdict that would be used to increase Mr. Scott's sentence.  As such, Mr. Scott has a Sixth Amendment right to have the fact proven to the jury beyond a reasonable doubt.  Booker v. United

- 12 -

States, *supra*.  Mr. Scott does not waive this Sixth Amendment right and objects to the court making any factual determination that has the effect of increasing his sentence under the Guidelines.

U.S.S.G. § 4B1.2 (a) defines a "crime of violence" as any offense, under federal or state law, punishable by imprisonment for a term exceeding one year, that (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or (2) is burglary, arson, or extortion, involves the use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

As discussed above, the instructions given by the court made it clear that there was no requirement that the jury find that any act, whatsoever, be committed by Mr. Scott, or any co-conspirator for that matter, in order to convict him of the racketeering conspiracy.  *See* Government Instruction 9, as given by the court.  In fact, the court instructed the jury that the racketeering enterprise in question need not even have existed for purposed of convicting Mr. Scott of Count Two.  *See* Government Instruction 3, given by the court.

By it's very definition, the offense for which Mr. Scott was convicted does not have, as one of it's elements, the "use, attempted use, or threatened use of physical force against the person of another" and does not meet the definition of "crime of violence" delineated in 4B1.2 (a)(1).

That leaves the definition of  4B1.2 (a)(2).  The 18 U.S.C. 1962(d) conviction is not a burglary, arson or extortion and it does not involve the use of explosives.  The instant offense cannot constitute a "crime of violence" unless the facts support the conclusion that it involves "conduct that presents a serious potential risk of physical injury to another."

After Booker, *supra*, the court is not in a position to make factual determinations increasing a defendant's sentence pursuant to the Guidelines. Those facts must be presented to the jury and found to be proven beyond a

- 13 -

reasonable doubt.   Although the jury was presented with a special verdict form, they were not asked to determine if the government had proven, beyond a reasonable doubt, that Mr. Scott's conduct presented "a serious potential risk of physical injury to another", a fact necessary to designate the current crime as one of violence under the Guidelines.

Even if the court were constitutionally permitted to make this determination, the offense for which Mr. Scott was convicted, does not present a serious potential risk of physical injury to another.

The Application Note 1 for this section states "the conduct set forth *(i.e. expressly charged)* in the count of which the defendant was convicted ...by its nature, presented a serious potential risk of physical injury to another." Emphasis added.  Note 2 states, "...in determining whether the offense is a crime of violence or controlled substance for the purposes of § 4B1.1 (Career Offender), the offense of conviction *(i.e. the conduct of which the defendant was convicted)* is the focus for the inquiry. Emphasis added.

Merriam-Webster Dictionary defines conduct as "the act, manner or process of carrying on."   The conduct expressly charged in Mr. Scott's conviction for violating 18 U.S.C. 1962(d) is the act of agreeing.  As the jury instruction stated: "*the conspiratorial agreement to commit a RICO offense* is the essential aspect of a RICO conspiracy offense."  Emphasis added.

Based on the elements of the crime for which Mr. Scott was convicted, conspiring to commit a RICO offense, is not in and of itself, conduct that presents a serious potential risk of physical injury to another and does not form the basis for qualifying this instant offense as a "crime of violence."

**5.  Criminal History**

The Probation Officer calculated that Mr. Scott has eighteen (18) criminal history points.  Mr. Scott objects to this calculation since it includes points for criminal conduct alleged to be part of the criminal conduct in this case; and lists

criminal conduct alleged to be part of the criminal conduct in this case as
convictions for which Mr. Scott was sentenced and serving time when he
committed the instant offense.  Mr. Scott also objects to the characterization of the
facts and circumstances surrounding his stabbing of inmate Erving Bond as
incomplete and submits additional facts to be included in the offense description
for that crime.

The criminal history calculation includes five (5) criminal history points
added pursuant to  U.S.S.G. § 4A1.1: three (3)  points for the stabbing of Erving
Bond (§ 4A 1.1 (a)); and two (2) points for the possession of contraband in prison
(§ 4A 1.1 (b)).  Because each of these offenses was alleged to be part of the
criminal conduct in the instant case, Mr. Scott objects to the offenses being
counted as "prior sentences of imprisonment" under 4A 1.1.  The Probation
Officer's calculation also includes three (3) points added pursuant to 4A1.1 (d) and
(e), and lists three offenses for which Mr. Scott was allegedly serving time.  Again,
offenses which constitute part of the criminal conduct in this case are listed as
contributing to this increase in criminal history points.

Mr. Scott notes that Paragraph 94 misstates the date of offense for the Bond
stabbing.  That date should be 11/24/00.

Mr. Scott objects to the allegations of paragraph 97 inasmuch as it does not
reflect the facts adduced at trial.  Mr. Scott requests the addition of the following
facts:

(1) Percipient witness Rafael Calderon-Velasques testified that Mr. Scott did
not yell anything to threaten Mr. Bond prior to the stabbing;

(2) At the time of the stabbing the correctional officers were admittedly not
following BOP mandated procedures in moving maximum custody inmates.
Inmates were being moved to and from their cells with fewer than three
correctional officers.  The correctional officers were not holding onto inmates as
required by BOP policy.  They were also moving maximum custody inmates at the

- 15 -

same time in the same hallways.  And, they were opening cell doors prior to handcuffing inmates for movement.  These precautionary procedures were in place to protect both inmates and correctional officers.  The failure of the correctional officers to follow the movement procedures increased both the inmates' perception of danger and the risk of harm to the inmates; and

(3) At the time of the stabbing, Mr. Scott's mental condition had deteriorated because he was undergoing alpha-Interferon treatment for Hepatitis C.  Mr. Scott's attending physician, employed by the United States Medical Center for Federal Prisoners at Springfield, Missouri, Dr. Tamer Khalil, acknowledged that in the weeks surrounding the stabbing, Mr. Scott complained of impaired mental functioning, increased anxiety, delusions and black-outs.  Dr. Khalil was aware that Mr. Scott's hemoglobin count was extremely low, that his brain was being starved of oxygen and that the side effects Mr. Scott complained of had a physiological origin caused by the Interferon treatment.  Dr. Khalil did not want to stop treatment due to the life threatening nature of Mr. Scott's illness.  And, Mr. Scott was not provided any mental health diagnosis or treatment.  This impaired mental state affected Mr. Scott's perception and judgment at the time of the offense.

Paragraphs 100-102 of the Pre-Sentence Report state that Mr. Scott was serving a sentence for USDC WDMO (docket number 01-03027-01).  This is the case in the Western District of Missouri in which Mr. Scott was prosecuted for the November 24, 2000 stabbing of Mr. Bond.  Mr. Scott was sentenced to 125 months for the stabbing on January 7, 2003, several months after the indictment in this case was unsealed.   The conspiracy alleged in this case includes this offense and ended prior to the imposition of Mr. Scott's sentence in the case.  Mr. Scott objects to the sentence being considered as a factor in calculating any additional points pursuant to 4A1.1 (b) (d) or (e).

Furthermore, Paragraphs 100-102, reference Mr. Scott's misdemeanor

sentence out of the District of Colorado in case 98-1200M, in which he was charged with possession of contraband in prison.  That case involved Mr. Scott's January 30, 1998 possession of a prison made knife.  The conduct was alleged in the indictment paragraph 299 as part of the race war with black inmates.  Mr. Scott objects to his sentence being considered as a factor in calculating any additional points pursuant to 4A1.1 (b) (d) or (e).

Based upon these objections, Mr. Scott submits that he has a total of thirteen (13) criminal history points.

**6.  Guidelines Calculation**

Based on the above objections, Mr. Scott offers the following guidelines calculation:

| | |
|---|---|
| Base offense level §2A1.5: | 19 |
| Minimal participation §3B1.2 | -4 |
| Offense Level | 15 |
| Criminal history category | VI |
| Sentence | 41-51 months |

**V.
APPLICATION OF 18 U.S.C. § 3553 (A) FACTORS**

After <u>Booker</u>, *supra*, sentencing courts must not give undue emphasis to the guidelines, rather they are to be viewed as one among a number of sentencing factors set forth in 18 U.S.C. § 3553(a).

The primary directive in Section 3553(a) is for a sentencing court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)...".  The court in determining an appropriate sentence must consider not only the nature and circumstances of the offense and the history and characteristics of the defendant; but also must be guided by the directive of Section 3553 (a)(2) which provides  the need for the sentence imposed:

(A) to reflect the seriousness of the offense, to promote respect for the
law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational
training, medical care, or other correctional treatment in the most
effective manner.

Mr. Scott submits that a sentence within the Guideline range calculated
above of 41-51 months is appropriate in light of the 18 U.S.C. 3553 (a) factors.
Mr. Scott was convicted of a violation of 18 U.S.C. 1962(d), a conspiracy to
violate RICO.  In examining the evidence and the jury's special verdict, it is
apparent that the conviction is based on the four letters the jury determined Mr.
Scott wrote to inmate Michael Klaker in December 1997 and January 1998 and Mr.
Scott's possession of the "Party List" sometime in January-June 1998.

The letters cannot be viewed in a vacuum.  By all accounts, prison is an
extremely dangerous and racially charged environment.  In order to survive,
inmates must be wary of the constant life threatening danger presented by other
inmates.  Individuals band together for protection and support.

These letters were sent at the end of what was a year of extreme racial
tension and violence within the BOP.   Violence that began at USP-Marion spread
to ADX, when inmates were transferred for disciplinary reasons.  It is undisputed
that D.C. Black leader, Walter "Butch" Johnson, expressed an intent to attack
white inmates and was actively engaged in recruiting other D.C. Black inmates to
do the same.  As a result of the violence, inmates were temporarily segregated.  At
the time of the Klaker letters, Mr. Scott, Mr. Klaker and other inmates were being
reintegrated and sent to recreation with racially mixed groups.  Importantly the
letters and the "Party List" were written and possessed within a very concentrated
time period, somewhere between three (3) weeks and six (6) months.  Mr. Scott did

not attack any inmates named in the letters or the "Party List." The content of the letters and the lack of any affirmative effort to attack other inmates, supports the conclusion that the letters were written out of a concern about Mr. Klaker's personal safety and ability to protect himself should he find himself on the tier or prison yard with D.C. Black inmates.

The government contends that Mr. Scott should receive the maximum sentence for his conduct in this case. To sentence Mr. Scott to the maximum of 20 years consecutive to his current term for trying to protect himself and others seems incredibly disproportionate to his conduct as proven. In considering all of the ways that 18 U.S. C. 1962(d) could be violated, certainly the violation shown in this case, is at the low end of the spectrum.

The government urges the court to severely punish Mr. Scott because he committed the 1992 assault on Mr. Benitez-Mendez and the 2000 assault on Erving Bond.

At trial, Mr. Scott did all but prove his innocence of the Benitez-Mendez stabbing. The correctional officer who witnessed the assault from an unobstructed distance of forty (40) feet, identified the assailant as African-American. The informants' testimony about purported admissions from Mr. Scott were discredited. Their claims were late-blooming, inconsistent and misstated the location and other facts relating to the stabbing. In one instance, an informant who stated in 1993 that he did not know Mr. Scott, claimed, years later when he needed a ticket out of jail, that Mr. Scott confided in him and confessed to the stabbing. Another claiming that Mr. Scott showed him the location of the stabbing, pointed to the completely wrong tier. The tattoo that BOP officials claimed that Mr. Scott got thereafter to commemorate the event and his initiation into the AB was, in fact, almost seven years old. The tattoo was depicted in a photograph of Mr. Scott taken before he ever went to federal prison, and it was captured in a photograph taken the day of the stabbing at Leavenworth looking anything but fresh. In spite of all of

the above facts, the government urges the court to punish Mr. Scott for this offense.  What legitimate penal interest could be served by punishing Mr. Scott for a crime he did not commit?

And, in the case of Erving Bond, Mr. Scott has been severely punished for his actions.  In January 2003, after this indictment in this case, Mr. Scott received a sentence of 125 months consecutive to his sentence for the stabbing of Mr. Bond.  Absent that sentence, Mr. Scott would have been released from federal prison in 2007.  At the time he stabbed Mr. Bond, Mr. Scott was in an extremely diminished physical and mental state.  The BOP doctor explained the physiological reasons for Mr. Scott's condition.  The testimony of the guards and other inmates both, described the lax security procedures in effect at the time of the incident. The jury did not find that Mr. Bond was stabbed as part of a conspiracy to murder black inmates.   Again, it does not seem to suit any appropriate penalogical purpose to further punish Mr. Scott for this offense.

Mr. Scott is fifty five (55) years old.  He is currently serving a sentence that will keep him in custody until he is almost seventy (70).  Even if he were released at the end of his current term, it is extremely unlikely that he would pose a continuing danger to society.

**VI.**
**CONCLUSION**

Based on the foregoing, it is respectfully submitted that the court sentence Mr. Scott to a term of 41-51 months in prison.


DATED: November 28, 2006                    _____

                                            AMY E. JACKS
                                            Attorney for STEVE LOREN SCOTT

# CERTIFICATE OF SERVICE

I, Amy E. Jacks hereby declare:

That I am employed in the County of Los Angeles, State of California; that my business address is 1717 Fourth St. Suite 300, Santa Monica, CA 90401; that I am over the age of eighteen and not a party to the within entitled action; that I am a member of the bar of this Court.

On November 28, 2006, I served a copy of:

DEFENDANT SCOTT'S POSITION RE: SENTENCING

Service was:

[x]    Placed in a sealed envelope and mailed via United States Mail, addressed as follows:
[ ]    By hand delivery addressed as follows:
[ ]    By facsimile as follows:
[ ]    By messenger as follows:

AUSA Joey Blanch
U.S. Attorney's Office
312 N. Spring St., 15th Floor
Los Angeles, CA 90012

Mr. Michael Barrett
United States Probation Officer
312 N. Spring St. 6th Floor
Los Angeles, CA 90012

This Certificate is executed on November 28 , 2006 at Santa Monica, California.  I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____

AMY E. JACKS
Attorney at Law

i

# EXHIBIT D

NAME: **STEVE LOREN SCOTT**

PRISON IDENTIFICATION/BOOKING NO. **55341-065**

ADDRESS OR PLACE OF CONFINEMENT: **U.S. PENITENTIARY- MAX P.O. BOX 8500**

**FLORENCE, CO 81226-8500**

Note: If represented by an attorney, provide name, address & telephone number. *It is your responsibility to notify the Clerk of Court in writing of any change of address.*

FILED
CLERK, U.S. DISTRICT COURT

OCT 11 2012

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

**STEVE LOREN SCOTT**

FULL NAME OF MOVANT
(Include name under which you were convicted)

Petitioner.

CASE NUMBER: **CV 12-8737 R**

To be supplied by the Clerk of the United States District Court

CR _____

Criminal case under which sentence was imposed.

**MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY 28 U.S.C § 2255**

## INSTRUCTIONS - READ CAREFULLY

This motion must be legibly handwritten or typewritten and signed by the movant under penalty of perjury. Any false statement of a material fact may serve as the basis for prosecution and conviction for perjury. All questions must be answered concisely in the proper space on the form. Where more room is needed to answer any questions use reverse side of sheet.

Additional pages are not permitted. No citation or authorities need be furnished. If briefs or arguments are submitted, they should be submitted in the form of a separate memorandum.

Upon receipt, your motion will be filed if it is in proper order. **NO FEE** is required with this motion

If you do not have the necessary funds for transcripts, counsel, appeal, and other costs connected with a motion of this type, you may request permission to proceed in forma pauperis, in which event you must execute the declaration on the last page, setting forth information establishing your inability to pay costs. If you wish to proceed in forma pauperis, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account in the institution.

Only judgments entered by one court may be challenged in a single motion. If you seek to challenge judgments entered by different judges or divisions either in the same district or in a different districts, you must file separate motions as to each judgment.

Your attention is directed to the fact that you must include all grounds for relief and all facts supporting such grounds for relief in the motion you file seeking relief from any judgment of conviction.

When the motion is fully completed, the original and three (3) copies must be mailed to the Clerk of the United States District Court, whose address is 312 North Spring Street, Los Angeles, California 90012.

RECEIVED
CLERK, U.S. DISTRICT COURT

OCT - 5 2012

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

## MOTION

1. Name and location of court which entered judgment of conviction under attack: <u>UNITED STATES DISTRICT</u> <u>COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES,</u> <u>CA - WESTERN DIVISION</u>

2. Date of judgment of conviction: <u>VERDICT: 10/6/06; SENTENCING: 1/8/2007</u>

3. Length of sentence: <u>220 MONTHS</u>           Sentencing judge: <u>MANUEL L. REAL</u>

4. Nature of offense or offenses for which you were convicted: <u>R.I.C.O. CONSPIRACY</u> <u>(18 U.S.C. § 1962(d))</u>

5. What was your plea?  *(check one)*

   ☑ Not guilty
   ☐ Guilty
   ☐ Nolo Contendere

   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

6. Kind of trial:  *(check one)*

   ☑ Jury
   ☐ Judge only

7. Did you testify at the trial?

   ☐ Yes       ☑ No

8. Did you appeal from the judgment of conviction?

   ☑ Yes       ☐ No

9.  If you did appeal, answer the following:

(a) Name of court   NINTH CIRCUIT COURT OF APPEALS

(b) Result   AFFIRMED

(c) Date of result   6/8/2008

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any federal court?

☑ Yes   ☐ No

11. If your answer to question number 10 was "yes", give the following information:

(a) (1) Name of Court   U.S. SUPREME COURT

(2) Nature of proceeding   PETITION FOR WRIT OF CERTIORARI

(3) Grounds raised   JUDICIAL MISCONDUCT

(4) Did you receive an evidentiary hearing on your petition, application or motion?

☐ Yes   ☑ No

(5) Result   DENIED

(6) Date of result   OCTOBER 11, 2011

(b) (1) Name of Court

(2) Nature of proceeding

(3) Grounds raised

(4) Did you receive an evidentiary hearing on your petition, application or motion?

☐ Yes   ☐ No

(5) Result

(6) Date of result

(c) (1) Name of Court

(2) Nature of proceeding

(3) Grounds raised

(4) Did you receive an evidentiary hearing on your petition, application or motion?

☐ Yes   ☐ No

(5) Result _____

_____

(6) Date of result _____

(d) Did you appeal, to an appellate federal court having jurisdiction, the results of action taken on any petition, application or motion?

(1) First petition, etc.  ☐ Yes ☐ No

(2) Second petition, etc. ☐ Yes ☐ No

(3) Third petition, etc.  ☐ Yes ☐ No

(e) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____

_____

_____

_____

12. State concisely every ground on which you claim that you are being held unlawfully.

**CAUTION:** If you fail to set forth all grounds in this motion, you may be barred from presenting additional grounds at a later date. For your information, the following is a list of the most frequently raised grounds for relief in these proceedings. Each statement preceded letter constitutes a separate ground for possible relief. You may raise any grounds which you have other than those listed. However, you should raise in this motion all available grounds (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

If you selected one or more of these grounds for relief, you must allege facts in support of the grounds listed below. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

 (a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea.

 (b) Conviction obtained by use of coerced confession.

 (c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

 (d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

 (e) Conviction obtained by violation of the privilege against self-incrimination.

 (f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

 (g) Conviction obtained by a violation of the protection against double jeopardy.

 (h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

 (i) Denial of effective assistance of counsel.

 (j) Denial of right of appeal.

A. Ground one: INSUFFICIENT SPACE (CONTINUED ON FOLLOWING PAGES).

Supporting facts (tell your story briefly without citing cases or law): INSUFFICIENT SPACE (CONTINUED ON FOLLOWING PAGES)

B. Ground two: SEE A ABOVE

Supporting facts (tell your story briefly without citing cases or law): _____

C. Ground three: SEE A ABOVE

Supporting facts (tell your story briefly without citing cases or law): _____

D. Ground four: SEE A ABOVE

Supporting facts (tell your story briefly without citing cases or law): _____

13. If any of the grounds listed in 12 A, B, C and D were not previously presented, state briefly what grounds were not presented, and give your reasons for not presenting them: NO GROUNDS ASSERTED HEREIN HAVE BEEN RAISED PREVIOUSLY DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL OR NOVELTY.

14. Do you have any petition or appeal now pending in any court as to the judgment under attack?

☐ Yes    ☑ No

# GROUND ONE

DENIAL OF DUE PROCESS THROUGH
INSUFFICIENT EVIDENCE RESULTING
IN MANIFEST INJUSTICE AND
CONVICTION OF INNOCENT PERSON,
ACCOMPANIED BY INEFFECTIVE
ASSITANCE OF TRIAL AND APPELLATE
COUNSEL.

A.    THE PREDICATES UPON WHICH THE
VERDICT RESTS DO NOT SATISFY
RICO'S STATUTORY DEFINITION OF
"RACKETEERING ACTIVITY" UNDER
18 U.S.C. § 1961 (1) (A).

THE PETITIONER WAS CONVICTED ON COUNT TWO OF THE
INDICTMENT CHARGING THAT HE VIOLATED 18 U.S.C. § 1962(d) (RICO
CONSPIRACY), WHICH REQUIRED PROOF OF HIS AGREEMENT THAT AT
LEAST TWO PREDICATE RACKETEERING ACTS WOULD BE COMMITTED
BY SOME MEMBER OF THE CONSPIRACY.

THE GOVERNMENT'S CASE-IN-CHIEF ATTEMPTED TO PROVE THAT
THE SCOPE OF THE PETITIONER'S CONSPIRATORIAL AGREEMENT

INCLUDED WHAT IT CHARACTERIZED AS EIGHT SEPARATE STATE LAW MURDER CONSPIRACIES AND TWO OR MORE DRUG TRAFFICKING CRIMES. THE SPECIAL VERDICT FORM INDICATED, HOWEVER, THAT THE JURY REJECTED ALL OF THE EVIDENCE DEALING WITH DRUG TRAFFICKING, AS WELL AS ALL OF THE EVIDENCE RELATING TO FIVE OF THE EIGHT MURDER CONSPIRACY ACTS. THIS LEFT ONLY THREE SO-CALLED RICO PREDICATES UPON WHICH THE ENTIRETY OF THE JURY'S VERDICT WAS BASED:

[6.] MURDER OF WALTER JOHNSON
(BUTCH / PRINCE): YES ✓ NO ___

[7.] CONSPIRACY TO MURDER A D.C.
BLACK INMATE (EXCLUDING ERVING
BOYD AND WALTER JOHNSON
(BUTCH / PRINCE)): YES ✓ NO ___

[8.] CONSPIRACY TO MURDER A SECOND
D.C. BLACK INMATE (EXCLUDING
ERVING BOYD AND WALTER JOHNSON
(BUTCH / PRINCE)): YES ✓ NO ___

ACCORDING TO THE ORIGINAL INDICTMENT AND THE GOVERNMENT'S EVIDENCE AT TRIAL, THE FEDERAL FACTION OF THE ARYAN BROTHERHOOD PRISON GANG WAS INVOLVED IN A

(7)

RACE WAR WITH THE D.C. BLACKS PRISON GANG BECAUSE WALTER (BUTCH) JOHNSON, A D.C. BLACK LEADER, STRUCK A WHITE INMATE AT THE FEDERAL PRISON IN MARION, ILLINOIS, IN THE HEAD WITH A RADIO. THIS WAR AMONG THE TWO FEDERAL PRISON GANGS WAS CHARGED IN THE INDICTMENT AS <u>RACKETEERING ACT THIRTY-SEVEN</u> | <u>CONSPIRACY TO MURDER BLACK INMATES</u>:

[55.] BEGINNING ON A DATE UNKNOWN TO THE GRAND JURY AND CONTINUING UNTIL AT LEAST NOVEMBER 24, 2000, WITHIN THE CENTRAL DISTRICT OF CALIFORNIA AND ELSEWHERE, DEFENDANTS BARRY BYRON MILLS, TYLER DAVIS BINGHAM, RONALD BOYD SLOCUM, MICHAEL PATRICK McELHINEY, DAVID MICHAEL SAHAKIAN, STEVE LOREN SCOTT, WAYNE BRIDGEWATER, STEVEN WILLIAM HICKLIN, CHRISTOPHER OVERTON GIBSON, JOHN STANLEY CAMPBELL, JR., JESSE ANTONIO VAN METER, RICHARD SCOT McINTOSH, CARL EDGAR KNORR, JR., JASON LEE SCHWYHART, AND HENRY MICHAEL HOUSTON, AND OTHERS CONSPIRED TO MURDER BLACK INMATES <u>IN THE INSTITUTIONS OF THE FEDERAL BUREAU OF PRISONS</u>, AND A CONSPIRATOR COMMITTED AN OVERT ACT IN FURTHERANCE OF THE CONSPIRACY, IN VIOLATION OF CALIFORNIA PENAL CODE SECTIONS 182 AND 187.

ONE OF THE OVERT ACTS REFERENCED IN RACKETEERING ACT THIRTY-SEVEN WAS OVERT ACT 249, WHICH APPEARS IN THE ORIGINAL INDICTMENT DIRECTLY UNDER THE HEADING "<u>RACE WAR WITH BLACK INMATES</u>"

(8)

[249] In or about December 1996, Defendant David Michael Sahakian ordered Aryan Brotherhood associate Michael Wagner to assault a Black inmate named Butch Johnson because Johnson had assaulted a white inmate.

During the petitioner's trial the government alleged that Butch Johnson's assault on a white inmate was the incident which sparked the so-called race war between the Aryan Brotherhood and the D.C. Blacks prison gang. Walter Butch Johnson appears nowhere else within the original indictment in the context of any of the individual racketeering acts.

Since the petitioner was tried separately, and only upon a single RICO conspiracy count, it was stipulated by the government that only a redacted portion of the indictment which related to the charge against the petitioner should be read to the jury. Thus, the jury was instructed that the following redacted conspiracy count was what the government was seeking to prove:

From a date unknown to the Grand Jury and continuing until at least July 25, 2002, within the Central District of California and

(9)

ELSEWHERE, DEFENANT [ ]... STEVE
LOREN SCOTT, aka "SCOTTIE,"...
AND OTHERS KNOWN AND UNKNOWN,
BEING PERSONS EMPLOYED BY AND
ASSOCIATED WITH THE ARYAN BROTHERHOOD
CRIMINAL ENTERPRISE DESCRIBED IN PARAGRAPHS
ONE THROUGH FIFTEEN OF THE INTRODUCTORY
ALLEGATIONS OF THIS INDICTMENT AS DEFINED
IN TITLE 18, UNITED STATES CODE, SECTION
1961 (4), WHICH ENTERPRISE WAS ENGAGED IN,
AND THE ACTIVITIES OF WHICH AFFECTED,
INTERSTATE AND FOREIGN COMMERCE,
UNLAWFULLY, WILLFULLY, AND KNOWINGLY
COMBINED, CONSPIRED, CONFEDERATED, AND
AGREED TOGETHER AND WITH EACH OTHER
TO VIOLATE TITLE 18, UNITED STATES CODE,
SECTION 1962 (C), THAT IS TO CONDUCT
AND PARTICIPATE, DIRECTLY AND INDIRECTLY,
IN THE CONDUCT OF THE AFFAIRS OF THE
ENTERPRISE THROUGH A PATTERN OF
RACKETEERING ACTIVITY, AS THAT TERM IS
DEFINED IN TITLE 18, UNITED STATES CODE,
SECTIONS 1961 (1) AND 1961 (5), CONSISTING
OF MULTIPLE ACTS INVOLVING MURDER, IN
VIOLATION OF ... ILLINOIS CRIMINAL SECTIONS
(10)

8-2 AND 9-1... KANSAS CRIMINAL CODE SECTIONS 21-3302 AND 21-3401... AND MISSOURI REVISED STATUTES SECTIONS 562.041, 564.011, AND 565.020; AND DISTRIBUTION OF CONTROLLED SUBSTANCES, INCLUDING HEROIN, METHAMPHETAMINE, AND COCAINE, IN VIOLATION OF TITLE 21, UNITED STATES CODE, SECTIONS 841(a)(1), 843(b), AND 846. IT WAS A FURTHER PART OF THE CONSPIRACY THAT THE DEFENDANT [ ] AGREED THAT A CONSPIRATOR WOULD COMMIT AT LEAST TWO ACTS OF RACKETEERING IN THE CONDUCT OF THE AFFAIRS OF THE ENTERPRISE.

ADDITIONALLY, THE GOVERNMENT STIPULATED THAT THE FOLLOWING OVERT ACTS (EXCLUDING FOR PRESENT PURPOSES THOSE RELATING TO PREDICATES THAT THE JURY REJECTED) APPLIED TO ITS CASE AGAINST THE DEFENDANT, AND AGREED THEREFORE THAT ONLY SAID OVERT ACTS SHOULD BE READ TO THE JURY:

"RACE WAR WITH BLACK INMATES"

[297] ON OR ABOUT DECEMBER 25, 1997, DEFENDANT STEVE LOREN SCOTT SENT A MESSAGE TO

(11)

ARYAN BROTHERHOOD MEMBER LAWRENCE KLAKER INFORMING KLAKER THAT THE ARYAN BROTHERHOOD WAS "AT ON SIGHT WAR" WITH THE D.C. BLACKS.

[298] ON OR ABOUT DECEMBER 29, 1997, DEFENDANT STEVE LOREN SCOTT SENT A MESSAGE TO LAWRENCE KLAKER INFORMING KLAKER OF EFFORTS TO MANUFACTURE WEAPONS TO ARM ALL MEMBERS OF THE ARYAN BROTHERHOOD FOR THE WAR AGAINST THE D.C. BLACKS.

[299] ON OR ABOUT JANUARY 3d, 1998, DEFENDANT STEVE LOREN SCOTT HAD SECRETED WITHIN HIS BODY A PRISON-MADE KNIFE TO BE USED IN THE WAR AGAINST THE D.C. BLACKS.

[302] ON OR ABOUT JUNE 9, 1998, DEFENDANT STEVE LOREN SCOTT POSSESSED A "HIT LIST" OF BLACK INMATES WHO WERE TO BE MURDERED.

IT IS IMPORTANT TO BEAR IN MIND THAT EACH OF THESE

(12)

ALLEGED OVERT ACTS OCCURRED IN THE FEDERAL SUPERMAX (ADX), WHICH IS LOCATED IN FLORENCE, COLORADO, AND THAT, EVEN THOUGH THE CONSPIRACY COUNT OF THE ORIGINAL INDICTMENT LISTED THE MURDER STATUTES OF COLORADO AS BEING RELEVANT TO THE STATE LAW RICO PREDICATES, OR PATTERN OF RACKETEERING ACTIVITY, THE STIPULATED REDACTION OF THAT COUNT, WHICH BOTH PARTIES AGREED SHOULD BE READ TO THE JURY, OMITTED ANY MENTION OF COLORADO'S MURDER LAW ALTOGETHER.

IN EACH CASE WITHOUT EXCEPTION, NO MATTER HOW MANY CONSPIRACIES THE THREE PREDICATES ARE DIVIDED INTO, BECAUSE THEY OCCURRED WHOLLY WITHIN THE TERRITORIAL BOUNDS OF FEDERAL ENCLAVES, *I.E.*, UNITED STATES PENITENTIARIES, OR "NEEDFUL BUILDINGS" CEDED TO THE FEDERAL GOVERNMENT, THEY WERE NOT VALID RICO PREDICATES, SUFFICIENT AS EVIDENCE UPON WHICH A CONVICTION FOR RICO CONSPIRACY COULD BE BASED. THIS IS SO PRIMARILY BECAUSE A CONVICTION FOR RICO CONSPIRACY UNDER 18 U.S.C. § 1962(d) REQUIRES PROOF OF AN AGREEMENT THAT ALL OF THE ELEMENTS OF 18 U.S.C. § 1962(c) WOULD BE SATISFIED. AMONG THOSE ELEMENTS IS THE REQUIREMENT THAT A PATTERN OF RACKETEERING ACTIVITY WOULD TAKE PLACE, MEANING SIMPLY THAT AT LEAST TWO SEPARATE BUT RELATED RACKETEERING ACTS (CRIMES) WOULD BE COMMITTED. THE RACKETEERING ACTS UPON WHICH THE PETITIONER WAS CONVICTED

WERE, ACCORDING TO THE SPECIAL VERDICT FORM, STATE CRIMES, AND, TO QUALIFY AS RICO PREDICATES, IT WAS NECESSARY THAT THEY MEET THE STATUTORY DEFINITION OF 18 U.S.C. §1961(1)(A), WHICH STATES IN RELEVANT PART:

AS USED IN THIS CHAPTER—

(1) "RACKETEERING ACTIVITY" MEANS

(A) ANY ACT OR THREAT INVOLVING MURDER..., WHICH IS <u>CHARGEABLE</u> <u>UNDER STATE LAW AND PUNISHABLE</u> <u>BY IMPRISONMENT FOR MORE THAN</u> <u>ONE YEAR</u>;

THERE CAN BE NO DISPUTE THAT EACH OF THE SO-CALLED STATE CRIME PREDICATES (ALL SUPPOSEDLY SEPARATE CONSPIRACIES TO COMMIT MURDER) WERE NEVER CHARGEABLE OR PUNISHABLE BY ANY STATE DUE TO A COMPLETE LACK OF SUBJECT MATTER OR PERSONAL JURISDICTION. THEY DID NOT OCCUR WITHIN ANY STATE. THEY OCCURED WHOLLY AND ENTIRELY WITHIN FEDERAL ENCLAVES "IN THE INSTITUTIONS OF THE FEDERAL BUREAU OF PRISONS," (QUOTING RACKETEERING ACT 37). AT NO TIME COULD ANY STATE LAW ENFORCEMENT AGENCY HAVE <u>CHARGED</u> THE PETITIONER, NOR COULD ANY STATE COURT HAVE <u>PUNISHED</u> HIM.

(14)

SEE, e.g., UNITED STATES V. SLOCUM, 486 F. SUPP. 2d 1104 (C.D. CA. 2007):

> THE RICO STATUTE DEFINES
> "RACKETEERING ACTIVITY" TO
> INCLUDE "ANY ACT OR THREAT
> INVOLVING MURDER... WHICH
> IS CHARGEABLE UNDER STATE LAW
> AND PUNISHABLE BY IMPRISONMENT
> FOR MORE THAN ONE YEAR..."
> 18 U.S.C. §1961. ALTHOUGH A MURDER
> IS TECHNICALLY "CHARGEABLE UNDER
> STATE LAW," IF AN AFFIRMATIVE
> DEFENSE EXISTS, SUCH A MURDER
> WOULD NOT BE "PUNISHABLE AT ALL."
> (CITING UNITED STATES V. MUSKOVSKY,
> 863 F.2d 1319, 1330-31 (7TH CIR. 1988)).

NOTABLY, THE MUSKOVSKY DECISION CITED BY THE COURT IN SLOCUM RELIED UPON UNITED STATES V. TONRY, 837 F.2d 1281 (5TH CIR. 1988), A TRAVEL ACT CASE THAT WAS REVERSED ON APPEAL BECAUSE THE PREDICATE STATE LAW BRIBERY OFFENSE WAS NOT TECHNICALLY "IN VIOLATION OF THE LAWS OF THE STATE IN WHICH COMMITTED," SINCE THE PERSON BRIBED DID NOT QUALIFY WITHIN THE DEFINITION OF THE PARTICULAR

(15)

STATE STATUTE (i.e. LOUISANA, ALTHOUGH THE FACTS WOULD HAVE CONSTITUTED BRIBERY IN OTHER STATES). THE TONRY COURT NOTED THAT STATUTES SHOULD BE CONSTRUED TO AVOID CONSTITUTIONAL QUESTIONS, AND THAT SERIOUS CONSTITUTIONAL QUESTIONS OF FAIR NOTICE WOULD BE RAISED IF THE STATUTE IN QUESTION WAS BROADLY CONSTRUED TO INCLUDE CONDUCT THAT COULD NOT BE ANTICIPATED BY ITS PLAIN LANGUAGE.

THE SAME RATIONALE APPLIES TO THE SUBJECT CASE. FEDERAL PRISONERS IN FEDERAL PRISONS KNOW THAT ANY ACTS THEY UNDERTAKE CAN NEVER BE PROSECUTED BY A PARTICULAR STATE, THAT SUCH CRIMES ARE NEITHER "CHARGEABLE" NOR "PUNISHABLE" IN THE STATE COURT SYSTEMS, AND IT IS ENTIRELY UNFAIR AND CONTRARY TO DUE PROCESS "NOTICE" PROTECTIONS TO STRETCH THE PHRASE "CHARGEABLE UNDER STATE LAW" BEYOND ITS ORDINARY, COMMON SENSE MEANING TO INCLUDE PREDICATE CRIMES THAT ARE COMPLETELY BEYOND THE REACH OF A PARTICULAR STATE'S LAW ALTOGETHER.

ALL OF THIS IS NOT TO SAY THAT CONSPIRACY TO COMMIT MURDER WITHIN THE CONFINES OF A FEDERAL ENCLAVE IS NOT AGAINST SOME LAW. OBVIOUSLY IT IS A FEDERAL CRIME. AND, HAD CONGRESS SO INTENDED, IT COULD HAVE EASILY LISTED IT AS A §1961 (1)(B) RICO PREDICATE

(16)

INDEED, CONGRESS DID LIST <u>EXTORTION</u> AS BOTH A STATE LAW PREDICATE AND A FEDERAL LAW PREDICATE. (<u>SEE</u> 18 U.S.C. § 1951). OR, AS IT DID WITH VICAR (18 U.S.C. § 1959), CONGRESS COULD HAVE SIMPLY USED THE ALL INCLUSIVE LANGUAGE OF "IN VIOLATION OF THE LAWS OF ANY STATE OR OF THE UNITED STATES." BUT CONGRESS TOOK NEITHER OF THESE APPROACHES WHEN DRAFTING RICO. INSTEAD, IT CAREFULLY AND METHODICALLY DELINEATED ONLY VERY SPECIFIC STATE CRIMES AND FEDERAL CRIMES THAT IT THOUGHT WOULD BE RELEVANT TO RICO BECAUSE OF THEIR EFFECT ON INTERSTATE COMMERCE, OR, MORE PARTICULARLY THEIR EFFECT ON LOCAL BUSINESSES THAT WERE BEING VICTIMIZED BY ORGANIZED CRIME (I.E., THE MAFIA). AND THE FACT THAT CONGRESS WAS NOT CONCERNED WITH INTER-PRISON CRIMES IN FEDERAL PENITENTIARIES (THAT UNDER NO STRETCH OF THE IMAGINATION WOULD AFFECT LOCAL BUSINESS) IS ABUNDANTLY CLEAR FROM ITS EXCLUSION OF ANY PERIOD OF IMPRISONMENT "IN THE PREDICATE CRIME LIMITATION PERIOD":

§ 1961 (5): "PATTERN OF RACKETEERING ACTIVITY" REQUIRES AT LEAST TWO ACTS OF RACKETEERING ACTIVITY, ONE OF WHICH OCCURRED AFTER THE EFFECTIVE DATE OF THIS CHAPTER AND THE LAST OF WHICH OCCURRED WITHIN TEN YEARS (<u>EXCLUDING ANY PERIOD</u>

(17)

<u>OF IMPRISONMENT</u> ) AFTER THE COMMISSION OF A PRIOR ACT OF RACKETEERING.

BECAUSE THE THREE STATE LAW MURDER CONSPIRACY PREDICATES UPON WHICH THE JURY'S VERDICT WAS BASED ALL ALLEGEDLY OCCURRED WHILE THE PETITIONER WAS CONFINED WITHIN THE "INSTITUTIONS OF THE FEDERAL BUREAU OF PRISONS," <u>i.e.</u>, WHOLLY WITHIN THE EXCLUSIVE TERRITORY OF THE UNITED STATES, SAID CRIMES WERE NEVER "CHARGEABLE" OR "PUNISHABLE" BY ANY STATE IN AND OF ITSELF, AND, THEREFORE, NO PATTERN OF RACKETEERING ACTIVITY WAS PROVED THAT COULD EVEN PLAUSIBLY CONSTITUTE SUFFICIENT EVIDENCE TO SUPPORT THE PETITIONERS CONVICTIONS FOR RICO CONSPIRACY.

B. THE THREE STATE MURDER CONSPIRACY "ACTS" UPON WHICH THE VERDICT DEPENDED WERE BUT A SINGLE CONSPIRACY TO MURDER D.C. BLACK INMATES AS PART OF A WAR BETWEEN TWO RIVAL PRISON GANGS; THEREFORE, THE EVIDENCE WAS INSUFFICIENT TO PROVE THAT THE PETITIONER AGREED THAT A "PATTERN" OF RACKETEERING ACTIVITY WOULD TAKE PLACE.

(18)

ALTHOUGH THE PETITIONER WAS TRIED FOR RICO CONSPIRACY AND NOT SUBSTANTIVE RICO, THE FACT THAT RACKETEERING ACT THIRTY-SEVEN OF THE ORIGINAL INDICTMENT SET FORTH AS A SINGLE CONSPIRACY THE WAR WITH THE D.C. BLACKS IS UNDENIABLE EVIDENCE THAT EACH OF THE SPECIAL VERDICT FORM'S "GUILTY" ACTS WERE MERELY MULTIPLE OBJECTS OF A SINGLE CONSPIRACY THAT CONSISTED ONLY OF A SINGLE AGREEMENT BY THE PETITIONER.

AND BEYOND THIS TELLING DEMONSTRATION IN THE INDICTMENT, THE GOVERNMENTS EVIDENCE AT TRIAL ALSO PROVED NO MORE THAN THAT THE CONSPIRACY TO MURDER D.C. BLACK GANG MEMBERS WAS A SINGLE CONSPIRACY WITH MULTIPLE OBJECTS. THE GOVERNMENT'S CLOSING ARGUMENT, AT PAGE 17, ADMITS AS MUCH:

"LET'S TALK ABOUT THE WAR WITH THE D.C. BLACKS. THERE SPECIFICALLY YOU HAVE HARD PHYSICAL EVIDENCE THAT THIS DEFENDANT AGREED THAT MEMBERS OF HIS CONSPIRACY, MEMBERS OF THE ARYAN BROTHERHOOD WOULD COMMIT ACTS INVOLVING MURDER."

THE EVIDENCE SHOWED THAT WALTER BUTCH JOHNSON WAS A LEADER OF THE D.C. BLACKS AND THAT HE STARTED THE WAR

(19)

BETWEEN THE D.C. BLACKS AND THE ARYAN BROTHERHOOD WHEN HE HIT JOE TOKASH IN THE HEAD WITH A RADIO AT USP MARION. ONLY THEN, AND SPECIFICALLY AS A CONSEQUENCE THEREOF, DID THE WAR WITH THE D.C. BLACKS ENSUE. AND THE FIRST RETALIATORY RESPONSE FOR THE RADIO - ASSAULT INCIDENT IS LISTED IN THE ORIGINAL INDICTMENT AS OVERT ACT 249 DIRECTLY BENEATH THE HEADING "RACE WAR WITH BLACK INMATES" (WHICH IS OBVIOUSLY MEANT TO COINCIDE WITH RACKETEERING ACT THIRTY SEVEN):

[249] IN OR ABOUT DECEMBER 1996, DEFENDANT DAVID MICHAEL SAHAKIAN ORDERED ARYAN BROTHERHOOD ASSOCIATE MICHAEL WAGNER TO ASSAULT A BLACK INMATE NAMED BUTCH JOHNSON BECAUSE JOHNSON HAD ASSAULTED A WHITE INMATE.

THEN, IN OVERT ACT 250, THE GOVERNMENT ALLEGED THAT BUTCH JOHNSON WAS ACTUALLY ASSAULTED BY MICHAEL WAGNER AS ORDERED. BUT OVERT ACTS ARE NOT INDIVIDUAL CONSPIRACIES, NOR ARE THEY "ACTS INVOLVING MURDER" SEPERATELY CHARGEABLE AND PUNISHABLE UNDER STATE LAW. THEY ARE NOT, THAT IS TO SAY, VALID RICO PREDICATES IN AND OF THEMSELVES, ALTHOUGH IT IS ABSOLUTELY CLEAR THAT THE GOVERNMENT THOUGHT THEY WOULD WORK JUST AS WELL.

(20)

Case 8:02-cr-00938-R Document 9715-0 Filed 05/18/16 Page 99 of 342 Page ID #:38918
Case 2:02-cr-00938-R Document 9715 Filed 05/18/16 Page 21 of 43 Page ID #:38919
#:38918

AND TO SAY THAT THE WAR WITH THE D.C. BLACKS WAS ONLY A SINGLE MURDER CONSPIRACY FOR PURPOSE OF RACKETEERING ACT THIRTY - SEVEN, BUT THAT IT WAS MULTIPLE CONSPIRACIES FOR THE PURPOSE OF SHOWING THAT THE PETITIONER'S RICO CONSPIRACY INCLUDED THE REQUISITE PATTERN OF RACKETEERING ACTIVITY, DEFIES LOGIC. EITHER THE WAR WAS A SINGLE CONSPIRACY, OR IT WAS MULTIPLE CONSPIRACIES, BUT IN NO EVENT WAS IT BOTH.

THE ESSENTIAL ELEMENT OF THE STATUTORY CRIME OF CONSPIRACY IS THE EXISTENCE OF AN "AGREEMENT". AS THE SUPREME COURT STATED IN BRAVERMAN V. UNITED STATES, 317 U.S. 49 (1942), "THE GIST OF THE CRIME OF CONSPIRACY AS DEFINED BY THE STATUTE IS THE AGREEMENT... OF THE CONSPIRATORS TO COMMIT ONE OR MORE UNLAWFUL ACTS." BECAUSE IT IS THE CONSPIRATORIAL AGREEMENT THAT THE STATUTE PUNISHES, A SINGLE AGREEMENT MAY HAVE MULTIPLE OBJECTS. Id. 317 U.S. AT 53-54. SEE, e.g., HAIRSTON V. UNITED STATES, 905 A.2d 765 (D.C. CT. OF APP. 2006) (INDICTMENT CHARGING SINGLE COUNT OF PARTICIPATION IN A VAST, GENERALIZED CONSPIRACY TO ASSAULT AND MURDER RIVAL GANG MEMBERS). SEE ALSO, BUI V. HEDGPETH, 2009 U.S. DIST. LEXIS 124401, FN 8 (CENTRAL DISTRICT OF CA) (UNDER CALIFORNIA LAW, " A SINGLE AGREEMENT TO COMMIT A NUMBER OF CRIMES IS ONLY ONE CONSPIRACY, REGARDLESS OF THE NUMBER OF CRIMES

(21)

sought to be committed or that are committed, under that conspiracy."); <u>United States V. Gordon</u>, 844 F.2d 1397, 1401 (9th Cir. 1988) (the evidence of a single conspiracy asks "whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy.")

As the special verdict form made clear, it was incumbent upon the government to prove beyond a reasonable doubt that the petitioner's RICO conspiracy agreement also included at least two underlying conspiratorial agreements in order to show the required pattern of racketeering activity. And the fact that all of the name-bearing special verdict form acts had corresponding racketeering act predicates in the original indictment, but the three conspiracies involving Walter Butch Johnson and the two unnamed D.C. Black inmates did not correspond to any racketeering act predicate other than racketeering act thirty-seven (the race war conspiracy), shows clearly that the latter three were one

Special verdict form acts / racketeering acts (R.A.):

i. Ismael Benitez Mendez: R.A. #9;

(22)

2. Jimmy Lee Inman: R.A. #20;

3. Frank Ruspoli: R.A. #35;

4. Erving Bond: R.A. #46;

5. Walter Johnson (Wakial): R.A. #34;

6. Walter Johnson (Buth/Prince): R.A. #37;

7. A D.C. Black Inmate: R.A. #37;

8. A Second D.C. Black Inmate: R.A. #37.

Of course, under the Government's theory, the conspiracy to murder D.C. Black Inmates involved essentially every D.C. Black Inmate in the Federal prison system. So, in using that theory for its methodology in drafting the special verdict form, there was nothing to prevent the Government from listing a veritable multitude of pattern acts (e.g., a third, fourth, fifth, sixth, seventh, etc., Ad Infinitum, unnamed Black Inmate). But the Government's methodology was fatally flawed and statutorily unauthorized.

Again, according to the RICO statute, "Racketeering Activity" means any act involving murder which is chargeable under state law and punishable by more than one year imprisonment. 18 U.S.C. § 1961(1)(A). And a "pattern" of racketeering activity must consist of at least two such chargeable and punishable acts. 18 U.S.C.

(23)

§ 1961 (5). IN ORDER TO CONVICT THE PETITIONER OF RICO CONSPIRACY IT WAS NECESSARY TO PROVE THAT THE SCOPE OF HIS CONSPIRATORIAL AGREEMENT ENCOMPASSED HIS ACKNOWLEDGMENT THAT EITHER HE OR SOME MEMBER OF THE RICO CONSPIRACY WOULD AGREE TO COMMIT SUCH A PATTERN OF RACKETEERING ACTIVITY. IN CONVICTING THE PETITIONER AT TRIAL, THE JURY "UNANIMOUSLY FOUND THE DEFENDANT AGREED THAT ACTS INVOLVING MURDER WOULD BE COMMITTED" AND "IDENTIF[IED] WHICH ACTS INVOLVING MURDER [IT] UNANIMOUSLY FOUND THAT THE DEFENDANT AGREED WOULD BE COMMITTED" AS FOLLOWS:

6. MURDER OF WALTER JOHNSON (BUTCH/PRINCE): YES ✓ NO ___.

7. CONSPIRACY TO MURDER A D.C. BLACK INMATE (EXCLUDING ERVING BOND AND WALTER JOHNSON (BUTCH/PRINCE): YES ✓ NO ___.

8. CONSPIRACY TO MURDER A SECOND D.C. BLACK INMATE (EXCLUDING ERVING BOND AND WALTER JOHNSON (BUTCH/PRINCE): YES ✓ NO ___.

CLEARLY, THESE SO-CALLED "ACTS" WERE NOTHING MORE THAN INTERRELATED OBJECTS OF A SINGLE CONSPIRATORIAL AGREEMENT (WHICH IS THE "ACT" UNDER CONSPIRACY LAW).

(24)

AND THIS FACT IS OBVIOUS FROM THEIR WORDING ALONE.
ACTS 7 AND 8 BOTH MENTION BUTCH JOHNSON IN THEIR
CONSPIRATORIAL CONTEXT TO AVOID UNANIMITY CONFUSION,
THEY ARE BOTH EXPLICITELY IDENTIFIED AS THE SAME
CONSPIRACY TO MURDER A FIRST AND A SECOND UNNAMED
D.C. BLACK INMATE, AND ACT 6 IS THE CONSPIRACY TO
MURDER BUTCH JOHNSON BECAUSE HE IS THE D.C. BLACK
INMATE WHO STARTED THE WAR WITH THE D.C.
BLACK INMATES.

THE JURY'S VERDICT WAS UNANIMOUS THAT THE
PETITIONER AGREED THAT A CONSPIRACY TO MURDER D.C.
BLACK INMATES WOULD BE COMMITTED, BUT BECAUSE THAT
CONSPIRACY WAS ENTIRELY SINGULAR, THERE IS NO JURY
VERDICT THAT UNANIMOUSLY FOUND THE PETITIONER GUILTY
OF CONSPIRING TO VIOLATE RICO, AS PROHIBITED BY
18 U.S.C. § 1962 (d), BECAUSE HIS CONSPIRATORIAL AGREEMENT
WAS NEVER PROVED TO ENCOMPASS MORE THAN ONE ACT
INVOLVING MURDER CHARGEABLE AND PUNISHABLE UNDER
STATE LAW. ACCORDINGLY, AND BEYOND ITS CONSTITUTIONAL
IMPLICATIONS, THIS MATTER CONSTITUTES AN ERROR IN
THE RECORD ARISING FROM OVERSIGHT OR OMISSION
THAT MAY BE CORRECTED BY THE COURT AT ANY TIME
PURSUANT TO RULE 36 OF THE FEDERAL RULES OF
CRIMINAL PROCEDURE SIMPLY BY CHANGING THE WORD

(25)

"GUILTY" TO "NOT GUILTY".

C. THE PETITIONER IS ACTUALLY
INNOCENT OF THE CRIME OF
RICO CONSPIRACY. HIS CONVICTION
AND SENTENCE IS INCONSISTENT
WITH THE RUDIMENTARY DEMANDS
OF FAIR PROCEDURE, AND, UNLESS
THIS COURT DECLARES THAT THE
VERDICT SHOULD BE SET ASIDE,
A MANIFEST INJUSTICE WILL
CONTINUE TO OCCUR.

THE PETITIONER REASSERTS AND INCORPORATES HEREIN
THE ENTIRETY OF HIS ARGUMENTS IN SUB-SECTIONS (A) AND (B)
ABOVE. TO THE EXTENT THAT SAID ARGUMENTS WERE NOT
PREVIOUSLY RAISED, THE PETITIONER ASSERTS THE PROCEDURAL
DEFAULT EXCEPTION OF ACTUAL INNOCENCE, AS RECOGNIZED
IN BOUSLEY V. UNITED STATES, 523 U.S. 614, 622, 140
L. ED. 2d 828, 118 S. CT. 1604 (1998). SEE ALSO,
UNITED STATES V. RATIGAN, 351 F.3d 957, 964-965
(9TH CIR. 2003) (IMPLYING, IN § 2255 APPEAL,
THAT ACTUAL INNOCENCE EXCEPTION WOULD APPLY IN

(26)

FEDERAL BANK ROBBERY CASE IF DEFENDANT COULD HAVE SHOWN, NOT ONLY THAT FDIC EVIDENCE AT TRIAL WAS INSUFFICIENT, BUT THAT BANK IN QUESTION IN FACT WAS NOT FDIC INSURED AT TIME OF CRIME).

UNLIKE RATIGAN, THE PETITIONER'S CASE IS NOT ONE OF EVIDENTIARY INSUFFICIENCY DUE TO MERE PROSECUTORIAL INADVERTENCE OR OVERSIGHT THAT COULD HAVE EASILY BEEN PREVENTED HAD THE PROPER QUESTION BEEN POSED. (IN RATIGAN, THE BANK WAS FDIC INSURED, A WITNESS TESTIFIED TO THAT FACT, BUT THE QUESTION WAS PHRASED IN THE PRESENT TENSE AT THE TIME OF TRIAL INSTEAD OF THE PAST TENSE AT THE TIME OF THE CRIME). IN THE PETITIONER'S CASE, NO AMOUNT OF REPHRASING OR ADDITIONAL QUESTIONING COULD HAVE CHANGED THE FACT THAT, UNDER THE LAW, THE EVIDENCE WAS INSUFFICIENT TO PROVE GUILT. NO UNDERLYING STATE CRIMES OCCURRED, AND EVEN IF THE TEXT OF THE STATUTE (e.g., "CHARGEABLE UNDER STATE LAW") COULD BE CONTORTED TO INCLUDE FEDERAL ENCLAVE COMMISSIONS, THE SINGLE STATE LAW MURDER CONSPIRACY COULD NOT BE SPLIT INTO TWO OR MORE NECESSARY PREDICATES.

CONSEQUENTLY, BECAUSE THE EVIDENCE WAS SO LACKING, AND BECAUSE NO POST-TRIAL ALTERATION OF WHAT ACTUALLY OCCURRED WOULD CHANGE THE EQUATION, THE

PETITIONER IS ACTUALLY INNOCENT OF VIOLATING THE RICO CONSPIRACY STATUTE AND IT WOULD BE A MISCARRIAGE OF JUSTICE TO REFUSE TO OVERTURN HIS CONVICTION ON A MERE PROCEDURAL DEFAULT OVER WHICH HE HAD NO CONTROL IN THE FIRST PLACE.

D. TRIAL COUNSELS' FAILURE TO MOVE UNDER RULE 29 FOR A JUDGMENT OF ACQUITTAL DEPRIVED THE PETITIONER OF HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT AND EXCUSES ANY PROCEDURAL DEFAULT FORFEITURE OR WAIVER.

DEFENSE COUNSELS' FAILURE TO MOVE FOR A JUDGMENT OF ACQUITTAL CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL IF THAT MOTION WOULD HAVE BEEN SUCCESSFUL. SEE, e.g., UNITED STATES V. WATTS, 532 F. SUPP. 354 (D.D.C. 1981).

THIS ISSUE REQUIRES VERY LITTLE ELABORATION AND ESSENTIALLY COMES DOWN TO WHETHER OR NOT THE INSUFFICIENCY OF EVIDENCE ARGUMENTS PRESENTED IN THIS §2255 MOTION HAVE MERIT AND WOULD HAVE REQUIRED

(28)

A JUDGMENT OF ACQUITTAL AT TRIAL HAD A RULE 29 MOTION BEEN MADE. THE PETITIONER RESPECTFULLY SUBMITS THAT SUCH A MOTION, IF MADE, WOULD HAVE, OR AT THE VERY LEAST SHOULD HAVE, RESULTED IN HIS ACQUITTAL AND THAT TRIAL COUNSEL'S OMISSION IN THAT REGARD NECESSARILY CONSTITUTES INEFFECTIVE ASSISTANCE.

E. APPELLATE COUNSEL'S FAILURE TO NOTICE OR ARGUE THE ISSUES PRESENTED HEREIN, WHILE ARGUING MUCH WEAKER, EVEN FRIVOLOUS ONES INSTEAD, RESULTED IN A DENIAL OF THE PETITIONER'S RIGHTS UNDER THE FIFTH AND SIXTH AMENDMENTS TO EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL, THUS EXCUSING ANY PROCEDURAL FORFEITURE OR WAIVER.

WHEREAS THE ALLEGATION OF TRIAL COUNSEL'S INEFFECTIVENESS IS MORE OR LESS LIMITED TO THE SINGLE RULE 29 OMISSION (SIMPLY BECAUSE THAT MOTION, IF MADE ON THE GROUNDS HEREIN SUBMITTED, WOULD HAVE

(29)

REQUIRED A JUDGMENT OF ACQUITTAL), THE STORY OF APPELLATE COUNSEL'S PREJUDICIAL PERFORMANCE IS COMPREHENSIVE AND COMPELLING.

IN ACCORDANCE WITH THE NINTH CIRCUIT'S ASSESSMENT-FORMULA (THAT A PETITIONER MAY ESTABLISH CONSTITUTIONALLY INADEQUATE PERFORMANCE IF HE SHOWS THAT APPELLATE COUNSEL OMITTED SIGNIFICANT AND OBVIOUS ISSUES WHILE PURSUING ISSUES THAT WERE CLEARLY AND SIGNIFICANTLY WEAKER [SEE BROYLES V. LEWIS, 1995 U.S. APP. LEXIS 25878 (9TH CIR.) (CITING MAYO V. HENDERSON, 13 F. 3d 528, 533 (2d CIR. 1994))]], A COMPARISON OF THE ISSUES ON APPEAL, TO THOSE ALLEGED HEREIN, IS IN ORDER. AND TO THIS END, A MORE EFFECTIVE AND INVALUABLE AID THAN THE NINTH CIRCUIT'S OWN OPINION COULD HARDLY BE ENVISIONED.

THE PETITIONER'S DIRECT APPEAL IS PUBLISHED AS UNITED STATES V. SCOTT, 642 F.3d 791 (9TH CIR, 2011). WITH REGARD TO THE RELATIVE WEAKNESS OF THE ISSUES THERE PRESENTED, IN COMPARISON TO THESE RAISED HEREIN, THE FOLLOWING EXCERPTS ARE REVEALING:

SCOTT SEEKS TO OVERTURN THE JURY'S VERDICT BECAUSE THE DISTRICT COURT

(30)

ABUSED ITS DISCRETION IN LIMITING
VOIR DIRE AND CROSS-EXAMINATION,
IN PROHIBITING JUROR NOTE-TAKING,
IN REFUSING CERTAIN JURY INSTRUCTIONS,
AND IN FAILING TO MAKE A PRELIMINARY
DETERMINATION ON THE ADMISSIBILITY OF
CO-CONSPIRATOR STATEMENTS. SCOTT ALSO
CLAIMS THAT THE JUDGE ENGAGED IN
MISCONDUCT THROUGH HIS INTERRUPTIONS
AND DEMEANING REMARKS AIMED AT
DEFENSE COUNSEL.

COURT'S RESPONSE TO VOIR DIRE ARGUMENT:

IN THE QUESTIONNAIRE AND DURING VOIR
DIRE, THE PROSPECTIVE JURORS WERE ASKED
ABOUT RACIAL BIASES AND WHETHER THEY
FELT THEY COULD NOT BE IMPARTIAL. THE
QUESTIONS SCOTT PROPOSED WERE EITHER
REPETITIVE OF THESE QUESTIONS OR COULD HAVE
ADDED "FUEL TO THE FLAMES" IN SUGGESTING THE
PRESENCE OF CONTROVERSIAL ISSUES. (CITATION
OMITTED). WE ARE SATISFIED THAT THE
DISTRICT COURT HERE PROPERLY EXERCISED
ITS DISCRETION.

(31)

COURT'S RESPONSE TO
CROSS-EXAMINATION ARGUMENT:

ON MOST OCCASIONS, SCOTT WAS ABLE TO ELICIT TESTIMONY
FROM THE WITNESS REGARDING RACIAL SEGREGATION
IN PRISON. THE QUESTIONS THAT THE DISTRICT COURT
PREVENTED DEFENSE COUNSEL FROM ASKING WERE SIMPLY
REPETITIVE OR FAR AFIELD OF THE ISSUES IN THE CASE.
(CITATION OMITTED). ON ANOTHER OCCASION,
DEFENSE COUNSELS' QUESTIONS ON RACE WERE
OUTSIDE THE SCOPE OF ANY TESTIMONY ON
DIRECT EXAMINATION. WE HAVE PREVIOUSLY
NOTED THAT THE DISTRICT COURT "IS
RESPONSIBLE FOR DETERMINING THE RELEVANCE
OF A GIVEN TOPIC AND THE EXTENT OF
CROSS-EXAMINATION TO BE PERMITTED ON
THAT TOPIC." (CITATION OMITTED). IN
PROHIBITING SUCH QUESTIONING ON A FEW
OCCASIONS, THE DISTRICT COURT DID NOT
ABUSE ITS DISCRETION. (CITATION OMITTED)

COURT'S RESPONSE TO
JUROR NOTE-TAKING ARGUMENT:

THE DISTRICT COURT HAS VERY BROAD

(32)

DISCRETION IN DECIDING WHETHER TO
ALLOW NOTE-TAKING, AND IT PROPERLY
EXERCISED THAT DISCRETION HERE.

COURTS RESPONSE TO
JURY INSTRUCTION ARGUMENT:

SCOTT DID NOT PRESENT OR RELY UPON THE
MUTUAL COMBAT THEORY AT TRIAL AND,
THUS, THERE WAS NO ERROR IN THE
DISTRICT COURTS' FAILURE TO GIVE THE
INSTRUCTION SUA SPONTE, MUCH LESS
PLAIN ERROR.

☆ ☆ ☆

AS TO THE IMPERFECT SELF-DEFENSE
INSTRUCTION, THERE WAS ALSO NO EVIDENCE
IN THE RECORD TO SUPPORT SUCH AN
INSTRUCTION:

☆ ☆ ☆

SIMILARLY, SCOTT ARGUES THE DISTRICT
COURT VIOLATED FEDERAL RULE OF CRIMINAL
(33)

PROCEDURE 30(b) BY FAILING TO PROVIDE
HIS ATTORNEY WITH THE JURY INSTRUCTIONS
EARLIER, THUS PREVENTING HIS ATTORNEY FROM
INTELLIGENTLY FORMULATING HER CLOSING ARGUMENT.
EVEN ASSUMING THE DISTRICT COURT FAILED TO
COMPLY WITH RULE 30(b), SCOTT HAS NOT
SHOWN THAT HIS COUNSELS' CLOSING ARGUMENTS
WERE PREJUDICIALLY AFFECTED.

COURTS' RESPONSE TO ARGUMENT ON CO-CONSPIRATOR
STATEMENT ADMISSIBILITY DETERMINATION:

[W]E ARE SATISFIED FROM READING THE
RECORD THAT THE DISTRICT COURT UNDERSTOOD
IT WAS REQUIRED TO MAKE THE INITIAL
DETERMINATION ABOUT THE EXISTENCE OF A
CONSPIRACY THAT WOULD ALLOW FOR THE
ADMISSION OF CO-CONSPIRATOR STATEMENTS.

COURT'S RESPONSE TO
JUDICIAL MISCONDUCT ARGUMENT:

ALTHOUGH MANY OF THE JUDGE'S COMMENTS
AND INTERVENTIONS WERE INCONSISTANT
WITH STANDARDS OF JUDICIAL DECORUM,

(34)

WE NEVERTHELESS CONCLUDE THAT THEY DID
NOT RISE TO A LEVEL THAT REQUIRES
REVERSAL.

IN LIGHT OF THE DISTRICT COURT JUDGES'
EXTENSIVE CURATIVE INSTRUCTIONS, THE
STRENGTH OF THE EVIDENCE OF SCOTT'S GUILT
ON THE OFFENSES FOR WHICH HE WAS
CONVICTED, AND THE JURY'S INDEPENDENCE
IN REJECTING FIVE OF THE ALLEGED PREDICATE
ACTS, WE CONCLUDE THAT SCOTT WAS NOT
PREJUDICED BY ANY IMPROPER CONDUCT
ON THE JUDGE'S PART, EITHER INDIVIDUALLY
OR IN THE AGGREGATE.

APPELLATE COUNSEL ALSO RAISED VARIOUS
SENTENCING ISSUES, ALL OF WHICH THE COURT
REJECTED.

CONSEQUENTLY, JUST FROM THE NINTH
CIRCUIT'S WRITTEN DECISION IT IS OBVIOUS
THAT THE ISSUES APPELLATE COUNSEL DID
PURSUE WERE CLEARLY AND SIGNIFICANTLY
WEAKER THAN THE PETITIONER'S ARGUMENT
HEREIN REGARDING THE INSUFFICIENCY OF THE

(35)

EVIDENCE (WHICH ARGUMENT, CONTAINED IN SUB-SECTIONS (A) AND (B) ABOVE, IS INCORPORATED INTO THIS ARGUMENT BY REFERENCE). BUT THERE ARE ADDITIONAL REASONS, NOT APPARENT FROM THE PUBLISHED DECISION, WHICH FURTHER DEMONSTRATE THE OVERALL INEFFECTIVENESS OF APPELLATE COUNSEL.

FIRST, JUST A QUICK GLANCE AT APPELLATE COUNSEL'S OPENING BRIEF REVEALS OVER 170 GLARING MISSPELLINGS OR TYPOGRAPHICAL ERRORS, NOT TO MENTION SEVERAL PASSAGES THAT ARE WHOLLY GRAMMATICALLY INDECIPHERABLE. TAKE THE LAST LINE OF PARAGRAPH 2 ON PAGE 74, FOR EXAMPLE:

> WITNESSES, TO THE ORDERS TO KILL
> D.C. BLACKS WHERE IS AOB
> IS THIS?).

OR THE FIRST SENTENCE OF PARAGRAPH 3 ON PAGE 111:

> IN DETERMINING PREJUDICE SUFFERED
> BY APPELLANT, IT IS IRRELEVANT THAT
> THE REQUESTED INSTRUCTION WAS
> "FAULTY," THE GOVERNMENT'S
> CHARACTERIZATION OF THE APPELLANTS'

(36)

REQUEST IN <u>WRIGHT</u>, SUPRA 280

OF COURSE IT IS POSSIBLE THAT THE VERSION
OF THE OPENING BRIEF THAT COUNSEL SENT TO THE
PETITIONER WAS ONLY A ROUGH DRAFT (IT CERTAINLY
HAS THAT APPEARANCE), BUT THIS IS A MATTER THAT
CAN EASILY BE ASCERTAINED EXAMINING THE RECORD.
AND IF IT TURNS OUT TO BE THE CASE THAT THE OPENING
BRIEF COUNSEL SENT TO THE PETITIONER WAS THE SAME ONE
SHE FILED WITH THE NINTH CIRCUIT, THERE CAN BE
ABSOLUTELY NO EXCUSE FOR SUCH SHODDINESS.

AND BEYOND THE FACT THAT APPELLATE COUNSEL'S WORK
PRODUCT IS RIDDLED WITH NUMEROUS TYPOGRAPHICAL
AND GRAMMATICAL ERRORS THAT BESPEAK A COMPLETE LACK
OF RESPECT FOR THE ESTEEMED JUDGES OF THE COURT OF
APPEALS, MUCH OF THE BRIEFS' SUBSTANCE WAS TOTALLY
IRRELEVANT. A CASE IN POINT IS THE INSTRUCTIONAL ISSUED
RAISED BY APPELLATE COUNSEL AS TO IMPERFECT SELF-DEFENSE
WHICH, AS THE NINTH CIRCUIT NOTED " SCOTT ASSERTED... IN
RELATION TO HIS STABBING OF ERVING BOND IN THE SHOWER."
BUT AS THE SPECIAL VERDICT FORM MADE CLEAR, THE JURY
CONCLUDED THAT THE ERVING BOND INCIDENT WAS UNRELATED
TO THE RICO CONSPIRACY CHARGE, SO THE FAILURE
TO GIVE THE INSTRUCTION WAS A NON-ISSUE.

(37)

THE BOTTOM LINE IS BEYOND DISPUTE:
THE INSUFFICIENCY OF THE EVIDENCE ARGUMENTS IN THIS
§ 2255 MOTION ARE MUCH STRONGER THAN THE ISSUES
RAISED BY APPELLATE COUNSEL AND, HAD THEY BEEN
RAISED INSTEAD OF THOSE THAT WERE THERE IS NO DOUBT
BUT THAT THE NINTH CIRCUIT WOULD HAVE GRANTED THE
APPEAL AND DIRECTED THIS COURT TO ENTER A JUDGMENT
OF ACQUITTAL, WITH THE ULTIMATE EFFECT BEING THAT
NO RETRIAL COULD OCCUR. BECAUSE APPELLATE COUNSEL'S
PERFORMANCE WAS UNREASONABLY DEFICIENT AND BECAUSE SUBSTANTIAL
PREJUDICE TO THE PETITIONER ENSUED THEREFROM, THE
PETITIONER WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL ON
APPEAL AND HE SHOULD THEREFORE BE EXCUSED FROM ANY
PROCEDURAL DEFAULT THAT MIGHT OTHERWISE PREVENT HIM FROM
PURSUING HIS INSUFFICIENCY OF EVIDENCE ARGUMENTS.


## F. NOVELTY


TO THE EXTENT THAT THIS COURT FINDS THAT THE ARGUMENTS
HEREIN MAY HAVE BEEN SUFFICIENTLY NOVEL AS TO EXCUSE TRIAL
OR APPELLATE COUNSEL FROM RAISING THEM, THE PETITIONERS'
PROCEDURAL DEFAULT SHOULD BE EXCUSED ON THE BASIS
OF SUCH NOVELTY AS WELL.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attached herein:

(a) At a preliminary hearing: UNKNOWN

(b) At arraignment and plea: UNKNOWN

(c) At trial: AMY JACKS

(d) At sentencing: AMY JACKS

(e) On appeal: GRETCHEN FUSILIER, P.O. BOX 305, CARLSBAD, CA 92018

(f) In any post-conviction proceeding: N/A

(g) On appeal from any adverse ruling in a post-conviction proceeding: N/A

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court at approximately the same time?

☐ Yes    ☑ No

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?

☑ Yes    ☐ No

(a) If so, give the name and location of the court which imposed sentence to be served in the future: WESTERN DISTRICT OF MISSOURI

(b) Give the date and length of sentence to be served in the future: SENTENCE BEING SERVED NOW; TOTAL OF 125 MONTHS; EXPIRES APPROXIMATELY 2016?

(c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed sentence to be served in the future?

☑ Yes    ☐ No

WHEREFORE, movant prays that the court grant him all relief to which he may be entitled in this proceeding.

N/A
_____
Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on SEPTEMBER 27, 2012
_____
Date

Steve I. Scott
_____
Signature of Movant

**MOTION**
**28 U.S.C § 2255**

# Certificate of Mailing

I, Steve Loren Scott, by my signature below, swear under penalty of perjury that three (3) conformed copies of the attached § 2255 motion to vacate were, this __3RD__ day of __October__, 2012, handed by me to a Florence USP-ADX unit team official in charge of accepting legal mail to be placed in the Florence USP-ADX outgoing legal mail system, with first-class, return receipt, certified mail postage prepaid, properly addressed to:

> Clerk
> United States District Court
> Central District of California
> 312 North Spring Street, Room G-8
> Los Angeles, CA 90012

Sworn to under penalty of perjury by __Steve Loren Scott__ on: __October 3, 2012__

Steve Loren Scott
55341-065
United States Penitentiary - ADX
P.O. Box 8500
Florence, Co 81226-8500



Name: STEVE LOREN SCOTT
Reg. No: 55341-065
U.S. PENITENTIARY MAX
P.O. BOX 8500
FLORENCE, CO 81226-8500

CERTIFIED MAIL

7011 3500 0000 4062 1396

Pro Se

SPECIAL
LEGAL MAIL

CLERK U.S. DISTRICT COURT
OCT - 5 2012
CENTRAL DISTRICT OF CALIFORNIA
BY

2255

Clerk, U.S. District Court
Central District of California
312 North Spring Street, Room G-8
Los Angeles, CA 90012

Administrative Maximum
P.O. Box 8500
Florence, CO 81226-8500

The enclosed letter was processed through special
mailing procedures for forwarding to you. The letter
has been neither opened nor inspected. If the writer
raises a question or problem over which this facility
has jurisdiction, you may wish to return the material
for further information or clarification. If the writer
encloses correspondence for forwarding to another
addressee, please return the enclosure to the above
address.



**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**
312 North Spring Street, Room G-8 Los
Angeles, CA 90012
Tel: (213) 894-7984

**SOUTHERN DIVISION**
411 West Fourth Street, Suite 1053
Santa Ana, CA 92701-4516
(714) 338-4570

**EASTERN DIVISION**
3470 Twelfth Street, Room 134
Riverside, CA 92501
(951) 328-4450

**TERRY NAFISI**
District Court Executive
and Clerk of Court

Thursday, October 11, 2012

**STEVE LOREN SCOTT #55341-065**
**U.S. PENITENTIARY- MAX**
**P.O. BOX 8500**
**FLORENCE, CO 81226-8500**

Dear Sir/Madam:

A ☐ Petition for Writ of Habeas Corpus was filed today on your behalf and assigned civil case number _____

A ☒ Motion pursuant to Title 28, United States Code, Section 2255, was filed today in criminal case number _____ and also assigned the civil case number **CV12- 8737 R**

A ☐ Motion for Extension of Time to File Habeas Corpus Petition was filed today on your behalf and assigned civil case number _____

Please refer to these case numbers in all future communications.

Please Address all correspondence to the attention of the Courtroom Deputy for:

☒ District Court Judge **Manuel Real** _____

☐ Magistrate Judge _____

at the following address:

☒ U.S. District Court
312 N. Spring Street
Civil Section, Room G-8
Los Angeles, CA 90012

☐ Ronald Reagan Federal
Building and U.S. Courthouse
411 West Fourth St., Suite 1053
Santa Ana, CA 92701-4516

☐ U.S. District Court
3470 Twelfth Street
Room 134
Riverside, CA 92501

The Court must be notified within fifteen (15) days of any address change. If mail directed to your address of record is returned undelivered by the Post Office, and if the Court and opposing counsel are not notified in writing within fifteen (15) days thereafter of your current address, the Court may dismiss the case with or without prejudice for want of prosecution.

Very truly yours,

Clerk, U.S. District Court

By: _SBOURGEO_____

Deputy Clerk

CV-17 (06/09)          **LETTER re FILING H/C PETITION or 28/2255 MOTION**

# EXHIBIT E

1
2
3
4
5
6
7
8                     UNITED STATES DISTRICT COURT

9                     CENTRAL DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,        )        CASE NO. CR 02-0938-R
                                      )                 LACV 12-8737-R
12              Plaintiff,            )
                                      )
13          vs.                       )        ORDER DENYING DEFENDANT'S
                                      )        MOTION TO VACATE, SET ASIDE OR
14                                    )        CORRECT SENTENCE BY A PERSON IN
     STEVE LOREN SCOTT,               )        FEDERAL CUSTODY
15                                    )
                Defendant.            )
16   _____ )

17

18          On October 6, 2006, Defendant Steve Loren Scott ("Defendant") was convicted of a Title 18

19   U.S.C. § 1962(d) Racketeer Influenced and Corrupt Organizations ("RICO") conspiracy charge

20   for conspiring to murder two people, while he was incarcerated in a Federal prison.  Defendant's

21   Motion to Vacate, Set Aside, Correct Sentence ("Defendant's Motion"), CR 02-938-R, ECF No.

22   6,978, p. 2.  Defendant's conviction was affirmed by the Ninth Circuit Court of Appeals on June

23   8, 2008.  *Id.* at 3; *see also* ECF No. 6,936.  Defendant also filed a petition to appeal the matter to

24   the United States Supreme Court, but his petition was denied on October 11, 2011.  Defendant's

25   Motion, p. 3.

26          Now, Defendant moves to vacate, set aside or correct his sentence, pursuant to Title 28

27   U.S.C § 2255, on the following grounds: (1) "[t]he predicates upon which the verdict rests do not

28   satisfy RICO's statutory definition of 'racketeering activity' under 18 U.S.C. § 1961(1)(A)" (*id.* at

6); (2) "[t]he three state murder conspiracy acts upon which the verdict depends were but a single conspiracy to murder . . . therefore, the evidence was insufficient to prove that the petitioner agreed that a 'pattern' of racketeering would take place" (*id*. at 18); (3) "[Defendant] is actually innocent of the crime of RICO Conspiracy" (*id*. at 26); (4) "[t]rial counsel's failure to move under [R]ule 29 for a judgment of acquittal deprived the petitioner of his right to effective assistance of counsel in violation of the Sixth Amendment and excuses any procedural default[,] forfeiture[,] or waiver" (*id*. at 28); and (5) Appellate counsel's failure to notice or even argue the issues presented [in the instant motion] . . . resulted in denial of [Defendant's] rights under the Fifth and Sixth Amendments to effective assistance of counsel on appeal, thus excusing any procedural forfeiture or waiver" (*id*. at 29). As discussed below, the Court rejects each of Defendant's contentions.

**(1) <u>The Predicates Upon Which the Verdict Rests Satisfy RICO's Definition of Racketeering Activity</u>**

Defendant's first argument, that the predicate offenses do not satisfy RICO's definition of racketeering activity, evidences a fundamental misunderstanding concerning what the Government must prove to establish a RICO conspiracy. "'Racketeering activity' means [] any act or threat involving murder . . . which is chargeable under State law and punishable by imprisonment for more than one year[.]" Title 18 U.S.C.S. § 1961. In this matter, Defendant is not disputing that the jury found he conspired to commit two murders. Instead, he contends that even if the murders had been committed, he could not have possibly been charged under any State law because the murders would have taken place "wholly and exclusively within the Territorial jurisdiction of a United States Penitentiary." Defendant's Reply, ECF No. 7,003, p. 8.

However, impossibility is not a defense to a conspiracy charge. In order to obtain a conviction for RICO conspiracy, the Government does not need to prove that the Defendant committed or agreed to commit two predicate acts himself, or even that any overt acts have been committed. *See Salinas v. United States*, 522 U.S. 52, 63, 139 L. Ed. 2d 352, 118 S. Ct. 469 (1997) ("There is no requirement of some overt act or specific act in the statute before us."). In fact, the Supreme Court has held:

> One can be a conspirator by agreeing to facilitate only some of the

2

acts leading to the substantive offense. It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself.

*Id*. at 65; *see also United States v. Feola*, 420 U.S. 671, 693, 95 S. Ct. 1255, 43 L. Ed. 2d 541 (1975) (discussing the values served by conspiracy law, including "protection of society from the dangers of concerted criminal activity"). The Ninth Circuit has further held that a conspiracy conviction may be sustained even where the goal of the conspiracy is impossible. *See, e.g., Rodriguez*, 360 F.3d 949, 957 (9th Cir. 2004) (where "the conspiracy arose out of a federal law enforcement sting operation, . . . the nonexistent status of the target drug traffickers [was] inapposite" because "[i]mpossibility is not a defense to [a] conspiracy charge"); *United States v. Bosch*, 914 F.2d 1239, 1241 (9th Cir. 1990) (rejecting the defendant's argument that, because the undercover agent never actually possessed cocaine, it was "legally impossible . . . to conspire to aid and abet a nonexistent offense"); *United States v. Everett*, 692 F.2d 596, 599 (9th Cir. 1982) (rejecting the defense of legal impossibility to a conspiracy charge where the conspiracy was with an undercover agent).

The verdict form in Defendant's underlying trial made sufficiently clear that the jury was only required to find that "defendant agreed that two or more acts of racketeering activity would be committed by some member or members of the conspiracy." Plaintiff's Opposition, ECF No. 6,999, Ex.1, p. 1. The fact that prosecution for the two murders under State law in this case may have been a legal impossibility is inapposite. Therefore, Defendant's conviction must be upheld as it furthers the goal of conspiracy law to address the "distinct evil" of a conspiracy to engage in a criminal enterprise. *Salinas*, 522 U.S. at 67.

### (2) The Evidence Was Sufficient to Prove That the Defendant Agreed That a Pattern of Racketeering Would Take Place

Defendant contends that the two acts of murder he conspired to commit constitute insufficient evidence of a pattern of racketeering because the agreement is only one conspiracy. Defendant's Reply, ECF No. 7,003, p. 36-37 ("[E]ven if a hundred altogether, [the acts involving murder] were only chargeable under State law and punishable one time as unit within a single

3

State murder conspiracy charge.").  However, Defendant cites no authority for his conclusory proposition that each conspiracy would not be separately chargeable and punishable under State law.  As stated above, "racketeering activity" includes any act or threat involving murder which is chargeable under State law and punishable by imprisonment for more than one year.  *See* Title 18 U.S.C.S. § 1961.  And a pattern of racketeering activity "requires at least two acts of racketeering activity." *Id*. § 1961(5).  Here, the jury found that each conspiracy to commit murder constituted an act of racketeering, and two such acts make a pattern of racketeering activity.  Thus, the evidence was sufficient to prove that Defendant agreed that a pattern of racketeering would take place.

### (3) Defendant Has Not Met His Burden of Establishing Actual Innocence

Defendant contends that he is actually innocent because, as discussed above, (1) he could not possibly have been charged under State law, and (2) his conspiracies to commit two murders actually constitute one conspiracy.  *See* Defendant's Petition, p. 21.  However, "'[a]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998).  "To establish actual innocence, petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Id*.  (internal quotation marks and citation omitted).

Here, Defendant does not deny that he actually conspired to murder two people.  And Defendant does not object to any of the evidence presented at the time of trial or present new evidence to this Court.  Instead, he relies on his legal insufficiency claims discussed above, which the Court rejects.  Thus, Defendant has not met his burden of establishing actual innocence.

### (4) Defendant's Ineffective Assistance of Counsel Claims Have No Merit

Defendant contends that he received ineffective assistance at trial and during the course of his appeal because his attorneys failed to raise the issues discussed above.  In order to show that counsel was ineffective, petitioner must demonstrate that (1) defense counsel's representation "fell below an objective standard of reasonableness," and (2) counsel's deficient performance prejudiced petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland v.*

4

*Washington*, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Here, the contentions that Defendant complains about not being raised have no merit. Therefore, his attorneys' refusals to raise the same were neither below an objective standard of reasonableness nor prejudiced petitioner. For these reasons, Defendant's petition must be denied.

IT IS HEREBY ORDERED that Defendant's Title 28 U.S.C. § 2255 Motion to Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody is DENIED, and this action is DISMISSED with prejudice.

Dated: June 5, 2013.

_____
MANUEL L. REAL
UNITED STATES DISTRICT JUDGE

5

# EXHIBIT F

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 129 of 342    Page ID
#:38948

UNITED STATES DISTRICT COURT

1

1                UNITED STATES OF AMERICA
                 UNITED STATES DISTRICT COURT
2            CENTRAL DISTRICT OF CALIFORNIA
                     WESTERN DIVISION
3
                        - - -
4            HONORABLE MANUEL L. REAL
         UNITED STATES DISTRICT JUDGE PRESIDING
5                       - - -

6
    UNITED STATES OF AMERICA,         )
7                          )
         PLAINTIFF,        )
8                          )
    VS.                    )  CR 02-938(A)R
9                          )
    STEVEN LOREN SCOTT,              )
10                         )
         DEFENDANT.         )
11  _____)

12

13

14            JURY TRIAL - DAY 7

15     REPORTER'S TRANSCRIPT OF PROCEEDINGS
          WEDNESDAY, OCTOBER 4, 2006
16            A.M. SESSION
          LOS ANGELES, CALIFORNIA
17

18

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

19

20

21              SHERI S. KLEEGER, CSR 10340
           FEDERAL OFFICIAL COURT REPORTER
22           312 NORTH SPRING STREET, ROOM 402
            LOS ANGELES, CALIFORNIA 90012
23              PH:  (213)894-6604

24

25

              UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial/2002-938/10-04-07%20Day%206%20All%20Day.txt
Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 131 of 342    Page ID
#:38950

UNITED STATES DISTRICT COURT

2

1    APPEARANCES OF COUNSEL:

2    ON BEHALF OF PLAINTIFF:
          DEBRA W. YANG
3          UNITED STATES ATTORNEY
          BY:  JOEY BLANCH,
4          ASSISTANT UNITED STATES ATTORNEY
          1100 UNITED STATES COURTHOUSE
5          312 NORTH SPRING STREET
          LOS ANGELES, CA 90012

6

7    ON BEHALF OF DEFENDANT:
          LAW OFFICES OF AMY JACKS
8           BY:  AMY JACKS, ATTORNEY AT LAW
          LOS ANGELES, CA 90012

9

10

11

12

13

14

15

16

17

18

19

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 132 of 342    Page ID #:38951

20

21

22

23

24

25


UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 133 of 342    Page ID
#:38952

UNITED STATES DISTRICT COURT

3

1

2

3

4                           INDEX

5       EXHIBIT                        PAGE

6         316                    10

7

8

9

10

11

12

13

14

15

16

17

18

19

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 134 of 342    Page ID
#:38953

20

21

22

23

24

25


UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

4

1          LOS ANGELES, CALIFORNIA; WEDNESDAY, OCTOBER 4, 2006

2                    A.M. SESSION

3                       - - -

4

5          MS. WRIGHT:  This United States District Court is

6     now in session.  The Honorable Manuel L. Real presiding.

7          THE CLERK:  Item Number 1, CR 02-938(A)-R:  United

8     States of America versus Steven Loren Scott.

9          Counsel, your appearances, please.

10         MS. BLANCH:  Good morning, Your Honor.

11         Joey Blanch for the United States.  Heather Jordan

12    is also present at counsel table.

13         MS. JACKS:  Amy Jacks for Mr. Scott.

14         THE COURT:  All right.  You have the -- the charge

15    as I propose to give it.

16         And any objection by the Government to the charges

17    as I propose to give.

18         MS. BLANCH:  Only, Your Honor, that it's my

19    understanding that you are going to give a general verdict

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 136 of 342    Page ID
#:38955

20    form, which is what the Government does request, and you have

21    included the special verdict form that the Government

22    originally requested, but we are withdrawing that request.

23    And we don't think there should be both.

24           THE COURT:  Ms. Jacks, any objection from the

25    defendant.


                  UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 137 of 342    Page ID
#:38956

UNITED STATES DISTRICT COURT

5

1          MS. JACKS:  I have several objections.

2          First of all, the instructions, when I viewed them

3    just a few minutes ago for a period of approximately nine

4    minutes, aren't numbered -- not all of them are numbered, but

5    I think I took some notes.  Let me see if I can state my

6    objections.

7          The instructions as to the elements of the offense,

8    the enterprise, the effect on interstate commerce, the

9    association, the RICO elements, the pattern of racketeering

10   activity are all what appear to be submitted by the

11   Government as these DOJ model instructions.  I think I

12   previously stated that these instructions -- in writing that

13   these instructions are argumentative, they apply the facts to

14   the law, and they essentially put the Court in the position

15   of making the Government's argument.  For those reasons I

16   object to all of those instructions.

17          I would request the special verdict form.  I think

18   it is required that the jury be unanimous as to which

19   racketeering acts Mr. Scott conspired to commit, and because

20    there has been proof -- or attempts to prove numerous

21    racketeering acts, I think that --

22          THE COURT:  Well, the conspiracy is RICO.  The

23    conspiracy is RICO.

24          MS. JACKS:  Right.

25          It's a conspiracy to violate --

                    UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

6

1        THE COURT:  RICO.

2        MS. JACKS:  -- the racketeering --

3        THE COURT:  Yes.

4        MS. JACKS:  -- clause.

5        THE COURT:  And it starts at a time before, and all

6    of the overt acts by any of the -- of any of the defendants

7    are applicable to all defendants.

8        MS. JACKS:  But in order for Mr. Scott to conspire

9    to commit them, the jury has to agree which ones he conspired

10   to commit.

11       I also object to the Court's circumstantial

12   evidence instruction in that it leaves out the -- part of the

13   circumstantial evidence instruction, which I think I included

14   in my reasonable doubt instruction about if there are two

15   reasonable --

16       THE COURT:  No.  That is not -- that is not the

17   law.

18       MS. JACKS:  If there are --

19       THE COURT:  That is state law.  That is not the

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 140 of 342    Page ID
#:38959

20   law --

21          MS. JACKS:  There --

22          THE COURT:  -- in the Federal Courts.

23          MS. JACKS:  I submitted the -- the O'Malley cite to

24   the circumstantial evidence instruction included in the

25   reasonable doubt instruction, and that is not included in the


          UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 141 of 342    Page ID #:38960

UNITED STATES DISTRICT COURT

7

1    Court's.

2            THE COURT:  All right.

3            MS. JACKS:  Finally, the Court is instructing the

4    jury extensively on the crime of murder as it applies in

5    Colorado, in Missouri, and in California.  I don't have the

6    instructions in front of me.

7            I would note that the Court has submitted or has

8    not provided the jury any instructions on defenses to murder,

9    and specifically the two instructions that I requested were

10   the defenses to murders recognized in California, Missouri,

11   and Colorado, and that is of intoxication as it applies to an

12   individual's intent and an individual's ability to

13   deliberate, and imperfect self defense.  And in all of those

14   jurisdictions, if an individual acts with imperfect self

15   defense, that reduces the murder to a manslaughter, which

16   would not be a racketeering act.

17           THE COURT:  No.  The -- there is no evidence of

18   intoxication here upon which the jury could come to a

19   conclusion of intoxication, and there is no -- no evidence on

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 142 of 342    Page ID
#:38961

20    imperfect self defense.

21        MS. JACKS:  I would simply note that there is

22    evidence that Mr. Scott was under the influence of

23    prescription medicine at the time he stabbed Mr. Bond, and

24    certainly based on the testimony of Dr. Khalil, that

25    medication could have affected his ability to deliberate as


UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 143 of 342    Page ID #:38962

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

8

1    required by the Missouri --

2          THE COURT:  There is no evidence that at the time

3    he committed those offenses that there -- that he was under

4    the influence of any drug.

5          MS. JACKS:  I disagree.  The evidence is to the

6    contrary.

7          I would also --

8          THE COURT:  That would affect -- that would affect

9    his -- his intent.

10          MS. JACKS:  I would also note that there is

11    evidence from which the jury --

12          THE COURT:  His doctor -- doctor indicated he was

13    not an expert on Interferon.

14          MS. JACKS:  I would also note that the record

15    includes evidence from which the jury would conclude -- could

16    conclude that on the morning of November 24th, 2000,

17    Mr. Scott acted under a belief -- he heard Mr. Bond

18    sharpening a knife.  He was under --

19          THE COURT:  There's no evidence that he heard

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R     Document 7150     Filed 05/18/16     Page 144 of 342     Page ID #:38963

20    Mr. Bond sharpening any knife.

21          MS. JACKS:  Witness Scott Cupples testified to that

22    exact thing, and I have notes, given the last --

23          THE COURT:  Well, Mr. Cupples may have heard it,

24    but there's no evidence here that the defendant Scott heard

25    it.


                    UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

9

1          MS. JACKS:  Well, I guess the record speaks for

2    itself.

3          THE COURT:  Well, all right.

4          MS. JACKS:  But I do believe there is evidence from

5    which that instruction -- for which that instruction is

6    appropriate --

7          THE COURT:  All right.

8          MS. JACKS:  -- and I believe the Court's failure to

9    give those instructions, coupled with the Court's giving

10    argumentative instructions that argue the Government's case

11    is denying Mr. Scott is violating his Constitutional

12    rights --

13          THE COURT:  Oh, come on.  Come on, Counsel.

14    Please.

15          MS. JACKS:  -- and denying him due process of law.

16          THE COURT:  Please don't keep doing that.  That is

17    just silly talk.

18          MS. JACKS:  Your Honor, I don't think the

19    Fourteenth Amendment --

20          THE COURT:  Well --

21          MS. JACKS:  -- to the United States Constitution is

22   silly talk, and I'm surprised to hear that from the bench.

23          THE COURT:  There have been no violation of any

24   Constitutional rights here, Counsel, and you know it.

25          MS. JACKS:  I know there has been.


          UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

10

1          THE COURT:  No.  You have been arguing that to the

2   jury, and you know that that's improper.

3          All right.  Bring down the jury.

4          Do you have another exhibit to offer?

5          MS. JACKS:  I do.  Actually, although it was

6   reported to have been delivered last night, it was delivered

7   this morning.  And it -- I think we have -- I think your

8   clerk has requested that we mark that 316.

9          THE COURT:  All right.  Any objection.

10          MS. BLANCH:  No, Your Honor.

11          THE COURT:  316 in evidence.

12          (Exhibit Number 316 admitted into evidence.)

13          MS. JACKS:  And, Your Honor, there was one

14   stipulation about the inmate history quarters that we had

15   requested that the Court read to the jury.  I would reiterate

16   that request and ask the Court to do that.

17          THE COURT:  Which?  Which?

18          MS. JACKS:  We found that last night.

19          Thank you.  It's Government's Exhibit 150.

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 148 of 342    Page ID #:38967

20          THE COURT:  There it is.

21          (The following was held in the presence of the

22      jury.)

23          THE COURT:  All right.  Let the record show the

24      jury is present and in their proper places.  The defendant is

25      present with his counsel.


                UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R     Document 7150     Filed 05/18/16     Page 149 of 342     Page ID #:38968

UNITED STATES DISTRICT COURT

11

1        All right.  There is one -- one stipulation that

2    has to be read to you.  And that is an agreement between the

3    Government and the defendant that:

4        The Federal Bureau of Prisons keeps records of

5    where each inmate is housed.  These records are called the

6    Inmate Quarters Histories.  How detailed the Inmate Quarters

7    Histories are depends on the record keeping requirements at

8    the time for each institution.  For example, sometimes an

9    Inmate Quarters History will detail the exact cell in which

10    an inmate was housed.  At other times an Inmate Quarters

11    History will detail only the cell block or the institution

12    where the inmate was housed.

13        The United States Medical Center for Federal

14    Prisoners in Springfield, Missouri, does not keep records of

15    the cell assignments of inmates housed in Unit 21 E.  The

16    Bureau of Prisons has searched for records of the actual cell

17    assignment but cannot find such records.

18        During the course of this trial the Inmate Quarters

19    Histories for a number of inmates will be introduced -- has

20    been introduced.  These records are true and accurate copies

21    of the records maintained by the Federal Bureau of Prisons,

22    and the parties stipulate that they may be introduced into

23    evidence without further foundation.

24            And that's it.  That's Exhibit 316, and that has

25    been -- has been received in evidence.


            UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

12

1        All right.  Call your next witness, Ms. Jacks.

2        MS. JACKS:  Your Honor, I think we finished with

3    witnesses and we have, outside the presence of the jury,

4    admitted various items of evidence.

5        THE COURT:  Does the defense now rest?

6        MS. JACKS:  We do.

7        THE COURT:  Any rebuttal.

8        MS. BLANCH:  No, Your Honor.

9        THE COURT:  We will hear your opening summation.

10        MS. BLANCH:  Good morning, ladies and gentlemen.

11        In order to convict Steve Loren Scott of Count II

12    in the indictment, which is conspiracy to violate the RICO

13    laws, the Government has to prove a number of things.  The

14    Government has to prove first that the enterprise would be

15    established; that he agreed that the enterprise would affect

16    interstate commerce.  We have to prove beyond a reasonable

17    doubt that the defendant agreed that he would be associated

18    with the enterprise.  And lastly, we have to prove that the

19    defendant knowingly agreed to participate or conduct in the

20    affairs of the enterprise through a pattern of racketeering

21    activity.

22         Now, that sounds a little bit complicated; so I

23    want to talk to you a second about what the Government

24    doesn't have to prove.  We don't have to prove that the

25    Aryan Brotherhood ever existed.  We don't have to prove that


UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 153 of 342    Page ID #:38972

UNITED STATES DISTRICT COURT

13

1    this defendant ever actually did anything.  We don't have to

2    prove that anyone in the Aryan Brotherhood ever actually did

3    anything.

4         What we have to prove is that this defendant agreed

5    with other members of the conspiracy that a racketeering

6    organization would be formed.  We have to prove that this

7    defendant agreed that he would be associated with this future

8    enterprise.  And we have to prove that this defendant agreed

9    that at some point in the future, some co-conspirator, some

10    member of the conspiracy, would commit two racketeering acts.

11    And in this case the racketeering acts are crimes involving

12    murder and crimes involving drug trafficking.

13         So everything else after that is just gravy.

14         We have gone a step further.  We have proved that

15    the Aryan Brotherhood actually existed.  I don't think there

16    is really any doubt about that.  The Aryan Brotherhood

17    existed.

18         THE COURT:  That is not relevant, Counsel.

19         MS. BLANCH:  Thank you, Your Honor.

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 154 of 342    Page ID
#:38973

20        The evidence has shown that the Aryan Brotherhood

21   actually existed, and the evidence has shown that the Aryan

22   Brotherhood existed an a criminal organization; that the

23   purpose of that group was criminal.

24        I direct your attention to Government's Exhibit 1.

25   This is a document that was found in David Sahakian's cell.


          UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

14

1    David Sahakian is a prominent member of the Aryan

2    Brotherhood.

3          I've highlighted just a few sections on this

4    document, which you are going to be able to see when you go

5    back to the jury room.

6          At the time this document was formed, the Aryan

7    Brotherhood was reorganizing their organization, and they put

8    in writing the purpose of the Aryan Brotherhood.  They say,

9    "Our primary goal is to transform us from a dysfunctional

10   prison gang into a viable and productive criminal

11   organization inside prison and on the streets.  The purpose

12   of this organization is to provide us with material and

13   monetary assets through illegal and legal activities."

14          If you go to the end, it says, "We are deserving of

15   more than just being just a broke, dysfunctional jailhouse

16   bully.  This is about us becoming the very best possible

17   criminal organization.

18          Now, ladies and gentlemen, I submit to you that

19   this document alone proves that the Aryan Brotherhood was a

20    criminal organization and that they were organized.  They had

21    a structure.  They had governors, a commission, a council,

22    foot soldiers, and the goal of their organization was

23    criminal.

24            And you have heard evidence from individuals in

25    that organization who told you that the goals of that

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

15

1    organization were drug trafficking, gambling, and acts of

2    violence, including acts of murder.

3         And the next thing, the Aryan Brotherhood exists as

4    a criminal organization. Was the defendant part of that

5    conspiracy? Did he agree to be part of that conspiracy?

6    Well, ladies and gentlemen, I submit to you that he did.

7         I'm going to show you Government's Exhibit 50.

8    This is a membership list found in the cell of the Tyler

9    Davis Bingham, one the commissioners of the Aryan

10   Brotherhood. If you look, right here it says Steve Scott

11   with his membership.

12        And you have heard evidence from members and

13   associates of the Aryan Brotherhood that shows you it is not

14   possible for the defendant to have become a member of the

15   Aryan Brotherhood without agreeing that that group would

16   commit drug trafficking crimes and without agreeing that that

17   group would commit acts involving murder.

18        Now, ladies and gentlemen, we don't have to prove

19   that those acts of drug trafficking and those acts of murder

20   ever actually happened.  We just have to prove that the

21   defendant conspired with other members of the Aryan

22   Brotherhood and agreed that that would happen at some time in

23   the future.  But we have proven it.  We have proven what the

24   defendant agreed to by showing you evidence of his own

25   actions.


UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

16

1        First of all, let's talk about his agreement that

2    Benitez-Mendez -- Ismael Benitez-Mendez would be killed.  On

3    January 6th, 1992, in Leavenworth, Ismael Benitez-Mendez was

4    stabbed with a knife in the back of his shoulder, neck area.

5        Who committed the stabbing?  Steve Scott did, and

6    he did it on orders of the Aryan Brotherhood.

7        You have heard that it is a very fundamental basic

8    rule of the Aryan Brotherhood in prison that you may not lay

9    hands on a brother.  Benitez-Mendez violated that rule by

10   laying his hand on Red Lollar, and Tyler Davis Bingham gave

11   Steve Scott the order to teach him a lesson and stab him with

12   the intent to commit murder, and Steve Scott did that.  And

13   you have heard evidence from members of the Aryan Brotherhood

14   who said they spoke to Steve Scott, and he personally told

15   them that he did it.

16       In fact, Mr. Kelly told you that he had a

17   conversation with Steve Scott on the yard where Mr. Kelly was

18   complaining that whoever stabbed this guy didn't do a better

19   job because he lived.  And Steve Scott's response was, "Well,

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 160 of 342    Page ID
#:38979

20    I did my best."

21          Ladies and gentlemen, that, I submit, is an

22    admission that he intended to kill Ismael Benitez-Mendez.

23          What about Jimmy Lee Inman?  He was stabbed on the

24    rec yard on September 30th, 1993, at the United States

25    Penitentiary at Marion.  Steve Scott was there.  He was a


                    UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

17

1    member of the Aryan Brotherhood.  And you heard testimony

2    from Jimmy Lee Inman himself, who talked about why he was in

3    the hat with the Aryan Brotherhood and the Aryan Brotherhood

4    tried to kill him.  And you heard testimony from Kevin Roach,

5    who told you that Steve Scott himself provided the knife so

6    that Kurt King could stab Jimmy Lee Inman and try to kill

7    him.

8            Let's talk about the war with the D.C. Blacks.

9    There specifically you have hard physical evidence that this

10    defendant agreed that members of his conspiracy, members of

11    the Aryan Brotherhood would commit acts involving murder.

12            Let's look at the evidence in his own handwriting.

13    This is Government's Exhibit 2-C.

14            Now, remember at the time the defendant was at the

15    A.D.X., the super-max penitentiary, and he was a counselor in

16    the Aryan Brotherhood.  And you have heard evidence about

17    what that means.  The counselor is one of the leaders.  He is

18    in charge of formulating policy and instructing other members

19    of the Aryan Brotherhood who come on his tier about what is

20    going on in the gang and what they are supposed to do.

21          Lawrence Klaker was a member of the Aryan

22    Brotherhood.  He came on Steve Scott's tier, and acting in

23    line with his responsibilities as a counselor in the Aryan

24    Brotherhood, Steve Scott sent him a series of handwritten

25    notes.  And in his own handwriting you can see what he said


UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

18

1    to Lawrence Klaker.  He says, "I don't know how much you

2    know; so just bear with me.  I give it to you a little at a

3    time."  And then he says, "We are at onsite war with the

4    D.C. toads.  Are there any on the tier?  I have a nail and

5    plank down here."

6            He is telling Lawrence Klaker that the Aryan

7    Brotherhood is at onsite war with the D.C. Blacks.  On site

8    war, as you have heard, means anytime you get in the same

9    physical space as a D.C. Black, it is your job as an Aryan

10    Brotherhood to kill that member of the rival gang.

11            Now, ladies and gentlemen, you have heard some

12    evidence that the D.C. Blacks weren't a nice group of people.

13    I'm not trying to say that they were.  But war takes two

14    sides, and the Aryan Brotherhood has gone to war with the

15    D.C. Blacks.  And this man, the defendant, Steven Scott, was

16    in favor of that war, he agreed with that war, and he even

17    passed on the messages to other members of the Aryan

18    Brotherhood that if they could, they should take their

19    prison-made weapons, which is referred to here as a nail and

20    plank, and kill members of that rival gang.

21          He even passes on information about what's happened

22    in the war already.  He said, "Three toads bumped in

23    Lewisburg."  Well, ladies and gentlemen, you have heard

24    evidence about what actually happened in Lewisburg.  Members

25    of the Aryan Brotherhood got word that they were to go to war


                    UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

19

1    with the D.C. Blacks, and they broke out of their cells, and

2    they killed two members of the D.C. blacks at Lewisburg.

3        Here Steve Scott got it wrong.  He said three were

4    killed, but he's passing the message about what happened in

5    that war.  He says, "Jesse stabbed a D.C. eight times in

6    G Block."  Well, you know that happened.  Jesse Van Meter

7    stabbed a D.C. Black named Wardell Hillard on G Block at the

8    A.D.X.

9        And then he gives a little more information.  Here

10   the members at the A.D.X. of the Aryan Brotherhood -- Kevin,

11   that is Kevin Roach -- he was the head counselor at the time.

12   John, that's John McGinley, he was the counselor in charge of

13   security.  And he goes on, and he gives more information.  So

14   that new member of the Aryan Brotherhood on the tier knows

15   what is going on in their criminal organization.

16        Let's look in his own writing at Exhibit 3-C.  He

17   says, "If you wrap your nail in a plank in carbon paper, you

18   might beat an X ray."  Well, you know he actually did that.

19   He wrapped his prison-made weapon in carbon paper, secreted

20    it in his rectum, and later on you have seen that on

21    January 30th, 1998, Steve Scott was found with a weapon

22    wrapped in carbon paper, secreted in his rectum.

23         He goes on to talk about how to make weapons.  He

24    talks about how you can get pieces of metal out of the rec

25    cages.  And you have heard evidence from members of the


UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

20

1    Bureau of Prisons who were at the A.D.X. at the time that

2    after they got this note, they checked the rec cages, and

3    sure enough, inmates had been tampering with the rec cages

4    and had been using that metal to try and make weapons.

5         You see here a little more information.  The toad

6    that Jesse stabbed is named Wardell.  He is just from the

7    outskirts from D.C. who is way out of his league.

8         And again, ladies and gentlemen, you know that that

9    actually happened.

10         And other places in this kite shows you that the

11    defendant is a member of the Aryan Brotherhood.  He refers to

12    other people who are members of the gang.  He talks about

13    John; that's John McGinley.  Mike W.; that's Mike Wagner.

14    Gato; you have heard evidence that Gato is Danny Weeks.  All

15    of them are members of the Aryan Brotherhood.  And he goes on

16    to say, "We are going trying to arm all brothers."

17         Ladies and gentlemen, that is his own handwriting

18    saying he is in favor of committing murder, and that's what

19    we have to prove.  We have to prove that this defendant was a

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt
Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 168 of 342    Page ID
#:38987

20    member of the Aryan Brotherhood, that the Aryan Brotherhood

21    was a criminal enterprise, and that when he joined and during

22    the course of his participation in that conspiracy, he agreed

23    that at least two acts involving murder would occur.  And

24    there you have it in his own handwriting.

25           Government's Exhibit 4, also in his own


              UNITED STATES DISTRICT COURT

1   handwriting.  It says, "John is going to try to move," and

2   then you can't read it for a second.  And it says, "If they

3   let him out down there.  But if he can't, you know the bottle

4   stoppers will be on it."

5          You have heard evidence that bottle stoppers is

6   Aryan Brotherhood code for correctional officer.  It rhymes

7   with coppers.

8          He says, "They will know he had it in the happy

9   Easter."

10          Well, you have heard evidence that happy Easter

11   rhymes with keester.  It's Aryan Brotherhood code for having

12   a knife concealed in your rectum.

13          I suggest to you that when you get back in the jury

14   room you spend some time looking at these kites and letters.

15   Look at Government's Exhibit 1 for the Aryan Brotherhood's

16   own definition of what they are all about.

17          And look at Government's Exhibits 2, 3, 4, and 5 as

18   handwritten evidence, written by the defendant, that shows he

19   is a member of the Aryan Brotherhood, it's a criminal

20    organization, and that he is all in favor of members of that

21    organization committing crimes, specifically crimes involving

22    murder.

23         I'm going to show you Government's Exhibit 6.  He

24    has called it the party list.  Once again, this is

25    handwritten proof.  It was found in his cell.  It is in his


                    UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

22

1    handwriting.  This is a list of D.C. Blacks who were to be

2    killed at the A.D.X.

3          Now, how do you know this isn't just a list of just

4    people to be afraid of?  Well, first of all, you heard

5    evidence of what the Aryan Brotherhood is all about.  The

6    Aryan Brotherhood isn't afraid of anyone.  They are an

7    offensive group.  If they feel threatened they go on the

8    offensive and they figure out who their enemies are and they

9    make plans to kill them.  And ladies and gentlemen, that is

10   illegal.

11         Also, how do you know it's not just a list of

12   people that he is afraid of?  Well, look at the people that I

13   have highlighted.  These are people at the A.D.X. who we have

14   other independent evidence that has come in this case that

15   the Aryan Brotherhood wanted to kill.  Look at Wardell

16   Hillard.  He was actually attacked.  Willie Johnson,

17   nicknamed "Butch."  You also have heard evidence that he has

18   a nickname "Prince," and you have seen, and you can look at

19   it in the jury room, a letter that says, "We don't know if we

20  are going to war yet, but Prince is a boy's name."  And you

21  know that is code that Prince is on the hit list.

22          Beady Hinnit.  You have seen evidence and you can

23  look at it when you go back in the jury room.  The Napoleon

24  Bonaparte book.  It is a coded message instructing Beady

25  Hinnit to be killed.


                    UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 173 of 342    Page ID
#:38992

UNITED STATES DISTRICT COURT

23

1          Ladies and gentlemen, I submit to you that this is

2    evidence that the defendant is a member of the Aryan

3    Brotherhood and agreed that these people should be killed.

4    And ladies and gentlemen, that is what the Government has to

5    prove.  We have to prove that he was a member of the Aryan

6    Brotherhood or agreed that he would be; that he agreed he

7    would be associated with the Aryan Brotherhood, and he was

8    according to this evidence; and we have to prove that he

9    knowingly agreed to conduct or participate, directly or

10    indirectly, in the conduct of the affairs of the enterprise

11    through a pattern of racketeering activity.  And racketeering

12    activity, you will be instructed, means a pattern of two

13    crimes; that he agreed that two crimes would be committed,

14    either two crimes involving murder, two crimes involving drug

15    trafficking, or one of each.

16          How else do we know that this defendant agreed to

17    be part of the Aryan Brotherhood and agreed that people in

18    the Aryan Brotherhood would commit crimes involving murder?

19          Look at Irving Bond.  I'm showing you Government's

20    Exhibit 9.  This is a photograph of Irving Bond after the

21    defendant stabbed him in the chest.  Now, you have to ask

22    yourselves, was Irving Bond a threat to Steve Scott as he was

23    being escorted to the showers with his hands shackled behind

24    his back?  Or did Steve Scott conspire with Scott Cupples

25    long before he ever got out of his handcuffs -- got his

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

24

1    handcuffs in front of him and used the shank to stab Irving

2    Bond?

3           Ladies and gentlemen, I submit that this is a crime

4    that he conspired to commit.  He found out that there was an

5    enemy on his tier, he spoke to Scott Cupples about it, and

6    they came up with a plan.  And Scott Cupples made shanks that

7    looked like this and gave them to the defendant for the sole

8    purpose of killing their enemies.

9           Now, you have heard some evidence that the

10   defendant was taking Interferon, and you heard some evidence

11   that at the time the defendant was grouchier than usual; he

12   was more irritable.  But look at what he was doing before he

13   ever got to Springfield.  This is a man who, as a counselor

14   in the Aryan Brotherhood, spoke to Richard Bernard through

15   the toilet pipes at the A.D.X., and instructed him, "These

16   are the people you are to kill."  He told them -- he told

17   Richard Bernard, "We're at onsite war with the D.C. Blacks.

18   Here are the names of the people you are suppose to kill."

19   He told them the names of the people.  Some of them you have

20    seen already on the party list.

21           And then he got to Springfield.  And he was taking

22    Interferon, and maybe he got more irritable.  But you have to

23    ask yourselves, is what he did at Springfield, what he

24    conspired to do at Springfield consistent with the plan to

25    kill D.C. Blacks that this defendant was already involved in


                    UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

25

1    before he ever got there?  I submit that it is.

2            So once again, the defendant's own actions show

3    what he agreed the Aryan Brotherhood would do.

4            And I just want to remind you, we don't have to

5    prove that anyone in the Aryan Brotherhood ever actually did

6    anything, only that this defendant agreed that they would

7    commit those crimes.  The evidence about Benitez-Mendez and

8    Inman and the war with the D.C. Blacks and the knife that he

9    had and his assault on Irving Bond, all of that is proof

10   about what he agreed would happen.

11           We don't actually have to prove that he committed

12   those crimes.  What we have to prove is that he agreed that

13   someone would commit acts involving murder.  And these crimes

14   are evidence about what he agreed would happen.

15           Let's look at John Gotti and Walter Johnson -- the

16   other Walter Johnson, Wakil.  John Gotti was assaulted on the

17   yard at Marion.  He put out a contract, and the Aryan

18   Brotherhood took it up.  And you know who was one of the

19   Aryan Brotherhood members who was talking about how do we

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R     Document 7150     Filed 05/18/16     Page 178 of 342     Page ID
#:38997

20    kill Walter Johnson?  How do we get this money from John

21    Gotti?  We have to kill Wakil on site.  It was the defendant.

22    You heard evidence from members of the Aryan Brotherhood who

23    were conspiring to kill Walter Johnson, and they said this

24    defendant participated in those conversations and passed the

25    word.


UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

26

1          Same with Frank Ruopoli.  He was a cooperator, he

2     was in the hat, and this defendant instructed people, "Kill

3     him on site."

4          Let's talk about drug trafficking.  How do you know

5     that when the defendant joined the Aryan Brotherhood

6     throughout his participation in this criminal organization

7     that he agreed the Aryan Brotherhood would commit crimes

8     involving drug trafficking?  Well, first of all, you heard

9     from Eugene Bentley, who told you that while this defendant

10    was at Leavenworth he participated in the Aryan Brotherhood

11    drug trafficking crimes.  He also told you that this

12    defendant participated in the Aryan Brotherhood involved in

13    gambling in the institution.  And often drugs are used in

14    place of money when they are gambling.

15          You heard evidence that this defendant was promoted

16    to the head of the Aryan Brotherhood business department.

17    Well, where is the Aryan Brotherhood going to get money?

18    Ladies and gentlemen, there is no question, according to the

19    witnesses that you saw, that this defendant knew the Aryan

20    Brotherhood money would come from proceeds that would involve

21    drug trafficking.

22          Look at Government Exhibit 31, this is a $105 money

23    order made out to this defendant.  Where did the money come

24    from?  It came from drug proceeds.  You heard that from

25    Eugene Bentley, who told you that Sean Darcy is a friend of

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

27

1    T.D. Bingham, and T.D. Bingham told Eugene Bentley that this

2    $105 money order came as a distribution from drug trafficking

3    in the Aryan Brotherhood.

4         Look at -- when you get back to the jury room, look

5    at the evidence involving Mark Nyquist out on the street.

6    Look at the restaurant letter.  Kevin Roach says, "Mark,

7    you're a real good cook.  You should open up a restaurant."

8    And you heard Kevin Roach tell there was no restaurant; that

9    was the Aryan Brotherhood plan to get members out on the

10    street and to commit crimes involving drug trafficking and

11    send money back in to their members.

12         That is the plan that you can read about in the

13    Aryan Brotherhood mission statement found typed up in David

14    Sahakian's cell.  And you can read that mission statement

15    back in the jury room as Government's Exhibit 1.

16         Ladies and gentlemen, RICO sounds a little

17    intimidating.  It can be a complicated law.  But when you

18    look at the instructions that the Court is going to give you,

19    you'll see that the Government really has to prove very few

20   things; that an enterprise would be established and that the

21   defendant agreed that an enterprise would be established.

22          And ladies and gentlemen, we have gone way beyond

23   that.  We have shown you that the Aryan Brotherhood actually

24   exists.

25          Second, that the enterprises or its activities

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

28

1    would affect interstate commerce.  Well, what does that mean?

2    It means they use the telephone or they used the mail system.

3    If you find that the Aryan Brotherhood used the telephone or

4    used the mail in order to conduct their affairs, that you can

5    find effected interstate commerce.

6        Third, that the defendant agreed he would be

7    associate with the enterprise.  Again, we have gone beyond

8    that.  He didn't just agree that he would be associated; he

9    is one of their leaders.  He was head of the business

10    department, and then he became a counselor.  As one of the

11    few counselors in the Aryan Brotherhood, he was in charge of

12    conducting the Aryan Brotherhood's activity.

13        And fourth, that he knowingly agreed to conduct or

14    participate, directly or indirectly, in the conduct of the

15    affairs of the charged enterprise through a pattern of

16    racketeering activity.

17        Ladies and gentlemen, the evidence has shown it is

18    not possible for the defendant to have joined the Aryan

19    Brotherhood thinking it was just a social organization.  It's

20   simply not possible.  When he joined the Aryan Brotherhood,

21   he knew it was a criminal organization; he knew that members

22   of that organization were going to be conducting crimes

23   involving drug trafficking and involving murder.  And that's

24   what pattern of racketeering activity means.  Did he agree

25   that someone at some point over the course of the conspiracy

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R     Document 7150     Filed 05/18/16     Page 185 of 342     Page ID
#:39004

UNITED STATES DISTRICT COURT

29

1    commit two crimes involving drugs, two crimes involving

2    murder, or one of each?

3            And ladies and gentlemen, I suggest to you that

4    when you go back into the jury room and you look at the

5    evidence, read the mission statement, look at the kites he

6    sent in his own handwriting, look at the hit list we found in

7    his cell, and you will conclude that beyond a reasonable

8    doubt, the defendant is guilty of conspiring to violate the

9    RICO laws, and I ask that you will find him guilty.

10           Thank you.

11           THE COURT:  Okay.  Your summation, Ms. Jacks.

12           MS. JACKS:  Thank you.

13           Good morning, ladies and gentlemen.

14           I said at the beginning of this trial the trial is

15    to be the supposed to be the search for the truth, and the

16    purpose of the trial is for you, the jury, to arrive at a

17    verdict that reflects truth and that reflects justice.

18           It's not always an easy task, but I think you have

19    three things to help you.  You have the evidence, the

20    testimony that you have heard, the exhibits that you will be

21    able to actually look at in the jury room.  That's the first

22    thing.

23            The second thing you'll have to help you reach a

24    verdict that reflects truth and justice is the instructions

25    on the law, the law as to how to go about evaluating the

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

30

1    evidence and the law about what it is to violate the

2    racketeering -- the conspiracy to commit racketeering.

3        And the final thing you had when you walked in that

4    door and you are going to take home with you when this trial

5    is over, and that's your common sense.  And if you put those

6    three things together in this case, I think you can reach a

7    verdict that reflects --

8        THE COURT:  Well, your own thoughts are totally

9    irrelevant, Counsel.

10       MS. JACKS:  You can reach a verdict that reflects

11   truth and that reflects justice.

12       There is really one issue to decide in this case,

13   and that is whether the Government has proven beyond a

14   reasonable doubt that Steve Scott, sitting over there in the

15   defendant's chair, has conspired to violate the racketeering

16   laws of this country.  That's the issue.  Have they proven it

17   beyond a reasonable doubt.

18       And the Court told you, he even used these words,

19   "A trial is not a popularity contest.  This isn't a chance to

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 188 of 342    Page ID #:39007

20    come in here and give a thumbs up or a thumbs down on Steve

21    Scott or on the decisions he has made in his life."

22          Mr. Scott is not on trial for having tattoos.

23    Thank God for that.  I guess we would have to plead guilty.

24    He's not in trial for being in prison.  And he is not on

25    trial for associating or being a member of the Aryan


                    UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 189 of 342    Page ID #:39008

UNITED STATES DISTRICT COURT

31

1    Brotherhood.  He is on trial for conspiring to violate the

2    racketeering laws of that country, and that is only it.

3          And the burden of proof Ms. Blanch referred to in

4    her argument, the burden of proof in this case is proof

5    beyond a reasonable doubt.  It is the highest standard in the

6    law.  If there is a traffic accident and two people are

7    fighting over who caused the accident and who is going to pay

8    for the damage, the burden of proof in that case is a

9    preponderance of the evidence.  What side just slightly tips

10    the balance in his favor.

11          The standard of proof here is higher than that.  In

12    courtrooms in this country, Judges make decisions about

13    whether to take children away from their natural parents.

14    The standard of proof in this case is higher than that.

15    Proof beyond a reasonable doubt.

16          Unless -- unless and until the prosecution proves

17    the truth of the charges beyond a reasonable doubt,

18    Mr. Scott, under the law, is entitled to a verdict of not

19    guilty.  That's our standard of justice, and it's been

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 190 of 342    Page ID
#:39009

20    working all right for the last 200-or-so years.  And it

21    applies -- that standard applies regardless of the person

22    sitting in the defendant's chair, regardless of whether they

23    are a Hollywood celebrity and are rich and famous or somebody

24    serving a lengthy prison sentence.  Our law says that the

25    standard of proof is the same.


UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 191 of 342    Page ID
#:39010

UNITED STATES DISTRICT COURT

32

1          And what the Government is supposed to do in a

2    trial like this is bring in evidence of a character that is

3    so -- well, of quality -- of quality that's so convincing

4    that it's capable of belief beyond a reasonable doubt.

5          The Court will tell you at the end of this case

6    that a reasonable doubt isn't -- it isn't an imaginary doubt.

7    A reasonable doubt is doubt based on reason, a doubt based in

8    logic, something you could point to the evidence and say

9    "Well, wait a second.  I don't think that evidence" --

10         THE COURT:  Well, your thoughts are totally

11   irrelevant, Counsel.

12         MS. JACKS:  Your thoughts are relevant.  And if you

13   look at the evidence and consider the evidence and come to

14   the conclusion that there is something that doesn't add up

15   based on logic, that is a reasonable doubt.

16         Okay.  I want to just take a minute to talk about

17   something that's awkward, and I want to talk about it right

18   now.  And that is if you go the back in the jury room and

19   start talking about the evidence and considering some of the

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R     Document 7150     Filed 05/18/16     Page 192 of 342     Page ID
#:39011

20    things you heard in this Court, things can -- it can get

21    frustrating.  And I know every one of you has a life to go

22    back to.  You have already given quite a bit of your own time

23    to sit here and listen to the evidence in this case.  And

24    when you get back there and you get frustrated, it's easy to

25    start thinking, "Come on.  What are we worrying about?  I

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 193 of 342    Page ID #:39012

UNITED STATES DISTRICT COURT

33

1    mean, here we are struggling over whether this is proof

2    beyond a reasonable doubt.  And who cares?  I mean, look at

3    Mr. Scott.  He is tattooed.  He is associating or is in the

4    Aryan Brotherhood.  He is in jail.  Who cares?  Let's just

5    end it, vote guilty, and get out of here and go home."

6         If you find yourself thinking that way, I would

7    just ask you to make a minute, take a breath, and remember

8    your oath.  Because when you walked in before you became

9    jurors in this case you took an oath to follow the law.  And

10   the law is that what the Government has to prove, if they

11   can, is the truth of the charges beyond a reasonable doubt.

12        If you've seen the statue of justice or a drawing

13   of the statute justice, you might remember one thing:  She is

14   blind.  She is blind because the law and proof beyond a

15   reasonable doubt doesn't depend on who's sitting over there

16   in that chair.  Justice looks at the facts; it looks at the

17   law; it uses logic and reaches a decision.  And so if you are

18   tempted to say, "Forget it.  Who cares?  Who cares about

19   Mr. Scott.  He is not like me.  I don't like him," take a

20    breath and remember, justice is blind.

21          And, you know, ultimately I could sit up here all

22    day and tell you all these things.  It's just words.  Proof

23    beyond a reasonable doubt is not a mathematical formula.  You

24    won't know for certain, and there is no oath police, no one

25    is going to be back there in the jury room and saying,


                    UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 195 of 342    Page ID #:39014

UNITED STATES DISTRICT COURT

34

1    "Excuse me.  We will cite you for violating your juror oath."

2    That's not going to happen.

3        There is countries and other -- other judicial

4    systems in the world that have the same standards that we do.

5    And their citizens, I don't -- well, their citizens don't

6    feel the protection from the Government and its use of

7    Government power that we feel.  And the reason is -- what

8    makes our country different is our spirit and our conviction

9    and our belief in these values.

10       And if you want to go back in that jury room and

11   say proof beyond a reasonable doubt is met by contradictory

12   statements of witnesses that have been bought and paid for,

13   you can.  Nobody is going to stop you.  You, the 12 of you

14   who decide this case, are going to decide whether we follow

15   the law in this community and what justice is going to be in

16   this community.

17       Now, I said -- I said at the beginning -- I think I

18   said it -- that this case is about credibility.  Credibility

19   has two things associated with it, honesty and reliability.

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

20   You could be as honest as you wanted.  A witness could be as

21   honest as you could ever expect.  But if they didn't see it,

22   it they didn't perceive it, they have got nothing to base

23   their testimony on it.  And a witness that was there or that

24   maybe saw things, if they don't have a commitment to be

25   honest, to take an oath to tell the truth and tell it, then

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

35

1    they are not credible.

2         When you consider the testimony in this case,

3    consider both of those aspects of credibility.  Honesty, has

4    the witness expressed a commitment, conveyed a commitment,

5    exhibited a commitment to tell the truth.  And reliability,

6    was the witness testifying to something that they heard, that

7    they saw, or something that got passed down through many

8    other people?

9         You know, the Government acts like they don't have

10   to prove anything.  I think -- well, when you get back in the

11   jury room and after you hear the Judge's instructions you'll

12   see they have quite a bit to prove.  And if all they have to

13   prove is that Mr. Scott's in the Aryan Brotherhood, then I

14   think this case would have ended in about an hour.  Put in

15   some letters and photos, got some Aryan Brotherhood stuff in

16   this photo album, and I rest my case.  But what have we been

17   doing here?  What have we been doing here this past week?

18        The Government is trying to show you, what they

19   claim, is that Mr. Scott's actions show that he conspired to

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 198 of 342    Page ID
#:39017

20    violate the racketeering laws.  That is their argument.  And

21    that's why they spent time trying to show you that Mr. Scott

22    stabbed Benitez-Mendez or showed you why Mr. Scott stabbed

23    Mr. Bond.

24          I want to take some time to look at some of those

25    acts and the evidence that you heard and discuss that with

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

36

1    you.  And I'm going to start with the -- with the

2    January 4th, 1992, stabbing of Ismael Benitez-Mendez at

3    Leavenworth.  No question that Mr. Benitez-Mendez was

4    stabbed.  No question that it happened in B Upper at

5    Leavenworth.  And the Government brought you a parade of

6    paid-for witnesses to tell you various things about that.

7            I don't know if you remember this, but way back --

8    I barely remember it, but way back, one of the first days of

9    testimony, the Government read the stipulation of William

10   Halpin's testimony.  William Halpin was a correctional

11   officer at Leavenworth on January 4th, 1992.  He was an

12   eyewitness to the stabbing.  And William Halpin -- I'm going

13   to use some of the photographs that we -- that we introduced

14   yesterday about the crime seen when I talk about this.

15           But William Halpin was asked this question and he

16   gave this answer.

17               "Officer Halpin, where were you standing when

18               you saw these two inmates, one chasing the other

19               with a knife?

20          "ANSWER:  On the Flat 3 by the mailbox."

21          You'll -- you'll have these exhibits in the jury

22   room.  This is Exhibit 256.  This is the mailbox on B Upper

23   at Leavenworth.  And the reason you got this picture is to

24   help you see the mailbox in other pictures, because the way

25   that the place is painted, it's not always easy to find.

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

37

1    This is the mailbox.  Here's the mailbox in context.  And I

2    guarantee you that it's more clear on the eight-by-ten photos

3    that it shows up on the screen, but it's right here

4    (indicating).  That is where Officer Halpin is standing.

5          "QUESTION:  When you saw from the flat on the

6          third level the two inmates running, where did you

7          see them?

8          "ANSWER:  Coming off 5, down to 4, on the

9          steps."

10         Here's Exhibit 350.  You didn't get to see this

11   yesterday, but this is what is called 5-I.  The other

12   level -- if you remember the diagram of Leavenworth -- let

13   me -- let me fish that out.

14         Do you remember the schematic diagram of

15   Leavenworth and the -- and the three levels?  And this is the

16   one without the -- this is the diagram -- this is 350-A, and

17   it's the diagram without the stairway.

18         And this photograph, the photograph I'm about to

19   put right back on, is standing on this fifth here, this 5-I,

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 202 of 342    Page ID
#:39021

20    looking towards the front of the unit.  The mailbox is down

21    here looking towards the front of the unit.  Standing on

22    that fifth level, looking toward the front.  And what

23    Officer Halpin says is when he saw him, when he saw

24    Mr. Benitez-Mendez and the person that stabbed him, they were

25    coming off the 5, down to 4, on the steps.


UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

38

1          And you see right here, this is beginning of the

2     stairway here on 5.

3          Exhibit 353, if you look at 353-A, you will see

4     where this is taken from.  But this is standing at top the

5     stairs at 5.  You go down these stairs.  You are in Yard

6     Level 4.  And if you look here, this is the -- whoops, excuse

7     me.

8          This is the tier on Level 4.  You will have a

9     photograph of that, too.

10          So off of 5, down to 4, on the steps.  Right here,

11     this is the end of the stairway that goes down to the flat of

12     3.  And if you look right up here at the top, you can see the

13     phones -- the phone booths that are next to the mailbox.

14          Okay.  Here is Exhibit 355.  This is a stairway.

15     It's just from the bottom.  This is standing at the bottom of

16     the stairs on 3 looking up.  Whoops.  Looking up, fourth

17     level; further up, fifth level.  Let me see if this is -- the

18     stabbing happened, according to Halpin, coming off of 5 down

19     to 4 on the steps.  Off of 5, down to 4 on the steps.  Right

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt
Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 204 of 342    Page ID
#:39023

20    here.

21         And Exhibit 359 is Officer Halpin's view.  This is

22    a -- this is a photograph taken from the mailbox looking

23    towards the stairway where Officer Halpin saw the stabbing.

24         "QUESTION:  --"

25         They asked questions about what the inmates are

              UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

39

1    wearing and what the assailant was wearing.  And then he is

2    asked this question.

3              "QUESTION:  Were you able to see anything of

4         the size or hair coloring or eye coloring or skin

5         coloring of the man who had the knife?

6              "ANSWER:  No.  Not that I can recall, other

7         than he was an African-American."

8              This is the view the eyewitness had, Correctional

9    Officer Halpin, standing at the mailbox, watching

10   Mr. Benitez-Mendez get stabbed, off of 5, down to 4, on the

11   steps.  The stabber was an African-American.

12             And what -- what else do you know?  Remember the

13   testimony of Officer Del Muro, the -- the hunter, the

14   correctional officer who testified that he saw the blood

15   splatter?  And that he has some experience about determining

16   how -- where something occurred -- well, the movement based

17   on the blood splatter.

18             And do you remember what Officer Del Muro told you?

19   That the blood splatter was coming down off of 5, down to 4.

20    And then whoever was cut ran back up.  It corroborates

21    Officer Halpin's testimony.

22         And yet the Government parades in, if I count it

23    right, one, two, three, four, five -- five witnesses, bought

24    and paid for, took an oath to tell you the truth, got up on

25    that stand, and said, "I heard it was Steve Scott."


             UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 207 of 342    Page ID #:39026

UNITED STATES DISTRICT COURT

40

1          "T.D. Bingham told me it was Steve Scott."

2          "Steve Scott told me it was Steve Scott."

3          Let's just take a look at some of that testimony,

4     and let's take a look at how credible that is.  I'm going to

5     take them in order that the Government brought them to you.

6          The first was Glenn West.  He is out of custody

7     right now.  This is a man that's been -- received over

8     $80,000 in benefits from the Federal Government.  Somehow,

9     even though was doing a 65-year sentence, had some escapes, I

10    think hostage taking, he managed to get out of prison.

11          And he was brought to you -- if you remember,

12    Mr. West was charged in this case.  And Mr. West was

13    arrested, put on bail out, and was taken down to Terminal

14    Island where he sat in his cell 22, 23 hours a day, reading

15    the indictment in the case with access to the reports in the

16    case.

17          And I think it was Agent Halualani who told you,

18    those documents included reports, Lieutenant Benson's report

19    regarding the stabbing of Ismael Benitez-Mendez.  And

20   after -- what, 12 years after the Benitez-Mendez stabbing,

21   Mr. West says, "Oh, yeah, yeah.  Steve Scott did it.  Donny

22   Kennedy told me.  Donny Kennedy told me he gave Steve Scott

23   the knife."

24        Well, first of all, I'll just take a second to talk

25   about that.  Remember, I think I asked Agent Halualani about

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 209 of 342    Page ID
#:39028

UNITED STATES DISTRICT COURT

41

1    that.  Because remember, Donny Kennedy says, "That didn't

2    happen.  I didn't give the knife to Mr. Scott to stab

3    Benitez-Mendez, and I never told Mr. West that I did."

4           And we asked Agent Halualani, "Well, you had these

5    two conflicting stories.  I mean, West is one of your

6    Government witnesses.  Donny Kennedy is one of your

7    Government witnesses.  They are saying different things.

8    Well, what did you do?"  He said, well, he looked at -- he

9    thinks he looked at the housing records to corroborate it.

10   Well, you are going to get to look at the housing records,

11   and you're going to see, they don't corroborate it.  In fact,

12   they show there's no way that Mr. West -- that Donny Kennedy

13   said anything to Mr. West about that at Leavenworth.

14          Let's see if I can do this.  These housing records

15   are a little challenging at first, but they are not hard to

16   read.  They are not hard to understand.  We're going to let

17   you look at them.

18          Essentially what they do is they show the

19   institution with an abbreviation, where an inmate was housed

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 210 of 342    Page ID #:39029

20    and when.  Some of the records show cell assignments.  And

21    I'm looking at Exhibit 161, which are the housing records for

22    Donny Kennedy.  And we know that Benitez-Mendez was stabbed

23    in January of 1992.

24         And it helps, I think, when look at these records

25    to have a piece of paper to help you follow across the line.


                    UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 211 of 342    Page ID
#:39030

UNITED STATES DISTRICT COURT

42

1    But let's look -- here we go.  Is that on the screen over

2    there?  Donald Kennedy.  Let's go -- let's look at both of

3    these.

4         All right.  This shows -- the one I'm add -- the

5    one I'm onto right here is from 08/23/91, 1911, 7:11,

6    military time.  But 01/07/92, at 1533 hours, 3:30, he's in

7    Unit B Upper at Leavenworth, L.D.X.  And then he gets moved

8    to administrative detention, and he is there at Leavenworth

9    until 04/29/92, 11:14 in the morning.  After that, he is

10   moved to another institution.  You can see that right here.

11   He goes to E.R.E., looks like Oklahoma, and then Lompoc.  So

12   he has moved.  04/29/92.

13        Now, remember Mr. Halualani said that West told him

14   that Kennedy told him that he gave the knife to Steve Scott

15   to stab Benitez-Mendez.  And he told him that at Leavenworth.

16        So here we have Exhibit 169, the housing records

17   for Glenn West.  And these -- I'm not sure what your copy is

18   going to be like, but the copy I pulled out appears to have

19   been Xeroxed incorrectly.  I'm not sure that's not the case.

20          But let's look at when Steve Scott left

21     Leavenworth.  Well, first of all, where was he in January of

22     1992?  Looks to me like he was in Marion in December -- in

23     Cell B -- B-C-7 from December of '91 to April of '92.  And if

24     you look up here, he does go to Leavenworth eventually.  He

25     gets there in the June, June 24th of 1992, two months after

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

43

1    Donny Kennedy left.  So the records don't corroborate that

2    there was that conversation at Leavenworth.  In fact, it

3    shows that it's impossible.  It didn't happen.

4         You have got to wonder what's the Government's

5    commitment to the truth when that's the kind of evidence they

6    are presenting and trying to tell you is believable.

7         MS. BLANCH:  Objection.

8         MS. JACKS:  Donald Kennedy, Witness Number 2 to try

9    to pin Steve Scott with the Benitez-Mendez -- well, the

10   Benitez-Mendez attempted murder.  Donald Kennedy was also

11   charged in this case, and he -- he was in the unique position

12   of witnesses in this case because he was actually interviewed

13   before he had access to the discovery, unlike Mr. West.

14         And Donald Kennedy in November of 2002, was asked

15   questions about the case, shown the indictment, didn't say a

16   word about Benitez-Mendez or Mr. Scott or anything of that

17   nature.  But after sitting in his cell for about a year or

18   so, reading the discovery, making a deal on the case to

19   become a Government witness, suddenly it's, "Oh, yeah, yeah."

20          I don't know if any of you ever watched Saturday

21     Night Live, Joe Piscopo, the guy from Jersey, "That's the

22     ticket.  It was Mr. Scott."

23          And he tells -- he tells us, in an effort to get

24     out of his legal troubles, make a deal with the Government,

25     "I was there, and Mr. Scott showed me where it happened."

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

44

1        "Well, Mr. Kennedy, would you show us where you

2    claim Mr. Scott showed you?"

3        And where did he point?  Do you remember?  Over

4    here on the even side of the tier.  I mean, if Mr. Scott

5    showed him where it happened, you would think he would get it

6    right.

7        It's a lie.  And can you blame these people?  I

8    mean, these people have the rest of their lives to look

9    forward to sitting in a cell 22 or 23 hours a day.  Most of

10    them have tried to escape.  That hasn't been a particularly

11    worthwhile endeavor.  And so they come up with other ways to

12    get out.  It worked for Mr. West.  Why wouldn't it work for

13    Mr. Kennedy.

14        And the way they escape is not using force, like

15    many of them have tried in the past.  It's not taking

16    hostages, like they have tried in the past.  It's using their

17    mouth.  And, you know, I mean, what's the downside?  Come on?

18    I mean, "Oh, if we get caught lying we won't be a Government

19    witness."  Well, yeah.  So you will just be back in your cell

20    where you started; right?  Sitting in jail for the next

21    59 years or whatever it is.  That's Mr. Kennedy.

22         They we have Weasel, William Kelly.  William Kelly,

23    who when initially interviewed within a year or so after

24    Benitez-Mendez was stabbed, asked specifically, "Steven

25    Scott, do you know him?"  No idea.  You heard him saying


UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 217 of 342    Page ID
#:39036

UNITED STATES DISTRICT COURT

45

1    himself, he interviewed for something like four days in

2    November of 1993, numerous law enforcement agencies.  They

3    gave him a copy of report they wrote so he could go through

4    it make sure it was right.  Didn't know Mr. Scott.  But

5    suddenly, when it helps to know Mr. Scott and to implicate

6    Mr. Scott, he's happy to come in here and tell you, "Well, I

7    know him.  Not only do I know him, he confided in you what he

8    did to this guy."

9        Waylon Gene Bentley.  Didn't take him long to jump

10    on the witness train.  This is the guy who at least said at

11    one point that, well, "I was --"  This is the guy that gets

12    to Leavenworth and starts up his own book.  He is not exactly

13    needing any sort of gang affiliation because he is a con man,

14    and he knows how to run a hustle.  He has been running a

15    hustle his whole life.  He runs them from prison and

16    apparently still running them.

17        THE COURT:  Counsel, there is no evidence of that.

18    Please do not state that.

19        MS. JACKS:  Mr. Bentley told you at the --

20    testified that -- he said, "Originally that when you an

21    associate --"  He was an associate of the Aryan Brotherhood,

22    is what he said.  And associates don't learn the Aryan

23    Brotherhood business.  They wouldn't -- they wouldn't fill

24    you in on their inner workings.

25          But suddenly, when it helps to have known what was


UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

46

1    going on at Leavenworth, he was an associate.  He was

2    associate in the note, and Mr. Scott confessed to him and, in

3    fact, he had talked to Mr. Scott.

4         If you look at his housing records -- and I forgot

5    what exhibit that is -- you will see he was at Leavenworth a

6    total of maybe, what, four or five months before the

7    Benitez-Mendez stabbing.  But he would like to convince you

8    that -- the he was hearing all the inner workings of the

9    Aryan Brotherhood and that Mr. Scott's copping now to him to

10   an offense that he never did.

11        Now, Kevin Roach.  That was kind of an interesting

12   one because -- well, wait.  Let me go back a second to

13   Mr. Bentley because I forgot this part of it.  Mr. Bentley's

14   original story was that he didn't hear it from Mr. Scott.  It

15   was that he heard it from T.D. Bingham, who told him that he

16   ordered Mr. Scott to stab Benitez-Mendez.

17        By the time he got around to testifying earlier

18   this year, it was, "Oh, yeah.  Mr. Scott told me to."

19        You know, the Court is going to read an instruction

20    about statements like that, people testifying that so and so

21    told me this or so and so told me that.  And there is really

22    two levels to analyzing that.  That is the easiest thing in

23    the world to make up.

24        I mean, I don't know if any of you have ever

25    experienced it, but when somebody claims that I told them

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

47

1    something that I didn't tell them, it makes me mad.  And it's

2    the hardest thing in the world to disprove because all it is

3    somebody saying you said something.

4           And there are two levels of inquiry with that --

5    with a statement like that.  You have got to try to figure

6    out, did the person ever really say it, and if they did say

7    it, what did they say?

8           And I think that instruction is particularly

9    appropriate to analyzing some of the things that Mr. Bentley

10    said from the stand.

11          But let's move on to Kevin Roach because Kevin

12    Roach tells you, "Two people told me that Mr. Scott stabbed

13    Benitez-Mendez.  They said it happened in A unit, and they

14    said that Mr. Benitez-Mendez was a Latin King.  Those two

15    people were Mr. Bingham and Mr. Scott."

16          And miraculously, "Although I talked to them at

17    different times, they both chose to lie about it in the same

18    way," by obscuring where it really happened or the gang

19    affiliation of the person who was stabbed.

20          He got it wrong.  Mr. Roach got it wrong because it

21     never happened.  Remember, Mr. Roach wasn't even at

22     Leavenworth when this whole thing happened.  How did he even

23     hear about Benitez-Mendez or anything that was going on at

24     Leavenworth in '92?  Any idea?  Wasn't Mr. Roach housed with

25     Mr. Bentley and Mr. Bernard after all three of them had made

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

48

1    deals to become witnesses for the Government?  Sitting around

2    the table all day, nothing really to do except work on the

3    case that they are getting paid to work on; that they are

4    expecting to be their ticket to freedom out of the A.D.X.

5    Well, all of these guys sitting around talking, how

6    surprising that Mr. Roach has inside information on what

7    supposedly happened at Leavenworth when he wasn't even there.

8            As the icing on the cake, on the icing of that

9    Government witness paid-for case, the Government has offered

10    you something else.  There is more.  What did they offer you?

11    The testimony of Lieutenant Benson.

12            Here is a photograph of Steve Scott.  I think

13    Ms. Adams told you that this was taken -- this is at A.D.X.

14    And again, photographs, the eight by tens are much clearer,

15    but what you are going to see when you look at the eight by

16    ten -- and you'll have it back in the jury room.  This is

17    Exhibit 306.

18            It is right here.  It's that 666 tattoo you have

19    heard so much about.  It's right here.  It's real charming.

20    But significant to the tattoo, and the reason we put these

21    photographs in, is because the Government is trying to say as

22    their icing on the tape of these informants laws is we know

23    it was Mr. Scott because right after Benitez-Mendez was

24    stabbed, he had a fresh Aryan Brotherhood tattoo of 666.

25    Right?  Isn't that what Benson tried to say?  Conveniently.


UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 225 of 342    Page ID
#:39044

UNITED STATES DISTRICT COURT

49

1          And he showed you some photographs during the

2    testimony of Mr. Benson that Mr. Benson -- where were they

3    taken?  When were they taken?  We don't really have any idea

4    of exactly when those photographs were taken.  He claims it

5    shows a fresh tattoo.  You can look at it back there in the

6    jury room, and you'll see very clearly, it doesn't show a

7    fresh tattoo.

8          And then Mr. Benson seems to have forgotten about

9    this photograph.  This is Exhibit 303.  And this one is not

10   that good of quality.  It's a copy of Polaroid.  But

11   obviously it's even more blurry when you look at it on the

12   Elmo.

13          This is a photograph -- Mr. Benson tried to act

14   like he didn't know about this photograph.  Remember, he was

15   taking Polaroids the day that Benitez-Mendez was stabbed and

16   dating them and signing them.  I think several of them were

17   introduced.  When he looked at this one, he sort of tried to

18   shy away from it and acted like, "Wait a second.  I don't

19   remember this photograph," although it is dated and signed

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 226 of 342    Page ID
#:39045

20    the same day as the other Polaroids.

21          And if you look -- and again, this original is

22    better than what you seeing up there, there is a 666 tattoo.

23    Now, I don't know what -- exactly what Mr. Benson's theory

24    is.  I mean, did Mr. -- did Mr. Scott stab Benitez-Mendez and

25    then run to his cell and for the next ten hours quickly get

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R     Document 7150     Filed 05/18/16     Page 227 of 342     Page ID #:39046

UNITED STATES DISTRICT COURT

50

1    tattooed, pop out just before midnight, and get this

2    photograph taken or what?  I mean, what is the explanation?

3           He is trying to sell you a bill of goods about

4    Mr. Scott, and he thinks he can do it because Mr. Scott is an

5    inmate that he says is in the Aryan Brotherhood.

6           And what's really interesting, I mean, the

7    Government has got a video of a correctional officer

8    unwrapping a knife that Mr. Scott had in his rectum.  He's

9    got that in all of its gory detail.  And yet a photograph of

10   this supposedly fresh, oozing, bleeding "666," I just joined

11   Aryan Brotherhood tattoo, where is that?

12          How about just a photograph of what Mr. Scott

13   looked like before Mr. Benitez-Mendez was stabbed?  Oh, no.

14   That don't exist.  Can't really explain why.  We just can't

15   find them.  They can't find them because they don't exist.

16   Mr. Scott had that tattoo, as unattractive as it is, since

17   1985.

18          Paul Brown, the tattoo artist, told you about it.

19   He told you about how long it took, how he did it, that he

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R     Document 7150     Filed 05/18/16     Page 228 of 342     Page ID #:39047

20    did it to match the other tattoo Mr. Scott had.  And if you

21    look at the photograph of Mr. Scott at A.D.X. -- I'm going to

22    show you that in a second.  But if you look at it, you can

23    see the location -- you can see where the tattoo is located.

24          Now, Mr. Scott has been in prison a long time.  I

25    think you heard the stipulation that it was sometime in 1989.


                    UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

51

1   This picture -- I think it's part of -- part of Exhibit 383.

2   There are three photos.  This is the first photo, a snapshot

3   on the beach.  Well, we know for sure that that had to be

4   taken before 1989 or before Mr. Scott ended up in jail in

5   1989 because he is not going to beach with women in swimming

6   suits after 1989.

7           And he has his shirt off.

8           And what you are going to see there are two

9   enlargements.  There is two enlargements of this photograph.

10   And it's grainy, and it's not the best quantity, but it's the

11   best we can do to show you that Mr. Scott, at this time, on

12   the beach sometime before 1989 had a tattoo in the same place

13   that the Paul Brown give him the 666.  And this is the first

14   enlargement.  I'm sure it's going to be fuzzy on there.  It

15   is fuzzy.  I'm going to put it up.  And if you look at --

16           Let me go back.

17           Let me go to 306.  If you look at this carefully,

18   Mr. Scott has a tattoo of what appears to be a woman, and

19   these are her breasts on his chest.  And this 666 is just

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 230 of 342    Page ID #:39049

20    under what would be the woman's right breast.  Right here.

21    The blowup of the photograph on the beach, you can kind of

22    make out the woman, and here's her left breast, and here is

23    what appears to be a tattoo in the exact position as the 666.

24    It's not perfect.  And I wish we had a better photograph, but

25    we don't.  This is the best we can do.  And it certainly


UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

52

1    shows you, if you look at it carefully, that Mr. Scott had a

2    tattoo where Paul Brown says he gave him the 666 tattoo

3    before he ever ended up in federal prison.

4        Startling?  I mean, the Government's lined up,

5    what, six or -- six people to come in and tell you a story

6    that you know is false.  I mean, it's -- it's a little

7    shocking that people would be so willing to do something to

8    help themselves at the expense of another person.

9        MS. BLANCH:  Objection.

10        MS. JACKS:  Maybe that gives you some idea of how

11    desperate people get when they are serving long prison terms.

12    And you've got to wonder when the agent in charge of the

13    investigation tells you he corroborated something that he

14    clearly didn't corroborate.  How clear -- how clearly the

15    Government is really looking at this sort of thing, looking

16    at this evidence.  Or are they just sort of accepting

17    whatever fits their version of the truth and turning a blind

18    eye to stuff that doesn't.

19        I try to remind myself this is the same Government

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

20    that told us there were weapons of mass destruction in Iraq.

21         MS. BLANCH:  Objection.

22         THE COURT:  The objection is sustained.

23         And you know that is improper, Counsel.

24         MS. JACKS:  It is --

25         THE COURT:  Please do not do that.


              UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

53

1      MS. JACKS:  The Leavenworth stabbing of

2   Benitez-Mendez provides you with an example of what's going

3   on here.  And what's going on is there is not a concern or

4   commitment to finding the truth.  There is a commitment to

5   convicting Mr. Scott.

6      I want to talk to you about Springfield, and I'm

7   rapidly running out time.  Springfield, why is that

8   important?  And you have got in your -- you have got in your

9   exhibits, Mr. Scott's been convicted of that.  Mr. Scott's

10   been given time for stabbing Mr. Bond.

11      The point that the Government wants to make about

12   the Bond stabbing is they want to tell you that was done in

13   furtherance of a war against black inmates.  That's why we

14   have heard testimony about it today or in this trial.

15      And they want you to rely on Scott Cupples.  They

16   want you to take Scott Cupples word that this was a plan;

17   that it was a plan that was hatched because John Gotti --

18   always good to work Gotti into it.  That John Gotti came onto

19   the unit and communicated while at the rec yard with Patrick

20    Mills, using sign language about you've got to hit this guy

21    Bond because of -- because he is from Marion or he is from

22    D.C., and we don't like him.  And as Bond left the unit, he

23    kind of give a little thumbs up or a signal to Mr. Cupples

24    that, yeah, that is the guy, the guy in Cell Number 1.  And

25    that as a result of that conversation, Mr. Scott stabbed

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R     Document 7150     Filed 05/18/16     Page 235 of 342     Page ID #:39054

UNITED STATES DISTRICT COURT

54

1    Mr. Bond.  That is the story.

2         First of all, you will have in the jury room some

3    pictures from Springfield and the diagram, and you will be

4    able to get sort of an idea about -- about where things were

5    situated.

6         But this is the rec unit, and this is exhibit -- or

7    the outside rec, 374.  It reminds me of dog kennels, you

8    know.

9         THE COURT:  No.  Your personal opinion is totally

10   irrelevant, Counsel.

11        MS. JACKS:  They are cages in Cyclone fencing.  And

12   according to Mr. Cupples, Mr. Gotti was in one of these cages

13   when he communicated with Patrick Mills through one of these

14   windows using sign language.  That's the story he tells you,

15   and that provides his motive for attacking Mr. Bond,

16   according to the Government.

17        There is one problem with that -- and there is

18   probably more than one problem, but there is one problem, one

19   big problem.  This is Exhibit 374-A.  And I'm not going to be

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 236 of 342    Page ID
#:39055

20    able to fit the whole thing on the Elmo.  This is a -- it's

21    the same diagram as Exhibit 18.  It just encompasses more of

22    the institution.  And if you compare it to Exhibit 18, you

23    will see here the entrance to the unit.  Here is -- here is

24    the center hallway.  Here is the big shower where

25    Mr. Calderon told you he was, and you keep going through this


UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 237 of 342    Page ID #:39056

UNITED STATES DISTRICT COURT

55

1    hallway, down the stairs, here is the outside rec yard.

2         Now, what do you know?  What do you know about this

3    story?  Certainly we heard some testimony that Mr. Gotti

4    occasional uses outside rec area.  That's possible.

5         But what do you know about Patrick Mills, the

6    person who was supposedly signing with Mr. Gotti, according

7    to Mr. Calderon's story?  Patrick Mills wasn't housed in

8    these cells.

9         MS. BLANCH:  Objection.

10         MS. JACKS:  According to the testimony of

11    Officer Conard and the testimony of Mr. Calderon, another

12    inmate, Mr. Mills was housed down here on the same wing as

13    the big shower, just further down.  He didn't sign anybody in

14    the rec yard.  And we know, if you look at Mr. Cupples'

15    housing records -- which I thought I pulled out.  I did --

16    you can almost -- this is Exhibit 158.  And let me get this

17    piece of paper.

18         We've got Mr. Cupples -- that the stabbing --

19    Mr. Scott stabbed Mr. Bond the day after Thanksgiving in

20   2000.  November 24th.  We've got Mr. Cupples on the unit for

21   an hour and four minutes on October 24th.

22          You see that?  He comes in at 11:30 and leaves at

23   12:34.  And then he goes to a different ward at Springfield,

24   Ward 1-4, and he is there until November 7th.  And he is on

25   Unit 21 E from November 7th at 1:30, 1:44 in the afternoon to

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

56

1    December 6th.  And remember, the stabbing happens

2    November 24th.  So Mr. Cupples was there for, what, two or

3    three weeks prior to the stabbing.  That's it.  I'm talking

4    about a very short period of time.

5          And Mr. Cupples -- well, let me go back.

6          What else do you know about Mr. Cupples?  He told

7    you.  He -- at the time he became a witness for the

8    Government, he wrote a letter to the S.I.A., the person in

9    charge of intelligence at A.D.X.  And this was after the

10    indictment came out, and I think it was March of -- I'm

11    sorry.  February of 2004.

12          And Mr. Cupples told you that in that letter, he

13    was -- he wanted to get rid of his Iowa sentence.  He had

14    been -- remember, he claimed he had 65 years to do in Iowa

15    and he did six years.  He was brought to the federal.  And he

16    found out that Iowa wanted him to come back and do 59 years,

17    and he was angry about it.  And he wrote that he could

18    provide, quote, incentive if the Government could do

19    something about those 59 years.

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 240 of 342    Page ID #:39059

20          And his first story -- his first story that he

21   writes out to the officer, remember what -- well, first of

22   all, did he mention John Gotti?  No.  Did he mention this

23   Patrick Mills signing with John Gotti and all this intrigue

24   about why Mr. Bond was stabbed?  No.  And do you think if

25   Mr. Cupples -- well, clearly he realized that information was


UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 241 of 342    Page ID #:39060

UNITED STATES DISTRICT COURT

57

1    for sale; that if he provided good enough stuff, maybe he

2    could get rid of those 59 years.  And he didn't mention

3    John Gotti or this signing or this mysterious way of passing

4    a message?  Come on.  If it was true, he would have told in

5    that -- he would have told Mr. Smith in that written -- in

6    that -- in answering those questions and in that writing.

7            But instead of what Mr. Cupples says was that,

8    yeah, Steve Scott stabbed Bond, says that he heard Mr. Bond

9    sharpening a knife in a cell the night before.

10           And Mr. Cupples, along with the correctional

11   officers and Mr. Calderon, told you what was going on there

12   on Unit 21 E when people were being moved.  It wasn't by the

13   book, lock up the inmate in this cuffs and escort them down

14   the empty hallway to the shower so there wasn't a chance that

15   somebody could attack somebody else.  They were running

16   people down to those showers to try them get it down.  And

17   they were running people; they were opening people's doors

18   without handcuffing them.  They were moving multiple

19   high-security inmates down the hall at the same time.

20          How do you think that affected Mr. Scott?  A man

21    who had lost 20-something pounds; a man who couldn't think

22    straight because his blood didn't have enough oxygen in it; a

23    man who heard the guy next to him in the cell sharpening a

24    knife all night.

25          Whether you think it was right or wrong that


                    UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 243 of 342    Page ID #:39062

UNITED STATES DISTRICT COURT

58

1    Mr. Scott stabbed Mr. Bond, it is really -- clearly, it was

2    the wrong decision, and Mr. Scott's been convicted and

3    sentenced for that.

4           The question for you is did Mr. Scott stab Mr. Bond

5    because he thought Mr. Bond was going to stab him?  Or did he

6    stab Mr. Bond because of a 1988 conspiracy to kill black

7    inmates?

8           I want to show you one other thing about that

9    because, remember -- remember that list, the party list?

10    Mr. Bond's name isn't on it, and you check me on that.  Go

11    look and see.  But there was one inmate who was on it that

12    Danine Adams identified, a guy named Gerald Kelly.  So, I

13    mean, he was on that list from the beginning.  And I want to

14    you show something interesting about Mr. Kelly.  We have his

15    housing records, and those have been introduced for you to

16    take a look at.

17           You know what?  I pulled out -- I pulled out the

18    page.  Here they are.

19           This is a guy on the list.  D.C. Black inmates,

20    inmates that the Government says Mr. Scott was ordering hits

21    on.  Look where he is.  Oh, my gosh.  You heard Mr. Scott got

22    to Springfield, I think according to Dr. Khalil, June of

23    2000.  Let's see.  Well, goodness, Mr. Kelly is on Unit 21 E

24    in June of 2000, in July of 2000.  Looks like he gets moved

25    around sometimes.  He back there in September of 2000.  He is

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

59

1    back there again in September -- September to October.

2        What evidence is there of Mr. Scott trying to put

3    the hit on Mr. Kelly?  Somebody on the list.  And this is

4    before -- you notice that if Mr. Scott was -- was at war with

5    the D.C. Blacks and out to kill them, he had access -- was on

6    the same unit as Mr. Kelly prior to starting the Interferon

7    treatment, prior to losing 20-something pounds, prior to

8    feeling -- how can I say -- well, how did he describe it?

9    Like he was losing his mind, prior to being weakened by the

10    treatment he was given for Hepatitis C.  No evidence that he

11    ever tried to do anything to hurt Mr. Kelly.

12        I'm -- I'm rapidly running out of time; so I'm

13    going to kick it up a little bit here.

14        Inman, that was an interesting one.  We --

15    Mr. Scott --

16        THE COURT:  Your personal opinion is totally

17    irrelevant, Counsel.  Please.

18        MS. JACKS:  According to the testimony of

19    Mr. Roach, he first implicated Mr. Scott and Inman in the

20    Inman stabbing something like, what, 13, 14 years after that

21    happened.  If you recall, Mr. Inman was the man that was

22    stabbed on the yard at Marion, and suddenly in 2006,

23    Mr. Roach jumps on the bandwagon and says, "Oh, yeah.

24    Mr. Scott -- yeah, yeah.  He was the one that hid the knife."

25        First of all, we know Mr. Roach made stuff up about


UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

60

1    Mr. Scott regarding Benitez-Mendez.

2           MS. BLANCH:  Objection.

3           THE COURT:  The objection is sustained.

4           MS. JACKS:  The evidence shows.

5           THE COURT:  It will go out.

6           MS. JACKS:  The evidence shows that Mr. Roach made

7    stuff up about Mr. Scott regarding Mr. Benitez-Mendez.  And

8    the evidence will show you that Mr. Roach made stuff up about

9    the Inman stabbing.  You haven't seen these documents yet,

10   but remember, Mr. Roach said the word and the message to stab

11   Inman came from David Sahakian, came from Pelican Bay.

12           And we just got these documents in.  You've got to

13   wonder -- we -- we just got the documents in.  They are

14   marked as an Exhibit 316, and it's David Sahakian's history

15   at California Department of Corrections and where he was

16   housed.  And it takes some navigating to get through it, but

17   what you will see, if you compare where he was to the

18   institution, the key that shows what the abbreviation for the

19   institution was, it will show you that David Sahakian, he was

20    in a California state prison all right, but never at

21    Pelican Bay.

22          I want to take a minute to talk to you about the --

23    the letters and the writings that -- that -- I think it's

24    People's 2 through 6, something like that, the writings of

25    Mr. Scott.  Hopefully the questions and the testimony help


UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

61

1    you put those letters in the context and -- of when they were

2    written and what was going on at the A.D.X.

3            And if you recall, probably the testimony of Danine

4    Adams was the most comprehensive as to what was going on at

5    A.D.X. at that time, and what sort of altercations had been

6    happening between the black inmates and the white inmates.

7            And there is one thing I want to draw your

8    attention to in particular, which was there was -- that

9    Ms. Adams told you that she concluded that that list, that

10   party list was a hit list.  And she conceded that she didn't

11   take into account when she made that conclusion how Mr. Scott

12   used the word "party" in other communications.

13           And you are going to have the letter that -- that

14   Mr. Scott wrote that Danine Adams testified about, and that's

15   also an exhibit.  I don't remember the number, but it's in

16   the late 300s.  And that is the letter to Irese Simpson.  And

17   if you read the letter -- and you will have the original of

18   that letter.  You will see that Mr. Scott refers to -- it's

19   something along the lines of "Is it true that Gene won't let

20    little Stevie come to the party?"  And in the context of the

21    letter what is clear is that Mr. Scott is using the word

22    "party" and "coming to the party" as meaning into or

23    associating with the gang.

24          And I would submit to you that when you look at the

25    evidence and the testimony about the party list and the way


                    UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 251 of 342    Page ID #:39070

UNITED STATES DISTRICT COURT

62

1    Mr. Scott has used word "party," that party list is not a

2    list of people to be murdered.  It's a list of people

3    associated with and involved with the D.C. Black gang, the

4    gang that was threatening to kill white inmates on site, they

5    ended up at the rec yard.  The gang that Butch Johnson was in

6    when he hit the old man, Joe Tocash with a radio and started

7    the events that you heard about in the past week.

8            One just final sort of aside on that list, the --

9    the Government has brought up the fact that Wardell Hillard

10   is on that list, and Wardell Hillard was stabbed by Jesse Van

11   Meter.  And if you think back on the testimony, and I know

12   there's been a lot of detailed factual testimony.  But if you

13   think back on that and look at the testimony of Scott Cupples

14   and the testimony of Danine Adams, Mr. Hillard was stabbed by

15   Jesse Van Meter in November of '97.  Jesse Van Meter was the

16   guy -- a white guy from a gang called The Dirty White Boys.

17   Jesse Van Meter got his jaw broken and stabbed at Marion in

18   January of '97, and he got transferred to A.D.X. for being in

19   that fight.  And when he ended up there and was put on that

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 252 of 342    Page ID
#:39071

20    yard, he attacked the first black inmate he came upon.

21         And Mr. Cupples told you at that time Jesse Van

22    Meter wasn't in the Aryan Brotherhood.  Jesse Van Meter was a

23    white inmate that had been attacked at Marion, and he was in

24    The Dirty White Boys.

25         The knife.  No question that Mr. Scott had a weapon


                    UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

63

1    keestered on January 30th, 1998.  Is that evidence of a

2    conspiracy to murder black inmates?  I guess that is a

3    question for you to decide.  When you think about that, I

4    would ask you to think about a couple of things.

5          Is that knife or was the weapon or the piece of

6    metal that was bent in condition at that point to be used as

7    a weapon?  Was it readily accessible?  And what do you know

8    about inmates and weapons in prison?  Does the fact that an

9    inmate possessed a knife in prison in 1998 at A.D.X. make

10   them a conspiracy -- involved in a conspiracy to murder

11   blacks?  And if it does, I would submit that there ought be

12   about 500 people sitting here at this table instead of

13   Mr. Scott.

14          Is the evidence that Mr. Scott possessed a weapon

15   anything more than evidence that he was attempting to exist

16   and survive in a violent and brutal environment?

17          There are a couple of exhibits in the exhibit book

18   that you haven't heard testimony about.  Some -- there are --

19   there is one exhibit which is pages from Mr. Scott's photo

file:///C|/Documents%20and%20Settings/Owner/My%2...rial%2002-938/10-04-07%20Day%206%20All%20Day.txt (125 of 214)2/22/2007 10:38:24 AM

20    album or scrap book, whatever you want to call it, the pages

21    that were returned.  And essentially it's been -- it's been

22    offered into evidence to give you a complete picture of what

23    that photo album and what that scrap book looked like.

24    Consider it for what you want.

25          And -- and the other thing is -- you know, I'm not


                    UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 255 of 342    Page ID #:39074

UNITED STATES DISTRICT COURT

64

1    sure -- I don't remember off the top of my head if this is in

2    evidence or not, but you heard some testimony about it.  And

3    it's just another example, I think, of some of the

4    overreaching that you have witnessed here during the course

5    of this trial.  And that is the reading list.  I think -- I

6    want to say, off the top of my head, it was Exhibit 63.  And

7    it was the reading list that was found in Mr. Scott's cell

8    that turned out to be -- I think Mr. Roach told you about

9    this.  It turned out to be a list of books and reading that

10    were part of the course that was being played on the -- on

11    the closed-circuit prison TV channel, part of The Stepdown

12    Program, where they were watching college lectures on various

13    philosophers and -- and reading those books, listening to the

14    lectures, and provided with the discussion questions about

15    those.  That was a study guide.

16          And if you recall, one way to get out of A.D.X. is

17    to progress through The Stepdown Program and to educate

18    yourself.  And -- and the fact that that's found in

19    Mr. Scott's property isn't some incriminating evidence of

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 256 of 342    Page ID
#:39075

20    conspiratorial Aryan Brotherhood gang activity.  It's an

21    effort to work his way out of prison based on what the prison

22    says is the way to work yourself out.

23          There is a reading list that has been testified

24    about, as the -- you know, sort of the Aryan Brotherhood

25    university, the reading materials for the future criminal

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

65

1    that the Aryan Brotherhood sponsoring.  Just a couple of

2    comments about that.

3            Number one, Mr. West told you he saw that list back

4    in 1993, and I think the evidence is that thing wasn't even

5    put together until November or December of 1997.  But that's

6    some of the evidence that the Government has offered you.

7            And I think if you compare -- well, look at that

8    list and some of the reading materials on the list that came

9    from Mr. Scott's cell, you will see that there are

10   similarities in some of the books and some of the selections.

11           That's the evidence.  I don't get to argue again.

12   The rules are whoever has the burden of proof gets to go

13   twice.  So after Ms. Blanch argues, when I don't get up and

14   start to move toward the podium, it's not because I don't

15   have something to say.  It's because I can't.  I only get one

16   chance.

17           I want to -- I know that I have probably annoyed

18   some of you throughout this trial and that some of you

19   probably have things to say to me about -- about my skills as

20    an attorney.

21              I have two things to say to that.  One is I'm happy

22    to hear them when the trial is over.  But the second thing is

23    Mr. Scott didn't get to pick who his lawyer was.  And it

24    wouldn't be fair if I have done something to annoy you or if

25    you have should criticism of my behavior to hold that against

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 259 of 342    Page ID
#:39078

UNITED STATES DISTRICT COURT

66

1    Mr. Scott.  My job here is to try to present -- present facts

2    and information that's relevant to a very important decision

3    that you have to make, and if I just sat there and didn't do

4    anything it wouldn't be fair to you, and it wouldn't be fair

5    to Mr. Scott.

6         This has been a difficult situation, and I would

7    just say that if you remind yourself of why you are here and

8    what your job is and that it's not a popularity contest about

9    Mr. Scott or whether you approve of his lifestyle -- and

10   really what your job is is to look at the facts and apply the

11   law and attempt to reach a verdict that's an honest and

12   logical -- that results from an honest and logical discussion

13   about the facts and law, you can do the job, and you can

14   reach a verdict in this case that reflects truth and that

15   reflects justice, and that's a verdict of not guilty.

16        THE COURT:  Ms. Blanch, your final summations.

17        MS. BLANCH:  Thank you, Your Honor.

18        Ladies and gentlemen, Ms. Jacks is right about a

19   number of things.

20          First of all, justice is blind.  She is absolutely

21    right.  But you're not.  And you have sworn an oath to look

22    at the evidence in this case.  You must look at Exhibit 1,

23    Exhibit 2, Exhibit 3, Exhibit 4, 5, 6, and all the rest of

24    the evidence.  And you must look at that evidence and

25    determine whether beyond a reasonable doubt this defendant


              UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

67

1    conspired to violate RICO.

2          You're not allowed to look at him and hate him

3    because of his tattoos.  Similarly, you are not allowed to

4    look at him and have sympathy for him because of who he is in

5    this situation.  You are not allowed to vote not guilty

6    simply because you like Ms. Jacks.

7          You have to look at the evidence.  And the evidence

8    is that Mr. Scott conspired with other members the Aryan

9    Brotherhood to operate a criminal organization within the

10   walls of prison, and as part of that criminal organization,

11   he agreed that people would die.

12         Now, I want to talk about the witnesses in this

13   case.  She is right.  They are convicted felons.  They have

14   been in prison.  And you don't have to like them.  I don't

15   have to like them.

16         But the fact of the matter is you have heard

17   evidence that the Aryan Brotherhood is a secretive, closed

18   organization.  How in the world would we get information

19   about what they do and what they are all about if we can't

20    talk to the members themselves, without talking to the people

21    who dropped out?  And those are the people that you heard.

22          You don't have to like them.  You don't have to

23    like their lifestyle.  You don't have to like their tattoos.

24    But you have to look at their testimony and determine whether

25    they are credible.  You have to look at whether they

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial/2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 263 of 342    Page ID #:39082

UNITED STATES DISTRICT COURT

68

1    corroborate what each other says.

2         For example, with Benitez-Mendez, many of them told

3    you that Steve Scott admitted trying to kill Benitez-Mendez.

4    Some of them told you that T.D. Bingham, one of the leaders,

5    told you that he ordered that hit.  Do the stories always

6    match up?  Do they always agree with each other?  No.

7         Now ask yourselves, if they were reading the

8    indictment and making up a story, wouldn't they do a better

9    job?  Wouldn't their stories always match?  In the real world

10   people hear things differently.  They remember things

11   differently.  In some cases, they're remembering things from

12   15 and 20 years ago.

13        So ask yourselves, if they were all lying to you,

14   each and every one of them, wouldn't they have done a better

15   job of getting their stories straight?  And if they were

16   lying to you, how do you explain away the physical evidence?

17   the defendant's own words?  Those exhibit don't lie.

18        With respect to Mr. -- the assault on Mr. Bond, you

19   heard Scott Cupples tell you that this defendant told him to

20    kill members of the D.C. Blacks all the way back at the

21    A.D.X.  You heard that from Richard Bernard also that this

22    defendant at the A.D.X. ordered members of the Aryan

23    Brotherhood to kill members of the D.C. Blacks.  And how do

24    you know they are telling the truth?

25        Look at the hit list that was found in his cell.


UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 265 of 342    Page ID
#:39084

UNITED STATES DISTRICT COURT

69

1    Look at what he did with Irving Bond.

2            Now, there is some question about Mr. Cupples'

3    testimony that Patrick Mills got the information from

4    John Gotti on the rec yard and John Gotti told him -- well,

5    first of all, we don't know where Patrick Mills specifically

6    was housed.  We know that at some point he was housed in a

7    cell where you couldn't look at the rec yard.  We also know

8    that Springfield doesn't keep records of which cells inmates

9    are housed in, and we know that some cells on that unit look

10   over the rec yard.  And we know that John Gotti rec'd in that

11   rec yard, and when he got there, he would be taken to and

12   from through the hallway where he would have had the

13   opportunity to sign to Scott Cupples and to Steve Scott.

14           If Scott Cupples was lying about his conversations

15   with Steve Scott, why bother to tell John Gotti?  That's an

16   extraneous detail that is almost irrelevant except that it

17   tells you how things happened.  If he was lying, why bother?

18           Instead, you have to look at this evidence in the

19   context of the whole.  What was happening with the Aryan

20    Brotherhood at the time?  What was going on?  What was found

21    in his cell?  What kites was he sending?  This man said, "We

22    are at onsite war with the D.C. toads."  And when he got in a

23    position at Springfield to do something about it, he did.

24    And that is what the evidence shows consistently, and it

25    corroborates what the witnesses said.


UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 267 of 342    Page ID
#:39086

UNITED STATES DISTRICT COURT

70

1          In fact, Ms. Jacks talked about the Inmate Quarters

2    History regarding Gerald Kelly.  She says he was a member of

3    the D.C. Blacks.  He was on the hit list, and Steve Scott

4    didn't do anything about that.  Remember that -- what Scott

5    Cupples told you?

6          Your memory governs, not mine and not Ms. Jacks.

7    But if you will recall, Scott Cupples testified that the

8    original plan brought to him by Steve Scott was to kill a

9    correctional officer because at that time the guards had

10   started to become more lax.  Well, what does that tell you?

11   It tells you prior to that time the guards had not been so

12   lax, and he didn't have an opportunity to kill other people

13   on that cell.

14          And, if you'll recall, Scott Cupples testified that

15   part of the reason that Steve Scott wanted to kill the guard

16   was so he could get the keys and go up and down the tier and

17   kill not just Irving Bond but other enemies that were also on

18   that tier.  We don't know specifically who those enemies

19   were.  Could it have been Gerald Kelly?  Not sure.

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

20        Ladies and gentlemen, justice is blind.  You,

21   however, must look at the evidence.  And when you go back in

22   the jury room, you have to decide who you believe.  And you

23   don't have to like the Government's witnesses; they are

24   criminals.  But you do have to listen to what they had to say

25   and decide whether you believe them, whether their stories


                   UNITED STATES DISTRICT COURT

Case 2:02-cr-00938-R     Document 7150     Filed 05/18/16     Page 269 of 342     Page ID
#:39088

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

71

1   are sufficiently consistent with the other evidence in this

2   case, his handwritten letters; the fact that people were, in

3   fact, stabbed.

4           And then you have to decide was the Aryan

5   Brotherhood a criminal enterprise and was Steve Scott a

6   member?  That's part of what you have to decide.

7           Now, Ms. Jacks told you that simply being a member

8   of a gang is not enough to convict him.  And she is right.

9   Just being a member of a gang is not enough.  But if you find

10   that that gang is a criminal organization with criminal

11   goals, and that when he joined he said, "Yeah.  Let's commit

12   those crimes," and he agreed that there would be drug

13   trafficking and he agreed that there would be murder, that is

14   enough.

15          And ladies and gentlemen, I submit to you that the

16   evidence has shown that the Aryan Brotherhood exists, it is

17   an ongoing criminal organization; that its goals include

18   crimes involving drug trafficking and involving murder; and

19   that when Steve Scott joined that organization, he had to

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 270 of 342    Page ID
#:39089

20    have raised his hand and said, "Yes, drug trafficking; yes,

21    murder."

22            And I submit that the evidence has shown all along

23    during his membership in the Aryan Brotherhood his behavior

24    has been consistent with that agreement.  When the Aryan

25    Brotherhood told him to kill someone, he tried.  When the

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

72

1    Aryan Brotherhood told him to make weapons and to arm all of

2    the brothers, that's what he did.  When the Aryan Brotherhood

3    told him, "We are at war with the D.C. Blacks," he made a hit

4    list, and he made sure that everyone else on the tier that he

5    could get in touch with knew who the enemies were and who

6    needed to be killed on site.

7         And ladies and gentlemen, that is enough.  As long

8    as you believe that the Aryan Brotherhood is a criminal

9    organization and that when he joined he agreed that there

10   would be drug trafficking and there would be murders, at

11   least two of those things, and that the Aryan Brotherhood

12   effects interstate commerce by either using the mail or using

13   the telephone, using those people on the outside to forward

14   members back and forth, then I submit beyond a reasonable

15   doubt this defendant is guilty.

16        Thank you.

17        THE COURT:  All right.  Before you hear the

18   instructions, we will take a recess.

19        I would remind you of your duty not to converse or

20   otherwise communicate among yourselves or with anyone upon

21   any subject touching the merits of the cause on trial, and

22   you are not to form or to express any opinion in the case

23   until it's finally submitted to you for your verdict.

24          Now, as you -- as you go, you have not heard the --

25   the -- you have heard the arguments, but you have not heard


UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

73

1    the instructions of the Court; so we ask you not to make

2    any -- any determination of anything in terms of the facts

3    that have been presented to you possibly during the arguments

4    but not -- not with reference to its application to the -- to

5    the instructions which I will give you after the recess.

6         You are now excused until called.  Court will

7    remain in session.

8         (The following was held out of the presence of the

9         jury.)

10        THE COURT:  All right.  Ten minutes.

11        THE CLERK:  Court stands in recess for ten minutes.

12        (Brief recess.)

13        MS. WRIGHT:  This United States District Court is

14   now in session.

15        THE COURT:  Bring down the jury.

16        MS. JACKS:  Your Honor, I have one objection.  I

17   object to the general intent instruction.  The specific --

18        THE COURT:  I didn't hear you, ma'am.

19        MS. JACKS:  I object to the general intent

20    instruction.

21            (The following was held in the presence of the

22            jury.)

23            THE COURT:  The record will show the jurors are all

24    present and in their proper places.  The defendant is present

25    with his counsel.

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

74

1        Members of the jury, now that you have heard the

2    evidence and the arguments the lawyers, I must now instruct

3    you on the law that applies to this case.  Your duty is to

4    find the facts from all the evidence allowed during the

5    trial.

6        To apply the law to the facts and to return a

7    verdict you must follow the law as I give it to you, whether

8    you agree with it or not.

9        You must not be influenced by any personal likes or

10   dislikes, opinions, prejudices or sympathies.  You must

11   decide the case only on the evidence, as you promised to do

12   at beginning of the case.

13        All instructions are equally important; so you must

14   follow them all and not ignore any of them.

15        The indictment charges you -- charges a conspiracy

16   to violate the RICO laws.  And you will have the

17   instruction -- the in indictment in the jury room with you so

18   that you can guide your deliberations by that as to what acts

19   are charged and whether or not the evidence does support

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R     Document 7150     Filed 05/18/16     Page 276 of 342    Page ID
#:39095

20    whatever acts are charged in the indictment.

21          An indictment is not evidence, and you are not to

22    consider it as any evidence.  A defendant is presumed to be

23    innocent until every part the charges are proved against him

24    beyond a reasonable doubt.  A defendant is not required to

25    prove he is innocent.  If the Government fails to prove the


                    UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

75

1    charge, you must return a not guilty verdict.

2         A reasonable doubt is a doubt that is based upon

3    reason and common sense.  Proof beyond a reasonable doubt is

4    proof that leaves you firmly convinced of a defendant's

5    guilt.

6         There are very few thing in the world that we know

7    with absolute certainty.  And in criminal cases the law does

8    not require proof that overcomes every possible doubt.

9         You cannot convict on mere suspicion.  If based

10   upon your consideration of all of the evidence you are firmly

11   convinced that the defendant is guilty of the crime charged,

12   you must find him guilty.  If, on the other hand, you think

13   based upon reason and common sense that the Government has

14   not firmly convinced of the guilt of the defendant, you must

15   find him not guilty.

16         Evidence beyond a reasonable doubt is such proof

17   that a reasonable person in the use of reason and common

18   sense would be willing without hesitation to make the most

19   important decisions in his or her own life.

20         You have heard testimony that the defendant made --

21    made statements.  It is for you to decide, one, whether the

22    defendant made the statement, and if so, how much weight to

23    give to it.  In making those decisions, you must consider all

24    the evidence about the statement, including the circumstances

25    under which the witness may have made it.


                    UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

76

1            Count II is the count you are dealing with in the

2    indictment.  Count II alleges that from an unknown date and

3    continuing until at least July 25th of 2002, within the

4    Central District of California and elsewhere, defendant

5    Steven Loren Scott, and there are -- and you will have in the

6    indictment the names of all those persons who are -- who are

7    indicted in this matter in Count II of the indictment -- that

8    Steven Loren Scott and others, known and unknown, unlawfully,

9    willfully, and knowingly combined, conspired, confederated,

10   and agreed, together and with each other to violate Title 18

11   United States Code Section 16 -- 1962C; that is, to conduct

12   and participate, directly and indirectly, in the conduct of

13   the affairs of the enterprise through a pattern of

14   racketeering activity consisting of multiple acts involving

15   murder in violation of various state laws, and distribution

16   of controlled substances, including heroin, methamphetamine,

17   and cocaine, Count II further alleges that the defendant was

18   associated with the Aryan Brotherhood criminal enterprise,

19   the activities of which affected interstate commerce, and

20    that the defendant agreed that a conspirator would commit at

21    least two acts of racketeering in the conduct of the affairs

22    of the enterprise.

23            Section 1962D of Title 18 of the United States Code

24    provides that it shall be unlawful for any person to

25    conspire, to violate any provisions of subsections A, B, or C

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 281 of 342    Page ID #:39100

UNITED STATES DISTRICT COURT

77

1    of this section.

2            Section 1962C of the Title 18 of the United States

3    Code provides in part that it shall be unlawful for any

4    person employed by or associated with an enterprise engaged

5    in or activities of which affect interstate or foreign

6    commerce to conduct or participate, directly or indirectly,

7    in the conduct of such enterprise affairs through a pattern

8    of racketeering activity.

9            In order to convict the defendant on the RICO

10   conspiracy offense charged in Count II, the Government must

11   prove all of the following four elements beyond a reasonable

12   doubt.

13           First, that -- that an enterprise would be

14   established as alleged in the indictment;

15           second, that the enterprise or its activities would

16   affect interstate commerce;

17           third, that the defendant would be associated with

18   the enterprise;

19           fourth, that the defendant knowingly agreed to

20    conduct or participate directly or indirectly in the conduct

21    of the affairs of the charged enterprise through a pattern of

22    racketeering activity.

23          I will instruct you on the meaning of the terms

24    "enterprise," "affecting interstate commerce," "pattern of

25    racketeering activity," and "associated with the enterprise."


UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

78

1          To convict the defendant on the charge -- on the

2     charged RICO conspiracy offense in Count II, the Government

3     is not required to prove that the alleged enterprise was

4     actually established, that the defendant was actually

5     associated with the enterprise, or that the enterprise or

6     activities actually affected interstate commerce.  Rather,

7     because the agreement to commit a RICO offense is the essence

8     of a RICO conspiracy offense, the Government need only prove

9     that if the conspiracy offense were completed as

10    contemplated, the enterprise would be established, that the

11    defendant would be associated with the enterprise, and that

12    the enterprise or its activities would affect interstate

13    commerce.

14          The defendant may be convicted of a RICO conspiracy

15    offense even if he did not personally participate in the

16    operation or management of the enterprise when the evidence

17    establishes that the defendant knowingly agreed to facilitate

18    a scheme which, if completed, would constitute a RICO

19    substantive violation involving at least one conspirator who

20    would participate in the operation or management of the

21    enterprise.

22            First, to prove the RICO conspiracy violation

23    charged in Count II, the Government must prove beyond a

24    reasonable doubt the existence of an enterprise.  The

25    enterprise alleged in the indictment is the Aryan Brotherhood

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

79

1    prison gang.

2         As used in these instructions, the term

3    "enterprise" includes any union or group of individuals

4    associated in fact, although not a legal entity.  The term

5    "enterprise," as used in these instructions, may include a

6    group of people associated in fact, even though this

7    association is not recognized as a legal entity.  Thus, an

8    enterprise need not be a formal business entity, such as a

9    corporation, but may be merely an informal association of

10    individuals.  A group or association of people can be an

11    enterprise if these individuals have associated together with

12    a common purpose of engaging in a course of conduct.

13         Such an association of persons maybe established by

14    evidence showing an ongoing organization, formal or informal,

15    and by evidence that the people taking up the association

16    functioned as a continuing unit.

17         Therefore, in order to establish the existence of

18    such an enterprise, the Government must prove that there is

19    an ongoing organization -- ongoing organization with some

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 286 of 342    Page ID #:39105

20    sort of framework for making or carrying out decisions.

21            Two, that the various members and associates of the

22    association functioned in a continuing unit to achieve a

23    common purpose.

24            And three, the enterprise is separate and apart to

25    make pattern of activity in which it engages, in other words,


UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

80

1    that it has separate existence of the pattern of racketeering

2    acts.

3          Regarding organization, it is not necessary that

4    the enterprise have a particular or formal structure, but it

5    must have sufficient organization, and its members functioned

6    and operated in a coordinated manner in order to carry out of

7    the alleged common purpose or purposes of the enterprise.

8    Continuing membership exists even where the membership

9    changes by adding or losing individuals during the course of

10    its existence.

11          Therefore, such an association of individuals may

12    retain its status as an enterprise even though the membership

13    association changes by adding or losing individuals during

14    the course of the existence -- of its existence.

15          Separate existence means that the enterprise has an

16    existence beyond that which is necessary merely to commit

17    each of the charged racketeering acts.  That is, that the

18    organization continued to exist in the intervals between the

19    alleged racketeering activities.

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 288 of 342    Page ID
#:39107

20          It is not necessary, however, to find that the

21   enterprise had some function wholly unrelated to racket- --

22   to the racketeering activity.  Common sense dictates that the

23   existence of an association in fact enterprise is oftentimes

24   more readily proven by what it does than by abstract analysis

25   of it's structure.


UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

81

1    Moreover, you may consider proof of the

2    racketeering acts to determine whether the evidence

3    establishes the existence of the charged enterprise.  Thus,

4    evidence of the function of overseeing and coordinating the

5    commission of several different predicate racketeering acts

6    and other activities on an ongoing basis may satisfy the

7    separate existence of the enterprise requirement.

8    The second element that the Government must prove

9    beyond a reasonable doubt is that the enterprise or its

10   activities would affect interstate commerce.  The Government

11   is not required to prove a significant or substantial effect

12   on interstate commerce; rather, a minimal effect on

13   interstate commerce is sufficient.

14   It is not necessary for the Government to prove

15   that the individual racketeering acts themselves affected

16   interstate commerce; rather, it is the enterprise and its

17   activities, considered in their entirety, that -- that must

18   be shown to have that effect.

19   On the other hand, this effect on interstate

20    commerce may be established through the effect caused by the

21    individual racketeering acts.

22            Moreover, it is not necessary for the Government to

23    prove that the defendant knew that the enterprise would

24    affect interstate commerce, that the defendant intended to

25    affect interstate commerce, or that the defendant's

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

82

1    activities affected interstate commerce.

2        The Government contends that the enterprise in this

3    case affected interstate commerce in the following ways,

4    among others, through the use of interstate mail and through

5    the use of telephone facilities.

6        The Government must prove beyond a reasonable doubt

7    that the defendant would be associated with the enterprise.

8    "Associated with" should be given its plain meaning.  As

9    stated in Webster's Third International Dictionary,

10    "associate" means "to join, often in a loose relationship as

11    a partner, fellow worker, colleague, friend, companion, or

12    ally to join or connect with one another.  Therefore, it's a

13    person -- a person is associated with an enterprise when, for

14    example, he joins with other members of the enterprise and he

15    knowingly aids or furthers the activities of the enterprise

16    or he conducts business with or through the enterprise.

17        The agreement to -- to commit a RICO offense is the

18    essential aspect of a RICO conspiracy offense.  You may find

19    that the defendant has entered into the requisite agreement

20    to violate RICO when the Government has proven beyond a

21    reasonable doubt that the defendant agreed with at least one

22    other co-conspirator that at least two racketeering acts

23    would be committed by a member of the conspiracy in the

24    conduct of the affairs of the enterprise.

25         The Government is not required to prove that the


UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

83

1    defendant personally committed two racketeering acts or that

2    he agreed to personally commit two racketeering acts.

3    Rather, the Government must prove beyond a reasonable doubt

4    that the defendant agreed to participate in the enterprise

5    with the knowledge and intent that at lease one member of the

6    RICO conspiracy, which could be the defendant himself or some

7    other co-conspirator, would commit at least two predicate

8    racketeering acts in the conduct of the affairs of the

9    enterprise.

10         In addition, the indictment need not specify the

11    predicate racketeering acts that the defendant agreed would

12    be committed by some member of the conspiracy in the conduct

13    of the affairs of the enterprise.

14         You may consider evidence presented of racketeering

15    acts committed or agreed to be committed by any

16    co-conspirator in furtherance of the enterprise's affairs to

17    determine whether the defendant agreed at least -- that at

18    least one member the conspiracy would commit two or more

19    racketeering acts.

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 294 of 342    Page ID
#:39113

20          Moreover, in order to convict the defendant of the

21   RICO conspiracy offense, your verdict must be unanimous as to

22   which type or types of predicate racketeering activity the

23   defendant agreed would be committed.  For example, at least

24   two acts of murder, attempted murder, or drug trafficking, or

25   one of each, or any combination thereof.


          UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 295 of 342    Page ID
#:39114

UNITED STATES DISTRICT COURT

84

1          Furthermore, to establish the requisite

2     conspiratorial agreement, the Government is not required to

3     prove that each co-conspirator explicitly agreed with every

4     other co-conspirator to commit the substantive RICO offense

5     or knew -- know all these fellow co-conspirators or was aware

6     of all of the details of the conspiracy.  Rather, to

7     establish sufficient knowledge, it is only required that the

8     defendant know the general nature and common purpose of the

9     conspiracy and that the conspiracy extends beyond his

10     individual role.

11          Moreover, the elements of a RICO conspiracy such as

12     the co-conspirator -- the conspiratorial agreement, the

13     defendant's knowledge of it, and the defendant's

14     participation in the conspiracy may be inferred from

15     circumstantial evidence.

16          For example, if the evidence established that the

17     defendant and at least one other conspirator committed

18     several racketeering acts in furtherance of the charged

19     enterprise's affairs, you may infer the existence of the

20    requisite agreement to commit a RICO offense.  However, it is

21    for you to determine whether, based upon the entirety of the

22    evidence, the Government has proven that the defendant has

23    entered into the required conspiratorial agreement.

24         Furthermore, it is not necessary that the

25    Government prove that the defendant was a member of the


                    UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

85

1    conspiracy from its beginning.  Different persons may become

2    members of the conspiracy at different times.

3          To convict the defendant on -- on the charge --

4    charged RICO conspiracy in Count II, the Government is not

5    required to prove that the defendant partic- -- personally

6    participated in the operation or management of the

7    enterprise.  Rather, a defendant may be convicted of a RICO

8    conspiracy offense even if he did not personally participate

9    in the operation or management when the evidence establishes

10   that the defendant knowingly agreed to -- to facilitate a

11   scheme which, if completed, would constitute a RICO

12   substantive violation involving at least one conspirator who

13   would participate in the operation of the management of the

14   enterprise.

15          Thus, the Government must prove that at least one

16   conspirator participated in the operation or management of

17   the enterprise itself, or at least one conspirator had some

18   part in directing the enterprise's affairs.  Such proof may

19   include evidence of a conspirator intentionally performing

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 298 of 342    Page ID #:39117

20    acts, functions, or duties which are necessary to or helpful

21    in the operation of the enterprise.

22          However, participation in the operation or

23    management of the enterprise does not require one to have

24    exercised a significant control over or within the

25    enterprise, or to have a formal position in the enterprise,

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

86

1    or to have primary responsibility for the enterprise's

2    affairs.

3        The indictment alleges that the defendant and his

4    alleged co-conspirators conspired to violate Title 18 United

5    States Code 1962C; that is, to conduct and participate,

6    directly or indirectly, in the conduct of the affairs of the

7    enterprise through a pattern of racketeering activity

8    consisting of multiple acts involving murder -- multiple acts

9    involving murder, in violation of Illinois Criminal Code

10   Sections 8-2 and 9-1; Kansas Criminal Code Sections 21-3302

11   and 21-3401; the Missouri Revised Statutes, Sections 562.041

12   and 564.011 and 565.020; and distribution of controlled

13   substances, including heroin, methamphetamine, and cocaine,

14   in violation of Title 21 United States Code Sections 841A1,

15   843(b), and 846.

16       To convict the defendant on the charged RICO

17   conspiracy offense in Count II, the Government is not

18   required to prove that any defendant or any conspirator

19   actually committed, caused or aided and abetted any

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 300 of 342    Page ID
#:39119

20    racketeering act.

21         Moreover, it is not necessary in order to convict

22    the defendant of a charged conspiracy that the objectives or

23    purposes of the conspiracy, whatever they may be, have been

24    achieved or accomplished.  The ultimate success or failure of

25    the conspiracy is irrelevant; rather, the conspiratorial

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

87

1   agreement to commit a RICO offense is the essential aspect of

2   a RICO conspiracy offense.

3          To establish a pattern of RICO activity as alleged

4   in Count II of the indictment, the Government must prove

5   three elements beyond a reasonable doubt.

6          The defendant agreed to the commission of at least

7   two acts of racketeering within ten years of each other by

8   either the defendant or by a conspirator;

9          two, the racketeering acts are related; that is,

10  have the same or similar purposes, results, participants,

11  victim, or methods of commission, or be otherwise

12  interrelated by distinguishing characteristics and not be

13  merely isolated events.  Two racketeering acts may be related

14  even though they are dissimilar or not directly related to

15  each other, provided that the racketeering acts are related

16  to the same enterprise.

17          For example, the requisite relationship between the

18  RICO enterprise and a predicate racketeering act may be

19  established by evidence that the -- that the defendant was

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 302 of 342    Page ID
#:39121

20    enabled to commit the racketeering act solely by virtue of

21    his position in the enterprise or involvement or control over

22    its affairs or by evidence that the racketeering act

23    benefited the enterprise or involvement in or control over

24    the -- its affairs, or by evidence that the racketeering act

25    benefited the enterprise or by evidence that the racketeering

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 303 of 342    Page ID
#:39122

UNITED STATES DISTRICT COURT

88

1    act promoted or furthered the purpose of the enterprise.

2           The racketeering acts themselves, either extended

3    over a substantial period of time or they pose a threat of

4    continued criminal activity, the Government need not prove

5    such a threat of continuity by any mathematical formula or by

6    any particular method of proof; but rather may prove it by a

7    variety of ways.

8           For example, the threat of continued unlawful

9    activity may be established when the evidence shows the

10   racketeering acts are part of a long-term association that

11   exists for criminal purposes, or when the racketeering acts

12   are shown to be the regular way of conducting the affairs of

13   the enterprise.

14          The indictment alleges that the act -- that the

15   racketeering activity consists of multiple acts involving

16   murder, in violation of Colorado Criminal Code, Illinois

17   Criminal Code, Kansas Criminal Code, and Missouri Criminal

18   Code.

19          And -- and also the distribution of controlled

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 304 of 342    Page ID
#:39123

20    substances, including heroin, methamphetamine, and cocaine,

21    in violation of Title 21 United States Code Sections 841A1,

22    843B, and 846.

23         In order to find -- this is with reference to

24    Colorado.

25         In order to find that this racketeering activity


              UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

89

1    was committed, the Government must prove the following

2    essential elements beyond a reasonable doubt.  That a member

3    or members of the conspiracy caused the death of a victim and

4    that the member or members of the conspiracy did so after

5    deliberation with the intent to cause the death of the victim

6    or another person.

7           "After deliberation" means not only intentionally,

8    but also the decision to commit the act was made after the

9    exercise of reflection and judgment concerning the act.  An

10    act committed after deliberation is never one which has been

11    committed in a hasty or impulsive manner.

12           Question of conspiracy of murder in Colorado.

13           In order to find that this racketeering activity

14    was committed, the Government must prove the following

15    essentially elements beyond a reasonable doubt.

16           One, that a member or members of the conspiracy

17    agrees to the commission of the murder with the intent to

18    promote or facilitate its commission; and

19           two, that a member or members of the conspiracy

file:///C|/Documents%20and%20Settings/Owner/My%2...rial%2002-938/10-04-07%20Day%206%20All%20Day.txt (177 of 214)2/22/2007 10:38:24 AM

20    commit an overt act in pursuance of the murder.

21          "Overt act" means any act knowingly committed by

22    one of the conspirators in an effort to effect or accomplish

23    some object or purpose of the conspiracy.  The overt act need

24    not be criminal in nature.  If conspired separately and apart

25    from the conspiracy; it must, however, be an act which

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 307 of 342    Page ID #:39126

UNITED STATES DISTRICT COURT

90

1    follows and tends toward accomplishment of a plan or scheme

2    and must be knowingly done in furtherance of some object or

3    purpose of the conspiracy charged in the indictment.

4           Murder in Illinois.  In order to find that the

5    racketeering activity was committed, the Government must

6    prove the following essential elements beyond a reasonable

7    doubt.

8           One, that a member or members of the conspiracy

9    caused the death of the victim; and

10          two, that the member or members of the conspiracy

11   either, A, attended -- intended to kill or do great bodily

12   harm to the victim or another individual; or, B, knows that

13   such acts will cause death to the victim or another

14   individual; or, C, knows that such acts create a strong

15   probability of death or great bodily harm to the victim or

16   another individual.

17          In order to find the racketeering activity was

18   committed, the Government must prove the following essential

19   elements beyond a reasonable doubt.

20          That a member or members of the conspiracy agrees

21    to the commission of the murder with the intent that the

22    murder be committed; and

23          two, that a member or members of the conspiracy

24    commit an act in furtherance of the murder.

25          An agreement may be implied from the conduct of the

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 309 of 342    Page ID #:39128

UNITED STATES DISTRICT COURT

91

1    parties, although they acted separately or by different means

2    and did not come together or enter into an expressed

3    agreement.

4         The murders in Kansas.  One, that a member or

5    members of the conspiracy killed a victim; and, two, that the

6    member or members of the conspiracy did so intentionally and

7    with premeditation.

8         "Premeditation" means to have thought over the

9    matter beforehand.

10         In order to find that this racketeering activity

11    was committed, the Government must prove the following

12    essential elements beyond a reasonable doubt.

13         One, that a member or members of the conspiracy

14    agreed with one another person to commit the murder or to

15    assist in committing the murder; and

16         two, a member or members of the conspiracy

17    committed an overt act in furtherance the conspiracy.

18         A "conspiracy" is an agreement with other persons

19    to commit a crime or to assist in committing a crime followed

20    by an act in furtherance of the agreement.  The agreement may

21    be established by any -- in any manner sufficient to show

22    understanding.  It may be oral or written or inferred from

23    all of the facts and circumstances.

24              An act in furtherance of an agreement is an act

25    knowingly committed by a member of the conspiracy in an

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

92

1    effort to effect or accomplish the object of the conspiracy.

2    The act itself need not be criminal in nature.  It must,

3    however, be an act which follows and tends toward the

4    accomplishment of the object of the conspiracy.

5         The act may be committed by a conspirator alone.

6    It is not necessarily that other conspirators be present when

7    the act is committed.  Proof of only one such act is

8    sufficient.

9         Murder in Missouri.  In order to find that this

10   racketeering activity was committed, the Government must

11   prove beyond a reasonable doubt that a member or members of

12   the conspiracy knowingly caused the death of -- of the

13   victim; and, two, that the member or members of the

14   conspiracy did so after deliberation upon the matter.

15        Deliberation for purposes of first degree murder

16   means cool reflection upon victim's death for some amount of

17   time, no matter how short.

18        In order to find that this racketeering activity

19   was committed, the Government must prove the following

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R     Document 7150     Filed 05/18/16     Page 312 of 342     Page ID
#:39131

20          essential elements beyond a reasonable doubt.

21                  First, that a member or members of the conspiracy

22          agreed with each -- with -- with such person or persons that

23          they should commit murder with the purpose of promoting or

24          facilitating the murder;

25                  two, that one member or members of the conspiracy

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

93

1    committed at least one overt act in pursuance of the murder.

2        An "overt act" is an act which must be -- which

3    must accompany or follow the agreement and must be done in

4    furtherance of and designed to carry out the purpose or

5    object of the conspiracy.

6        There is no requirement that such act be a physical

7    one or be a substantial step in the commission of the murder.

8        To show a conspiracy, it is not necessary that

9    there be direct evidence of any explicit agreement between

10   two or more persons.  The agreement can be established by

11   circumstantial evidence and need show no more than a tacit

12   understanding among the participants.

13        Multiple acts of distribution of controlled

14   substances, including heroin, methamphetamine, and cocaine,

15   in violation of Title 21 United States Code Section 841A1,

16   843B, and 846 include distribution of a controlled substance

17   and conspire -- conspiring to distribute a controlled

18   substance.

19        Distribute a con- -- distribute of heroin,

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 314 of 342    Page ID
#:39133

20    methamphetamine, and cocaine, as alleged in Count II of the

21    indictment contains several essential elements.  In order to

22    find that one or more members of the conspiracy committed

23    this racketeering activity, the Government must prove the

24    following essential elements beyond a reasonable doubt.

25           A member or members of the conspiracy knowingly and


           UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 315 of 342    Page ID #:39134

UNITED STATES DISTRICT COURT

94

1    intentionally distributed, transferred approximately the

2    controlled substance described in Count II of the indictment;

3    and

4            two mat the time of such distribution or transfer,

5    that the -- he knew that the substance distributed was

6    heroin, methamphetamine, or cocaine.

7            It is solely for you, however, to determine whether

8    or not the Government has proven beyond a reasonable doubt

9    that the defendant distributed, possessed with intent to

10    distribute, or possessed a substance which was heroin,

11    methamphetamine, or cocaine.

12            The term "to distribute" as used in those

13    instructions means to deliver or to transfer, to attempt to

14    deliver or transfer possession or control of something from

15    one person to another.

16            The term "to distribute" includes the sale of

17    something by one person to another.

18            In order to prove a conspiracy to distribute

19    heroin, methamphetamine, or cocaine, the Government must

20    prove the following elements beyond a reasonable doubt.

21         That there was an agreement between two or more

22    persons to engage in conduct that violates federal drug law;

23         second, that the defendant knew of the conspiracy;

24    and

25         third, that the defendant knowingly and voluntarily

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

95

1   became a part of the conspiracy.

2           The law allows proof of a drug conspiracy by direct

3   or circumstantial evidence, and therefore you may consider

4   either in reaching your verdict.

5           Once it has been shown that a conspiracy exists,

6   the evidence need only establish a slight connection between

7   the defendant and the conspiracy to support conviction.  For

8   example, a defendant need not have knowledge of all

9   co-conspirators or of the details of the conspiracy and need

10   be convicted despite having played only a minor part in the

11   overall conspiracy.

12           Proof of an overt act in furtherance of the

13   conspiracy is not required to sustain a drug conspiracy

14   conviction.  Instead, the evidence is sufficient if it proves

15   these three elements that -- that is, that there was an

16   agreement to violate federal drug law, that the defendant

17   knew of the conspiracy, and that the defendant knowingly and

18   voluntarily became a part of the conspiracy.

19           Evidence of a defendant's membership in a gang, by

20    itself, is insufficient to establish that a person's guilt of

21    a crime or as a co-conspirator.

22            You have heard testimony that the witnesses

23    received benefits from the Government in this case, including

24    money, promises from -- from the Government that they will

25    not be charged or prosecuted for crimes, and promises from


UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

96

1    the Government to recommend lenient treatment in their own

2    cases.

3         You should examine such testimony with greater

4    caution than that of other witnesses.  In evaluating that

5    testimony you should consider the intent to which it may have

6    been influenced by the receipt of benefits from the

7    Government.

8         You have heard from witnesses who have pleaded

9    guilty to a crime arising out of the same -- of the same

10   elements for which the defendant is on trial.  This guilty

11   plea is not evidence against the defendant, and you may

12   consider it only in determining this witness' believability.

13   You should consider this witness' testimony with great

14   caution, giving it the weight you feel it deserves.

15         The parties have agreed that the testimony of

16   Mark Bezy, William Halpin, Brian Jett, Thomas Jones, and

17   Tom Smith would be -- would be, if called as a witness.  You

18   should consider the testimony in the same way as it has been

19   given to you here in court; that is, the reading of the

20    testimony by stipulation.

21          The parties have agreed to certain facts that have

22    been stated to you.  You should therefore treat those facts

23    as having been proved.

24          The evidence that you can use to reach your verdict

25    is the sworn testimony of the witnesses, all exhibits

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

97

1    received in evidence, all facts you accept as judicially

2    noticed, all facts which have been agreed or stipulated, and

3    all presumption upon which I instruct you.

4         In considering evidence, you need not accept simply

5    the bald statements of a witness.  You can use your own

6    experience to draw your conclusions from the facts you find

7    have been proved.

8         Evidence maybe either direct or circumstantial.

9    Direct evidence is direct proof of a fact, like eyewitness

10   testimony or the contents a document.  Circumstantial

11   evidence is proof of a chain of facts that leads to the

12   conclusion that some act has been committed or leads to

13   another fact.  In law, there is no difference.  You may use

14   both in determining the facts of this -- in this case.

15        A trial does not require that the prosecution call

16   every possible witness to an event or to produce everything

17   that may be mentioned during the trial.  That often could be

18   time consuming and of no real value.  You can consider the

19   failure to produce witnesses or evidence if you feel it is

20    necessary to your determination of the believability of a

21    witness or to meet the Government's burden of proof of every

22    element of the charge beyond a reasonable doubt.

23         "Knowingly" means that an act or failure to act

24    was done or omitted voluntarily or intentionally and not

25    because of accident, mistake or other innocent reason.


                    UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

98

1        "Willful" is a direct volition of the will to do an

2    act which the law forbids or to fail to do an act which the

3    law requires to be done.  It is simply a deliberate act to

4    violate a law.

5        To determine the intent of a -- of a defendant, you

6    may use circumstantial evidence.  Intent cannot ordinarily be

7    proved by direct evidence because there is no way of seeing

8    into the actual operation of a human mind.  What a defendant

9    says or does and the circumstances surrounding an act or

10    statement is generally the best method of determining the

11    intent or knowledge of a defendant.

12        You should not confuse motive and intent.  "Motive"

13    is why a person acts; "intent" is the state of mind with

14    which the act is done.

15        Personal advancement and financial gain are

16    recognized reason for peopling acting.  These are a lot of

17    the motives that may prompt one person to acts of good,

18    another to acts of crime.

19        Good motive alone is never a defense to a crime.

20    You should consider motive only as a help to determine the

21    intent or knowledge of a defendant.

22            The law does not compel a defendant to testify, and

23    in the exercise of that Constitutional right, you may not

24    presume any guilt of a defendant, not even an inference of

25    guilt can be drawn -- can be drawn from the failure of a

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

UNITED STATES DISTRICT COURT

99

1    defendant to testify.

2        When you retire, you should select one your number

3    to act as your foreperson.  That person will preside over

4    your deliberations and will be your spokesperson here in

5    court.

6        You will then discuss the case with your fellow

7    jurors to reach an agreement.  Your verdict must be

8    unanimous.  Each you must decide the case for yourself, but

9    you should do so only after you have considered all of the

10   evidence, discussed it fully with the other jurors, and

11   listened to the views of your fellow jurors.  Don't be afraid

12   to change your opinion if the discussion persuades that you

13   that you should.

14       You decide, and don't just join the opinion of

15   another juror unless you can conscientiously agree.

16       It is important that you try to reach a unanimous

17   verdict, but only upon your conscientious -- conscientious

18   individual decision.  Do not change an honest belief about

19   the weight and effect of evidence simply to reach a verdict.

20          In trying to reach a verdict, approach it as any

21     reasonable person would approach everyday decisions.  Use

22     your good common sense, consider the evidence for only the

23     purposes for which it has been allowed, and give it a

24     reasonable and fair interpretation of your experience with

25     the natural tendencies and inclinations of human beings.


                    UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 327 of 342    Page ID #:39146

UNITED STATES DISTRICT COURT

100

1       If the defendant have been proved guilty beyond a

2    reasonable doubt, say so.  If not proved guilty, say so.

3       Remember also that the question before you can

4    never be will the Government win or lose this case.  Our

5    system of Government always wins when justice is done,

6    whether the verdict is guilty or not guilty.

7       In determining whether the Government has proved

8    the charges against the defendant, you should not and cannot

9    consider punishment.  Punishment is my sole responsibility

10    and should not and cannot be considered by you in reaching an

11    impartial verdict.

12       We have prepared a formal verdict for your

13    convenience.  And it reads in the title of the matter, first:

14    "We the jury in the above-entitled cause find the defendant,"

15    and then there is a blank, "guilty or not guilty as charged

16    in Count II of the First Superseding Indictment."

17       The foreperson of the jury puts in the unanimous

18    verdict either guilty or not guilty as charged in Count II of

19    the first superseding indictment.

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 328 of 342    Page ID
#:39147

20          As was explained in the jury instructions, in order

21    to convict the defendant of a RICO conspiracy offense charged

22    in Count II, you must find beyond a reasonable doubt that the

23    defendant agreed that two or more acts of racketeering

24    activity would be committed by some member or members of the

25    conspiracy, and you must be unanimous as to which type or

UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%202002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R     Document 7150     Filed 05/18/16     Page 329 of 342     Page ID #:39148

UNITED STATES DISTRICT COURT

101

1    types of racketeering activity that you found that the

2    defendant had agreed would be committed.

3           If you found the defendant guilty of Count II, you

4    are asked to identify which kind or kinds of racketeering

5    activity you unanimously found that the defendant agreed

6    would be committed.

7           And there is two acts involving murder.  There is a

8    yes or no.  Do you unanimously find that there were two acts

9    involving murder?  Then you find that, and the foreperson of

10   the jury puts the unanimous verdict of the jury, either yes

11   or no.

12          Two acts involving drug trafficking.  If you find

13   that there's proof -- been proof of two acts of drug

14   trafficking, the person -- the foreperson of the jury puts in

15   the yes or no in the -- in the verdict.

16          One act of each, yes or no.  The foreperson puts in

17   the unanimous verdict of the jury.

18          If you unanimously found that defendant agreed that

19   acts involving murder would be committed, please identify

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 330 of 342    Page ID #:39149

20    which acts involving murder you unanimously found that the

21    defendant agreed would be committed.

22          One, murder of Ismael Benitez-Mendez; murder of

23    Jimmy Lee Inman; murder of Frank Ruopoli; murder of the

24    Irving Bond; murder of Walter Johnson, Wakil; murder of

25    Walter Johnson, Butch Prince; conspiracy to murder a

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

102

1    D.C. Black inmate, excluding Irving Bond and Walter Johnson,

2    Butch Prince; conspiracy to murder a second D.C. Black

3    inmate, excluding Irving Bond and Walter Johnson, Butch

4    Prince.

5        The foreperson of the jury puts in as each of those

6    yes or no.  The foreperson of the -- person of the jury then

7    signs the verdict and the special verdicts with the date that

8    the verdict is returned and returns it here to court.

9        Counsel, approach the bench.

10       THE COURT:  Any objection as given by the -- by the

11   Government?

12       MS. JACKS:  Your Honor.

13       THE COURT:  By the defendant.

14       MS. JACKS:  As previously stated.

15       THE COURT:  Let me caution you again that nothing I

16   have said in these instructions, nothing in the forms of

17   verdict that have been prepared for your use, no question of

18   mine, no admonition of mine to any counsel, no rulings that

19   have been made on any evidence is to suggest in any way what

20   verdict I think you should find.  Whatever verdict you

21   return, it is your exclusive responsibility and should not be

22   he affected by any outside influence.

23          If you need to communicate with me about any

24   questions that you have, you can send me a note.  You should

25   not attempt to communicate with me during deliberations

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

103

1    except by a signed note, and remember you are not to tell

2    anyone how the jury stands, numerically or otherwise, until

3    you have reached a unanimous verdict.

4            Swear the bailiff.

5            THE CLERK:  Would you bailiffs go to the lectern,

6    please.

7            Please state your names for the record.

8            BAILIFF NOBLE:  The first is Dennis, D-e-n-n-i-s;

9    the last name is Noble, N-o-b-l-e.

10            BAILIFF PERCIVAL-WRIGHT:  Janine Percival-Wright,

11    J-a-n-i-n-e P-e-r-c-i-v-a-l W-r-i-g-h-t.

12            THE CLERK:  Please raise your right hand.

13            Do you solemnly swear that you will keep this jury

14    together in some private and convenient place; that you will

15    not permit any person to speak to or communicate with them

16    nor do so yourself unless by order of the Court or to ask

17    them if they have agreed upon a verdict or that you will

18    return them to court when they have so agreed or by so order

19    of the Court, so help you God.

20          BAILIFF NOBLE:  I will.

21          BAILIFF PERCIVAL-WRIGHT:  I will.

22          THE COURT:  All right.  The members of the jury

23   will retire except Alternates 19, 49, 29, and 9, if you will

24   just remain in the courtroom.  You will retire to consider

25   the verdict.  We are going to send you to lunch together

UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT

104

1    immediately so that you have lunch.

2        All right.  You are excused.

3        (The following was held out of the presence of the

4        jury.)

5        THE COURT:  I'm sorry.  I had to address you by --

6    by numbers, but that's what we had to do in this case so that

7    there would be no problems arise in the case.

8        You -- I wanted to tell you that you performed a

9    significant public service in giving us your time, being

10   available to us.  If anything happened to any of the jurors,

11   that you would have to then be seated and deliberate with the

12   jurors as they deliberate now.

13       I ask you not to talk about the case until the jury

14   has finally reached a verdict.  If you wish to talk about the

15   case at that time you may do so, but nobody can force you to

16   talk about this case.  So if anybody asks you any questions

17   about the case and you don't want to talk to them, you just

18   walk away from them.  If they insist on talking to you and

19   you don't want to talk to them, you just go to a phone, call

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

20   (2130 894-5267, and we will take care the matter for you so

21   that you won't have to talk to those people.

22          You are now excused with our thanks until further

23   notice.  Thank you, all four of you.

24          (Whereupon, the alternate jurors leave the

25          courtroom.)


                UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 337 of 342    Page ID
#:39156

UNITED STATES DISTRICT COURT

105

1          THE COURT:  We will be in recess in this matter

2    until called by the jury.

3          MS. WRIGHT:  This court stands in recess.

4          (Luncheon recess taken.)

5          (Jury deliberating.)

6          THE CLERK:  This United States District Court is

7    now in session.  The Honorable Manuel L. Real presiding.

8          THE COURT:  Bring down the jury.  I'm going to send

9    them home.  4:50 p.m.  We are going to send the jury home.

10          (The following was held in the presence of the

11          jury.)

12          THE COURT:  The record should reflect the jurors

13    are in their proper places and the defendant present with his

14    counsel.

15          I'm going to send you home for the evening, and I

16    ask you just not to think about this case and to come back

17    tomorrow morning at 10:00 o'clock.  And I would ask you to

18    not to start any deliberations until all of you are together

19    so that you can put your collective minds to the testimony

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 338 of 342    Page ID
#:39157

20    and the evidence which you have to consider.

21         You are now excused until 10:00 o'clock tomorrow

22    morning.  The jury is excused.  Court will remain in session.

23         THE CLERK:  Court stands in recess.

24         (The following was held out of the presence of the

25    jury.)


                    UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt
Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 339 of 342    Page ID
#:39158

UNITED STATES DISTRICT COURT

106

1          THE COURT:  10:00 o'clock tomorrow morning.

2          (Whereupon, Court was adjourned at 10:13 a.m.

3          until 10:00 a.m. on Thursday, October 5, 2006.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 340 of 342    Page ID
#:39159

20

21

22

23

24

25


UNITED STATES DISTRICT COURT

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R     Document 7150     Filed 05/18/16     Page 341 of 342     Page ID
#:39160

UNITED STATES DISTRICT COURT

107

1

2

3                    C E R T I F I C A T E

4

5

6       I hereby certify that the foregoing matter is transcribed

7    from the stenographic notes taken by me and is a true and

8    accurate transcription of the same.

9

10

11

12

13

14          SHERI S. KLEEGER, CSR
            DATED:  FEBRUARY 21, 2007
15          Official Court Reporter
            License No. 10340.

16

17

18

19

file:///C|/Documents%20and%20Settings/Owner/My%20Documents/MacC...pts%20Scott%20Trial%2002-938/10-04-07%20Day%206%20All%20Day.txt

Case 2:02-cr-00938-R    Document 7150    Filed 05/18/16    Page 342 of 342    Page ID #:39161

20

21

22

23

24

25

UNITED STATES DISTRICT COURT